<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )   Docket No. 18 CR 781
                                      )
 4                  Plaintiff,        )   Chicago, Illinois
                                      )   February 26, 2020
 5             v.                     )   8:33 a.m.
                                      )
 6   XIANBING GAN,                    )
                                      )
 7                  Defendant.        )

 8                              VOLUME 7
                    TRANSCRIPT OF PROCEEDINGS - Trial
 9         BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

10   APPEARANCES:

11   For the Government:   MR. SEAN J.B. FRANZBLAU
                          MR. RICHARD M. ROTHBLATT
12                        Assistant United States Attorneys
                          Honorable John R. Lausch, Jr.
13                        United States Attorney
                          219 S. Dearborn Street, 5th Floor
14                        Chicago, IL 60604

15   For the Defendant:   MR. GLENN SEIDEN
                          MS. BROOKE L. STEVENS
16                        MR. AARON SCHWARTZ
                          Seiden Netzky Law Group LLC
17                        333 S. Wabash Avenue, Suite 2700
                          Chicago, IL 60604
18
     Also Present:        MR. XIANBING GAN
19                        SPECIAL AGENT STEFANIE MOTON
                             (Homeland Security Investigations)
20
     Court Interpreters:  MS. ROBIN XU MURPHY (Mandarin)
21                        MS. TIAN HUANG (Mandarin)
                          MS. TINA DILLON (CART)
22
     Court Reporter:      LAURA R. RENKE, CSR, RDR, CRR
23                        Official Court Reporter
                          219 S. Dearborn Street, Room 1432
24                        Chicago, IL 60604
                          312.435.6053
25                        laura_renke@ilnd.uscourts.gov
</pre>

I N D E X

PAGE

INSTRUCTIONS CONFERENCE ....................... 1387


WITNESS

MATTHEW DAOUD
     Cross by Mr. Seiden ...................... 1410
     Redirect by Mr. Rothblatt ................ 1431
     Recross by Mr. Seiden .................... 1435


GOVERNMENT RESTS ............................. 1439


RULE 29(a) MOTION FOR JUDGMENT OF ACQUITTAL ... 1440


WAIVER OF DEFENDANT'S RIGHT TO TESTIFY ....... 1445


DEFENSE RESTS ................................ 1449


JURY CHARGE (Final) .......................... 1449


CLOSING ARGUMENTS

       Not Transcribed ......................... 1472


JURY CHARGE (Final Resumed) .................. 1478


ALTERNATE JURORS EXCUSED ..................... 1483

E X H I B I T S

NUMBER                                    ADMITTED

Government Exhibit

     No. 301  ................................ 1438
     No. 303  ................................ 1438

1    (In open court outside the presence of the jury; defendant

2    not present.)

3              THE CLERK:  18 CR 781, United States of America v.

4    Xianbing Gan.

5              THE COURT:  All right.  Good morning.

6              MR. SEIDEN:  Good morning.

7              MR. FRANZBLAU:  Good morning.

8              THE COURT:  State your names for the record.

9              MR. FRANZBLAU:  Sean Franzblau and Rich Rothblatt for

10   the United States.

11             MR. SEIDEN:  Glenn -- I'm well trained.

12             THE COURT:  All right.

13             MR. SEIDEN:  Glenn Seiden, S-E-I-D-E-N, for -- for

14   Mr. Gan.

15             Ms. Stevens is not here yet.  I assume that she is

16   having some problems with storing her child this morning.  But

17   I'll carry on as far as I can, Judge, since I wasn't involved

18   last night on this.

19             THE COURT:  No, I understand everyone's been working

20   very hard on this, and things crept up on us so that --

21   preparing for closing arguments, preparing instructions, and

22   possibly even preparing for defendant to testify.

23             MR. SEIDEN:  And I tried to -- I tried to slip a

24   dinner in there somewhere along the line.

25             THE COURT:  Mr. Rothblatt, can you shut the door.  I

1   saw a juror walking by back there.

2            MR. SEIDEN:  Yeah, I tried to slip a dinner in there.

3            THE COURT:  Okay.  Well, all right.  I don't think

4   you're going to be prejudiced, Mr. Seiden, because the

5   objections by defense are clearly stated on the instructions I

6   got.

7            I would ask the government to file these instructions

8   on the docket because we're going to work off page numbers

9   here.

10           MR. FRANZBLAU:  Okay.

11           THE COURT:  And the only way for the appellate court

12  to know what page numbers we're talking about is if these are

13  put on the record.

14           MR. FRANZBLAU:  Yes, your Honor.

15           THE COURT:  Okay.

16           MR. SEIDEN:  Your Honor, I took a quick look at these

17  last night, knowing that I wasn't going to be involved with

18  preparing them.  But I do recall not seeing an instruction for

19  mere buyer or seller to a conspiracy.  Yes, there's an

20  instruction that the person is not involved in a conspiracy if

21  they're a mere buyer or seller.

22           And I did not see an instruction regarding a

23  co-conspirator not being a -- co-conspirator not being a

24  government agent.

25           THE COURT:  That is in there.  It is.

1    MR. SEIDEN:  Okay.  I don't remember seeing it, so

2  that's --

3    THE COURT:  Yeah.  There's a discussion of that.

4  There's a proposal for it, the government objects, and we'll

5  deal with it.

6    I didn't -- there's no buyer-seller instruction on

7  this.  If you're going to propose one, you know, so be it and

8  we'll discuss it.

9    MR. SEIDEN:  Well, I --

10    THE COURT:  But --

11    MR. SEIDEN:  -- I don't -- she's not here.  I don't

12  have the ability to do that now.  But I'm going to do it

13  orally.  We would ask that a buyer-seller instruction from a

14  conspiracy be submitted.

15    And the reason I'm asking for that, Judge, is that we

16  are going to be alleging -- or we have -- we perceive, not

17  alleging -- we perceive the evidence shows that Mr. Gan at best

18  was buying or selling a service to the conspiracy.  And as a

19  result of that, I would like an instruction to indicate that

20  his -- not only his mere presence but a mere purchase or seller

21  to a conspiracy does not make him a co-conspirator.

22    I think your Honor -- I think your Honor understands

23  the argument.

24    THE COURT:  All right.  It's Pattern

25  Instruction 5.10(A).

1          MR. SEIDEN:  Thank you, Judge.

2          THE COURT:  We'll deal with it before we finish our

3   instruction conference.  But so the record is clear, that's

4   the -- that is the instruction I think you're proposing, and --

5          MR. SEIDEN:  Also, your Honor, I don't know if -- I

6   don't know because I did not -- Mrs. Stevens is -- she's quite

7   brilliant when it comes to instructions, so usually I cede the

8   entire responsibility to her in my cases.  But I know that

9   there -- we had intended to submit two instructions with regard

10  to entrapment as well.

11         THE COURT:  You did.

12         MR. SEIDEN:  Okay.  Thank you.

13         THE COURT:  They're in --

14         MR. SEIDEN:  I didn't see them, so I don't know.

15         THE COURT:  Yeah.  No, they're in there.

16         All right.  We're going to work off of the page

17  numbers so that the appellate court, if there is a conviction,

18  has an accurate record of how this instruction proceeded.

19         MR. SEIDEN:  I'm going to move this so I don't hit my

20  head.

21         THE COURT:  All right.  So page 1 -- we'll refer to

22  these by page numbers.  But page 1 is agreed and will be given.

23         MR. SEIDEN:  Okay.

24         THE COURT:  Page 2 --

25         MR. SEIDEN:  Could you -- since mine are not

                    Instructions Conference

1   numbered --

2           THE COURT:  Let's go off the record.

3       (Off-the-record discussion.)

4           THE COURT:  All right.  Back on the record.

5           Page 1, agreed, will be given.

6           Page 2, agreed, will be given.

7           Page 3, agreed, will be given.

8           Page 4, agreed, will be given.

9           Page 5, agreed, will be given.

10          Page 6, agreed, will be given.

11          Page 7, agreed, will be given.

12          7 will be modified to add the words "including the

13  defendant" at the top if he testifies.  There's a modification

14  of the patterns for that.  So we'll have to reserve on that one

15  to see if, in fact, he testifies.

16          All right.  Page 8 is agreed, will be given.

17          Page 9 is agreed, will be given.

18          Page 10 will be given if he doesn't testify -- if he,

19  the defendant, doesn't testify.  So we'll reserve on that.

20          Page 11 is agreed, will be given.

21          Page 12 is opposed.  The argument by defense is that

22  Anthony Valdivia is someone who received or expects to receive

23  benefits in return for his testimony and cooperation with the

24  government.  I don't believe the evidence supports that.  He

25  was immunized.  He has no deal.

1    You can argue certainly, Mr. Seiden, under the general

2  credibility instruction that he has a bias and there's a reason

3  for him to want to be cooperative.  But, nonetheless, he would

4  have exercised his Fifth Amendment privilege had he been called

5  without immunity.

6    So the --

7    MR. SEIDEN:  Well --

8    THE COURT:  -- proposed instruction -- go ahead.

9    MR. SEIDEN:  With regard -- the one I'm looking at, it

10  says -- the last paragraph says, "You may" -- on 12 -- says,

11  "You may give Wei Li and Valdivia testimony whatever weight."

12  I still believe that that paragraph applies, irrespective of

13  the fact that he -- he's not received direct benefit.

14    THE COURT:  I don't understand your argument.

15    MR. SEIDEN:  Well, he -- his weight -- the weight of

16  his testimony should be given with great care and caution.  He

17  hasn't received a benefit, but he is under -- under a

18  significant impairment.

19    THE COURT:  No.  The general credibility -- the

20  general credibility instruction would cover him.  You can argue

21  he's got bias.  You can argue a variety of things.

22    But the -- the caution and great care instruction is

23  specifically given when someone has received a benefit in

24  exchange for testifying at the trial, their testimony.  And

25  that's the way I read the pattern instruction and the law

1   supporting it.

2          So 12 is going to be given over defense objection as

3   proposed by the government.  And defense has full opportunity

4   to argue that Mr. Valdivia has a bias, and you can use the

5   general instruction to argue that.

6          Page 13 is agreed and will be given.

7          Page 14 is agreed and will be given.

8          Page 15 is agreed and will be given.

9          Page 16 is agreed and will be given.

10         Page 17.  Defense is opposed to it.  Is this a pattern

11  instruction?

12         MR. ROTHBLATT:  No, Judge.  But it's supported by the

13  case law we cited in our original submission.

14     (Ms. Stevens enters the courtroom.)

15         MR. SEIDEN:  While you're looking, Mrs. Stevens has

16  just arrived.  She's putting her coat away.

17         THE COURT:  All right.  Let's go off the record for a

18  minute.

19     (Off-the-record discussion.)

20         THE COURT:  Back on the record.

21         The only contested instruction that -- Ms. Stevens,

22  that we talked about was whether Valdivia ought to be -- his

23  testimony ought to be viewed with caution and great care, and I

24  stated on the record why I believe -- he had no deal and that

25  the regular credibility instruction is sufficient to argue he

1    has some form of bias.

2           But the caution and great care instruction is reserved

3    for those who have a deal where they are going to get benefit

4    from the government for their testimony, at least in writing or

5    an oral agreement, neither of which exists for him.

6           All right.  We're on page 17.  This is they "should

7    not speculate why any other person whose name you may hear

8    during the trial is not currently on trial before you."  The

9    government provided case law allowing such an instruction, and

10   I believe it's an appropriate cautionary instruction here.

11          Frankly, it's a defense-friendly instruction.  If this

12   were not given and there was any argument about where is

13   Mr. Pan, I would instruct the jury Mr. Pan got indicted -- he

14   was indicted.  Is that correct?

15          MR. ROTHBLATT:  Yes, Judge.

16          MR. FRANZBLAU:  Yes, Judge.

17          THE COURT:  And he's a fugitive, or he hasn't been

18   brought to justice.  That doesn't help the defense, I don't

19   think.  If you wanted it, you could put it in, but I don't

20   think that helps the defense.  And --

21          MS. STEVENS:  I think it's already in evidence, your

22   Honor.

23          THE COURT:  Is it in evidence?

24          MR. FRANZBLAU:  No, not the fact that he was indicted.

25   You allowed me to ask --

1    (Unintelligible crosstalk.)

2         THE COURT:  One at a time.  One at a time.

3         MS. STEVENS:  It is in evidence.

4         MR. SEIDEN:  It is in evidence.

5         THE COURT:  That he was indicted?

6         MR. SEIDEN:  Yes.

7         MS. STEVENS:  Yes.

8         THE COURT:  Who put it in?

9         MR. SEIDEN:  I think it was either Moton or one of the

10   agents.  Somebody put it in.  I heard it.

11        MS. STEVENS:  Yeah, I did too.  And I don't -- I don't

12   remember who it came in with, but it is in evidence.

13        THE COURT:  Well, regardless, I'm going to -- whether

14   it's in or not -- and you ought to see if you can agree on that

15   because if it's going to be argued, I don't want to have an

16   objection and I have to sort that out.  I don't recall it

17   coming in, but it's possible your memory on that is better than

18   mine.

19        I'm going to give 17.  Are you still objecting to

20   this?

21        MR. SEIDEN:  Up to you.

22        MS. STEVENS:  No, it's fine.  We can withdraw our

23   objection.

24        THE COURT:  All right.  17 is given without objection.

25        18 is given over objection.

1              I think "on or about" is the way it was charged in the

2      indictment, and that's always a -- when the indictment charges

3      something happened "on or about," the jury needs to know that

4      exact dates are not necessary to be proven.  So it's given over

5      objection.

6              19 is given -- is agreed and will be given.

7              20 is agreed and will be given.

8              21 is agreed and will be given.

9              MR. SEIDEN:  Excuse me one second on 21.

10             Okay.  Thank you.

11             THE COURT:  All right.  22 is agreed and will be

12     given.  Page 23 is part of the instruction on page 22.

13             Page 24 is agreed and will be given.

14             Page 25 is agreed and will be given.

15             26 is a proposed instruction by defendants that --

16     or -- that a government agent cannot be a co-conspirator, which

17     is a correct statement of the law.  Government agrees with

18     that, right?

19             MR. FRANZBLAU:  Correct.

20             THE COURT:  All right.  And you instead propose an

21     alternative instruction.

22             My suggestion is we combine the two, put both the

23     first line, "government agent cannot be a co-conspirator," and

24     then follow it with the two separate paragraphs the government

25     proposes, all of which I think is an appropriate and correct

1    statement of the law.

2              Any opposition by the government?

3              MR. FRANZBLAU:  No, your Honor.

4              THE COURT:  By defense?

5              MR. SEIDEN:  I'm reading it.

6              THE COURT:  Okay.

7              MR. SEIDEN:  Yes.  The -- it should be "May 3rd."

8              THE COURT:  Oh.  You want to make it specific to

9    May 3rd?

10             MR. SEIDEN:  Yes.

11             THE COURT:  Any objection to that by the government?

12             MR. FRANZBLAU:  No.

13             THE COURT:  All right.  So it will be "May 3rd, 2018."

14   And we will combine the first sentence with the two paragraphs

15   proposed by the government.

16             As modified, any objection by the government?

17             MR. FRANZBLAU:  No, your Honor.

18             THE COURT:  By defense?

19             MS. STEVENS:  No, your Honor.

20             THE COURT:  All right.  That's how it will be given.

21             Page 27 is agreed and will be given.

22             Page 28 is agreed and will be given.

23             Page 29 is objected to by defense.

24             This is the definition that is provided in the -- in

25   the actual statute, 1956 -- I'm sorry.  Yeah.  1956(c) uses --

1    this is word for word what -- the definition in the statute.

2         MS. STEVENS:  It is, your Honor.  But the indictment

3    itself charges specific -- more specific knowledge.  And

4    that -- especially as regards the conspiracy.

5         THE COURT:  All right.  Which count are we talking

6    about?  Which section of Count I?

7         MS. STEVENS:  Just a second.

8         So in the conspiracy count, that the transaction

9    involved -- in -- page 2.

10        THE COURT:  What paragraph?

11        MS. STEVENS:  In paragraph a., that the transaction

12   involved the buying, selling, et cetera, of the controlled

13   substance, knowing that it was designed to conceal the proceeds

14   of the specified unlawful activity.  And then it only gets to

15   the "some form of unlawful activity."

16        But we are talking about a specific -- the specified

17   unlawful activity, the knowledge as to the specified unlawful

18   activity.

19        THE COURT:  What's the response of the government?

20        MR. FRANZBLAU:  Judge, there's no support in the case

21   law to say that if we are specific in the indictment -- which

22   we were for purposes of giving him notice -- that that raises

23   our burden of proof at trial.  That would be like saying if I

24   charge the defendant with a drug conspiracy and I specify

25   heroin, suddenly now I have to prove it was heroin instead of

1   any controlled substance.

2           The law is the law.  The government can't change the

3   law by the way it words the indictment.

4           MS. STEVENS:  Your Honor, I believe that the example

5   given by the government is substantively different from the

6   example that we're arguing.  We're not talking about specifying

7   a specific type of drug.  We're saying that the government in

8   this instruction is saying he only has to know it's bad money

9   essentially, doesn't have to know that it's from drugs, which

10  has been -- a great deal of the evidence entered by the

11  government in this case is that there's a massive drug

12  conspiracy.

13          THE COURT:  Well, this portion of the conspiracy,

14  which only spes -- sets forth several ways the conspiracy

15  occurred -- of which the government doesn't have to prove up

16  both of them or all of them, just has to prove one of the two.

17  But this Section a. says --

18          Could someone please shut the back door.  We have

19  jurors walking by.  Thanks.

20          (Continuing) -- charges that the defendant, with

21  others, conspired, in essence, to conduct financial

22  transactions affecting interstate commerce; transaction

23  involved proceeds of specified unlawful activity; sets forth

24  code sections relating to controlled substances; and that while

25  knowing the transaction was designed to conceal and disguise.

1        Excuse me.  What?

2      (Off-the-record discussion.)

3        THE COURT:  While conducting financial transaction

4    knew the property involved in the transaction represented

5    proceeds of some form of unlawful activity.

6        I think this is a correct statement of the law.  And

7    the next two instructions deal with whether or not these are --

8    what is a controlled substance, what is a felony.  But this is

9    a correct statement of the law.  I don't think the indictment

10   changes this definition.

11       MR. SEIDEN:  Your Honor?

12       THE COURT:  Yeah.

13       MR. SEIDEN:  The fact that it's a correct statement of

14   the law I perceive -- and I mean no disrespect -- I believe is

15   irrelevant.  An individual was charged with an indictment.  An

16   indictment -- purpose of an indictment or a charge is to inform

17   an individual what he is charged with and what he must defend

18   and, of course, protect him against being charged a second time

19   for the same offense.

20       This instruction generalizes the indictment.  So now

21   we have a -- a defendant who is charged with a specific

22   offense, yet this instruction tells him, "Never mind the

23   specific offense.  If he did anything that you think was

24   improper or wrong, you may find him guilty."

25       So when I say -- and I said I don't mean to be

1  disrespectful when I say that the fact that it's a statement --

2  a correct fact -- statement of the law makes it -- is

3  irrelevant.  It's irrelevant to this case.

4        I didn't charge this case; the government did.  The

5  government could have left out the reference to drugs.  They

6  could have -- they could have made some other specific finding

7  or suggestion.  But the indictment is clear.  It has nothing to

8  do with any other offense.

9        And double jeopardy -- now what happens if they indict

10  him for moving --

11        THE COURT:  Well, I understand your argument.  So are

12  you objecting to the last sentence?

13     (Counsel conferring.)

14        MR. SEIDEN:  The problem -- go ahead.

15        MS. STEVENS:  Both sentences essentially say the same

16  thing, that the property --

17        MR. FRANZBLAU:  I'm sorry.

18     (Counsel conferring.)

19        MR. SEIDEN:  I think you get the --

20        THE COURT:  I don't.  Hang on.  Once -- we'll stay off

21  the record.

22     (Off-the-record discussion.)

23        THE COURT:  Then let's go on the record.  Go ahead.

24        MS. STEVENS:  Just to be clear there, it's not just

25  one knowledge clause.  Every single clause in there has a

1 "knowingly" or "knowing" language in it.  He has to know what

2 he's doing.  And part and parcel of that is knowing that the

3 transaction was designed to conceal, dot dot dot, the proceeds

4 of the specified unlawful activity, which is drugs.

5 　　　　THE COURT:  All right.  Well, the first --

6 Mr. Franzblau is right.  There's two knowledge sections in

7 subsection a. of the conspiracy count: knowledge that the --

8 that -- knowingly conducting a financial transaction involving

9 the -- which transaction involved the proceeds of specified

10 unlawful activity, namely, drug felonies; and, two, knowledge

11 that the transaction was designed in part to conceal the

12 nature, location, source, et cetera, of the proceeds of the

13 specified unlawful activity.

14 　　　　MS. STEVENS:  Right.

15 　　　　MR. SEIDEN:  Right.  The antecedent is drugs.

16 　　　　THE COURT:  Well, the first one talking about drugs --

17 well, I'm -- off the record.

18 　　(Off-the-record discussion.)

19 　　　　THE COURT:  Back on the record.

20 　　　　So 29 is reserved.

21 　　　　30 is agreed and will be given.

22 　　　　31 is agreed and will be given.

23 　　　　32 I don't -- 32 and 33 are the -- two-page

24 instruction.

25 　　　　I believe this was agreed to by defense in the opening

1 instructions when we added the words "as it applies to Counts I

2 through IV" at the beginning of this.  That was an objection

3 you made.  We modified it, and there was no objection

4 preliminarily.

5          Are you still objecting to this?

6          MS. STEVENS:  Only in the sense that we believe it

7 needs to -- we need to also include all the Illinois law

8 instructions which are later.

9          THE COURT:  Yeah.  That -- this -- we're talking about

10 Counts I through IV here.  We put in the language --

11          MS. STEVENS:  Yes.  That's fine.  You're absolutely

12 correct.  I think we did withdraw it.

13          THE COURT:  All right.  So pages 32 and 33 are agreed.

14          MR. FRANZBLAU:  Judge, I'm sorry.  Can we go back to

15 31?  I just wanted to flag this for the defense.

16          THE COURT:  Yeah.

17          MR. FRANZBLAU:  They had -- Brooke had flagged --

18          MS. STEVENS:  Oh, yeah.  That's fine.

19          MR. FRANZBLAU:  That's agreed?

20          MS. STEVENS:  That's fine, yeah.

21          MR. FRANZBLAU:  Never mind.  We're good.

22          THE COURT:  All right.  31 is agreed, and it will be

23 given.

24          The instruction on pages 32 and 33 are agreed and will

25 be given.

1           The instruction on page 34 is agreed and will be

2    given.

3           Page 35 is agreed and will be given.

4           36 is agreed and will be given.

5           37 is going to be given over objection.  I believe

6    it's an accurate statement of the -- of the statute.

7           38.   This is where Gan has an objection, needing

8    clarification of the Illinois statutory definitions.  I'm going

9    to give that.  I believe that -- you can't charge someone

10   saying that they violated the licensing requirement in Illinois

11   without defining what that licensing requirement is.

12          So on page 38, the defense proposal will be given,

13   along with the government's statement, which is an accurate

14   statement, at the beginning.  But the definitions that are

15   proposed by Gan on the rest of page 38 are going to be given.

16          Is that over government objection?

17          MR. FRANZBLAU:  No.

18          THE COURT:  All right.  So that's without objection,

19   and we'll make those modifications.

20          39 and 40 and into page 41 are all entrapment

21   instructions.  I'm going to give them.  I believe there is a

22   gap between the time the conspiracy where Gan was allegedly

23   involved and the time that Lim began to cooperate.  And her

24   initiating the contact with Gan allows at least some

25   argument -- and it's a slight burden -- to at least allow the

1    instruction to be given.  I'm not going to substitute myself as

2    a fact-finder.  I'm going to give the entrapment instruction.

3            The jury can decide if there's predisposition.  The

4    government has plenty of evidence to argue that he was

5    predisposed.  They have plenty of evidence to argue that the

6    inducement was not extraordinary.  But they're entitled to

7    argue it and let the jury decide.  So the entrapment

8    instructions are going to be given.

9            And I believe that is it other than the one we

10   reserved on.

11           MR. SEIDEN:  And I think I had talked about buy-sell.

12           THE COURT:  All right.  Talk to the government about

13   that while I hear the motion call --

14           MR. SEIDEN:  Very well.

15           THE COURT:  -- and see if you reach agreement on it.

16   I'm not sure you will.  But we'll deal with the buyer-seller

17   instruction, and we'll deal with the one I reserved on after

18   our break.

19           And then, Mr. Seiden, find out if your client is going

20   to testify.

21           MR. SEIDEN:  Yeah.

22           THE COURT:  Okay.

23           MR. SEIDEN:  Well, we need him.

24           THE COURT:  I know you do.  I just want to give you

25   your list of things to do in the next 15 minutes.

Instructions Conference

1    MR. SEIDEN:  Now you're getting a taste of what I go

2  through, Judge.

3    THE COURT:  All right.  Thank you.

4  (The Court attends to other matters.)

5  ******************************************************************

1          THE COURT:  Well, let's go on the record now.

2          The defendant has proposed a buyer-seller instruction,

3    which is Instruction 5.10(A) in the Seventh Circuit pattern

4    instructions.  Mr. Seiden, succinctly put your reasons on the

5    record for why you want this instruction.

6          MR. SEIDEN:  Well, we perceive that it could be argued

7    that the services he provided to the conspiracy is that of a

8    vendor as opposed to a participant.

9          THE COURT:  All right.  Government's response?

10         MR. FRANZBLAU:  Judge, the buyer-seller instruction

11   does not apply outside of the context of drugs distribution,

12   specifically the on-the-spot exchange or sale of drugs between

13   a supplier and a user.  It's designed entirely as your Honor

14   stated, to protect a mere drug user from incurring

15   conspiratorial liability simply by purchasing drugs from

16   someone and consuming them.

17         THE COURT:  All right.  The committee comments for

18   this instruction note that "A routine buyer-seller

19   relationship, without more, does not equate to [a] conspiracy."

20   And this is given routinely in a situation where a -- typically

21   a user, someone who is not part of the overall conspiracy, just

22   buys drugs, doesn't through that action become a member of the

23   broader conspiracy that involves importation or larger

24   distributions of drugs.

25         In this case, it's not a drug conspiracy charge.

1  Certainly it -- it -- there's talk of drugs.  The proceeds are

2  drugs.  They have to be illegal proceeds of some kind, and in

3  this case it is illegal proceeds relating to drug transactions.

4          But the conspiracy charged is not a conspiracy under

5  21 U.S.C. 846, a drug conspiracy.  It's 18 U.S.C. 1956.  It's a

6  money laundering conspiracy.

7          So -- yeah, 1956(h), in fact.

8          So the instruction is refused.

9          Okay.  We have one other one left.  Let me give some

10 thought to it.  And then we're waiting -- off the record.

11     (Off-the-record discussion.)

12         THE COURT:  You want this on the record?

13         MR. FRANZBLAU:  Yeah.  I'm sorry.

14         Your Honor, as to the one instruction that we've

15 reserved and that you're going to consider further on page 29,

16 the government proposes adding a clause at the beginning "As it

17 applies to Counts I through IV," just as we have on page 28,

18 because for Count V, there's no requirement that we show that

19 the underlying money is derived from unlawful proceeds.

20         THE COURT:  All right.  Any objection to that

21 modification?

22         MS. STEVENS:  I mean, our objection to the instruction

23 remains the same, but I don't care about the modification.

24         THE COURT:  All right.  We'll make the modification if

25 this instruction's given.

1  MR. FRANZBLAU:  Thank you, your Honor.

2  THE COURT:  All right.  Thank you.

3  (Pause in proceedings.)

4  COURT SECURITY OFFICER:  All rise.

5  (Jury in at 9:36 a.m.; defendant present.)

6  THE COURT:  Please be seated, ladies and gentlemen.

7  All right.

8  MR. SEIDEN:  Thank you.

9  THE COURT:  Ladies and gentlemen, thank you for --

10  COURT REPORTER:  The mics aren't working.

11  THE CLERK:  What's going on here?

12  (Off-the-record discussion.)

13  THE COURT:  Well, good morning, ladies and gentlemen.

14  Sorry for the delay.  I know you got an instruction on witness

15  credibility.  And if I were a witness, I wouldn't be very

16  credible because I've told you every day when we're starting,

17  and I've been wrong each day.

18  But we were able to get some work done in your absence

19  relating to the case.  And I expect that you'll be hearing

20  closing arguments this morning, sometime this morning.

21  The schedule is after the closing argument by the

22  government, our court security officer is going to take you

23  down to the second floor for lunch.  We want to keep you

24  together.  So you're -- you don't have to eat the cafeteria

25  food if you brought your own, but he's going to buy you lunch.

1    Actually, the government will.  And in some ways you're paying

2    for that too because we're all taxpayers.

3            After that, you'll hear defense closing argument and

4    then the government rebuttal, and then the case will be in your

5    hands.

6            But right now we need to finish this witness.  So,

7    Mr. Seiden, you may begin cross-examination.

8            MR. SEIDEN:  If the Court please.  Thank you very

9    much.

10            MATTHEW DAOUD, GOVERNMENT WITNESS, PREVIOUSLY SWORN

11                       CROSS-EXAMINATION

12   BY MR. SEIDEN:

13   Q.  You are Matthew Daoud?

14   A.  Yes, sir.

15   Q.  You are the same Matthew Daoud that had testified yesterday

16   in this matter?

17   A.  Yes.

18   Q.  And you understand, sir, you're still under oath?

19   A.  Yes.

20   Q.  Okay.  I had a little problem hearing yesterday.  You have

21   a very soft voice.  I'm sure you're very large in life, but you

22   have a little voice.  So I'm going to ask you a few questions

23   you may have been asked yesterday.  Tolerate me if you would,

24   please.

25   A.  Okay.

1    Q.  You are associated with HSI?

2    A.  Yes, sir.

3    Q.  Homeland Security?

4    A.  Yes.

5    Q.  How long have you been with them?

6    A.  Over 13 years.

7    Q.  And I take it that your basic MOS is that you deal largely

8    with the electronics, technology?

9    A.  Yes.  My team -- my team -- within my team and partially

10   for my office, I deal with electronics.

11   Q.  Okay.  Now, I take it that's not your only responsibility.

12   A.  No, sir.

13   Q.  You are an armed agent under normal circumstances.

14   A.  Yes, sir.

15   Q.  Okay.  So you -- you also take -- you're also involved in

16   other activities, such as surveillance and interdiction with

17   suspects from time to time.  Is that correct?

18   A.  Yes.

19   Q.  But you are also -- you seem to be the expert in the

20   technology for your office.

21   A.  One of many.

22   Q.  You can -- you can say yes.  You don't have to be modest

23   about that.  Okay.

24         Now, you had indicated that you had seized a

25   telephone -- or you received a telephone, I believe you said,

1   from Mr. Gan.  Did I misunderstand that?

2   A.  No, I didn't receive any phones from them.

3   Q.  You did not.

4   A.  No.

5   Q.  Okay.

6   A.  I was given phones by the case agent.

7   Q.  Okay.  I'm going to ask you, if it's not too difficult for

8   you, either to pull the microphone closer or get -- I know the

9   knees get in the way there, but --

10           THE COURT:  Yeah.  The mic, you can move it toward

11   you.

12           THE WITNESS:  I apologize.

13   BY MR. SEIDEN:

14   Q.  You didn't do anything wrong to apologize for yet.

15           So you received a phone from -- purported to be

16   Mr. Gan's phone.

17   A.  Yes.

18   Q.  Okay.  And you were told that phone was as a result of his

19   arrest, I think you said, in November of 2018.  Is that right?

20   A.  Yes.

21   Q.  Okay.  And then you applied a software.  Cellebrite, I

22   think you said it was.

23   A.  Yes.

24   Q.  Okay.  And you did a Cellebrite report to determine some of

25   the contents of the phone.  Is that right?

1    A.  Yes.

2    Q.  Okay.  Now, you also received a phone, I believe, from

3    Ms. Lim at some point.

4    A.  Yes.

5    Q.  Okay.  And you did a Cellebrite on that phone as well.

6    A.  Yes.

7    Q.  When we looked in Ms. Lim's phone, it had the first name

8    was a guy by the name of Haiping -- I think it said "Haip Pan."

9         Do you remember that?

10   A.  I don't.  I don't recall.

11   Q.  Okay.  But then the 161st name was somebody else.  It was

12   Mr. Gan's, actually.  Do you know why there would be 160 names

13   between the two?

14   A.  I don't.

15   Q.  Okay.  Is that random, or is that by usage, or is it

16   alphabetical?  Do you know?

17   A.  To answer that question, I'd have to speculate on multiple

18   factors that might have --

19   Q.  I don't need you to speculate.

20   A.  So, yeah, I don't -- I don't know.

21   Q.  Okay.  But that is the way the phone worked.  Is that

22   right?  The Cellebrite.

23   A.  I would have to re-review Ms. Lim's Cellebrite report.

24   Q.  Okay.  Now, you also indicated -- you used the word

25   "encryption."  We all hear that word a lot.  Can you tell us

1  again, please, what that means.

A.  Encryption in the simplest terms I can think about is if

you take a piece of information and you scramble or disguise it

and that a code or a pass phrase can descramble it and make it

make sense again.

Q.  So let me see if I understand that.

So I use my iPhone and I text you.  And from the

time that the text that I send you -- makes a lot of sense --

to the time it floats down through the air -- when it's

floating through the air, it's encrypted.  So if Bob could grab

some of that information out of the air, it would just be

random nonsensical information?

A.  Roughly speaking, yeah.  There are different levels of

encryption.  Encryption can happen at different phases of the

communication.  End to end refers to the act of it being

transmitted, like you just said, intercepting it in the middle.

Things can be encrypted on the device also.

Q.  So when it travels through the air and ends up on another

phone that is designed to understand how to unscramble or

unencrypt, then I can read -- you can read the message I sent

you.

A.  Correct.

Q.  Okay.  And encryption isn't just used for our text

messages; it's used for codes.  Our -- our national coding and,

you know, the CIA and all kinds of government agencies use

1   encrypted information.  Is that right?

2   A.  I'm not sure specifically what you're referring to, but

3   encryption is widely used.

4   Q.  It's widely used.  And it's used so that the sender can

5   send information to the receiver and not have an open -- an

6   open airway, so to speak.

7   A.  Yes.

8   Q.  Okay.  And I have an iPhone.  Other people have the

9   Samsung and those phones.  Those all use encryption when it

10  comes to their text messages.  Is that right?

11  A.  No.

12  Q.  Who doesn't?

13  A.  Each -- each operating -- all these phones use different

14  operating systems.  That's the software that makes it work as a

15  phone or be able to do things like have applications or

16  text-message or make calls.

17          By default, devices on an Android platform created by

18  Google don't typically have their text messages encrypted.  You

19  would have to do -- install a third-party application.

20  Q.  But the OS with the Apple is encrypted, is it not?

21  A.  It has a form of encryption.

22  Q.  Okay.  Now, I live in the United States, so it would make

23  sense that I would either have one or the other that we just

24  described, an iPhone or a -- what was the other, a -- what

25  does Samsung use?

1  A.  They're based on an Android platform.

2  Q.  On an Android.  I would either have an Apple or an Android

3  phone most probably here in the States.  Is that right?

4  A.  I would say that's fair to say, yeah.

5  Q.  But if I lived in another country, I might have the service

6  that's provided in that country.

7  A.  Again, I'm not sure what you're referring to.  But there

8  are --

9  Q.  You're right.

10  A.  Yeah.

11  Q.  So I'll ask you a different question.  If I come from

12  China, it's probable I'm using WeChat.  Is that right?

13  A.  WeChat is an application that can be installed on a phone.

14  It's not an operating system.

15  Q.  Right.  It's common in -- it's more common in China than it

16  is here.  Is that right?

17  A.  I think that's fair to say.  But it's widely used here.

18  Q.  Okay.  And WeChat is also encrypted.

19  A.  Yes.  To my knowledge, yes.

20  Q.  All right.  And the fact that a message is encrypted

21  doesn't necessarily mean that the message is good or bad or --

22  there's no connotation to the actual message as a result of the

23  encryption.  Is that correct?

24  A.  I don't think there's an implied connotation.

25  Q.  Thank you.

1    All right.  You had talked about some messages being
2    marked for deletion.  All right.  And so without being too
3    technical, a phone has a hard drive.  Is that right?
4    A.   That's a good description, yes.
5    Q.   Okay.  And it also has software to teach the hard drive how
6    to work.  Is that correct?
7    A.   Yes.
8    Q.   It's like having a body without a soul.  Unless there's
9    something in there that gives it instructions how to work, it's
10   just a piece of metal.  Is that right?
11   A.   Yes.
12   Q.   Okay.  So there is a limitation -- is there not? -- to the
13   space on a hard drive.
14   A.   Yes.
15   Q.   Okay.  And -- so I get pictures all the time from my
16   family.  And if I just keep downloading those pictures,
17   eventually my hard drive will fill.  Is that right?
18   A.   Yes.
19   Q.   And then my phone will become useless unless I either get a
20   larger hard drive or I delete some of the pictures.  Is that
21   correct?
22   A.   That's fair to say, yes.
23   Q.   And that would be the same with text messages or any
24   information that would have to be stored on the hard drive.  Is
25   that right?

1  A.  That's not necessarily true.

2  Q.  Okay.  Some of the information may be stored in what we

3  call the cloud.  Is that right?

4  A.  Yes, some applications can be stored in the cloud.

5  Q.  Can be.  Okay.  And that would not necessarily be on my

6  hard drive.

7  A.  It could be in one or both places.

8  Q.  But if I wanted to keep my hard drive fairly clear, it

9  would be imperative that I delete some of the stuff I received,

10 "stuff" being a technical term.

11 A.  I guess that's a -- a personal choice of the user.  I mean,

12 there's ways to expand your storage.  But if you wanted to keep

13 it clear, you would have to delete things.

14 Q.  Okay.  Now, I'm not talking about expanding the storage;

15 I'm talking about utilizing the storage that I have.

16      Expanding the storage comes with a cost, does it not?

17 A.  Yes, cloud storage typically costs.

18 Q.  Okay.  So the fact that something is deleted from a phone

19 is not necessarily an indication of something bad.  Is that

20 right?

21 A.  Not necessarily.

22 Q.  Okay.  It could be nothing more than the user's desire to

23 keep -- to utilize the storage -- to utilize the storage

24 capacity less.  I think I said that badly, but I think you may

25 understand what I'm talking about.

1         To maximize the storage capacity.

2    A.  Certainly that could be their technique.

3    Q.  Okay.  Now, now that we've resolved that, let's jump ahead

4    a wee bit.

5        (Counsel conferring.)

6         MR. SEIDEN:  Excuse me one second, your Honor.

7        (Counsel conferring.)

8         MS. STEVENS:  I've got it.

9         MR. SEIDEN:  Do we have it?  Yes.  Okay.  Do we

10   have -- page 1.  Thank you.

11        She found it.

12   BY MR. SEIDEN:

13   Q.  Do you -- you don't have any of the --

14        THE COURT:  Do you want to use the ELMO?

15        MR. SEIDEN:  I think so, Judge.

16        THE COURT:  All right.  And is this an exhibit in

17   evidence?

18        MR. SEIDEN:  This exhibit is 304-9, government

19   exhibit, and it is in evidence.

20        THE COURT:  All right.

21   BY MR. SEIDEN:

22   Q.  This is 304-9.  Did you have occasion to see this yesterday

23   when you were testifying?

24   A.  Yes, I believe I did see this yesterday.

25   Q.  And this purports to be a -- a WhatsApp.  WhatsApp is an

1  application like WeChat or iText or one of the other

2  applications we talked about.  Is that right?

3          MR. SEIDEN:  Okay.  Turn this on.  I was moving away

4  and caught myself.

5      (Off-the-record discussion.)

6          THE WITNESS:  That's the --

7  BY MR. SEIDEN:

8  Q.  That's one of those --

9  A.  WhatsApp is an instant messaging application.

10  Q.  Pretty much like we were just talking about, right?

11  A.  Similar.

12  Q.  Okay.  Is that encoded or encrypted?

13  A.  It can be end-to-end encrypted.

14          MR. SEIDEN:  Excuse me, folks.

15  BY MR. SEIDEN:

16  Q.  And this apparently is a -- it's dated November 18, 2016.

17  Is that correct?

18  A.  Yes.

19  Q.  And it's on WhatsApp.

20  A.  Yes.

21  Q.  And does this say who this is from?

22  A.  This says -- yes, it does.

23  Q.  And it indicates:  "Use this from now on."

24  A.  Yes.

25  Q.  Do you know what the antecedent of "this" is?

Daoud - Cross by Seiden

1    A.  No.

2    Q.  I'm going to show you page 2, if I might, of that same

3    document of the -- of the same -- see if I can do this without

4    knocking it over.

5            This is dated -- this is page 2 of the same -- of

6    304-9, government's exhibit.  Do you see this document?

7    A.  Yes.

8    Q.  Dated December 9.

9    A.  Yes.

10   Q.  What's -- again, it's on WhatsApp.

11   A.  Yes.

12   Q.  All right.  And I notice that there are -- the Pan message

13   is empty.

14   A.  Yes.

15   Q.  Can you account for why it's empty?

16   A.  No.  I -- it would -- there's a variety of reasons why that

17   might be empty.

18   Q.  Okay.  And then Gan says:  "[I] got it."

19   A.  Yes.

20   Q.  And the next time you hear from Gan, empty message.

21   A.  Yes.

22   Q.  Can you account for why that message is empty?

23   A.  No, I can't.

24   Q.  Can you determine what was said or communicated in that

25   message?

Daoud - Cross by Seiden

1    A.   No.

2    Q.   I'm going to show you page 3, December 12.

3              Do you see that?

4    A.   Yes.

5    Q.   I'm going to try to make it just a little bigger so

6    everybody can see it better.  There we go.

7              And that's also WhatsApp?

8    A.   Yes.

9    Q.   Okay.  That's the same platform that we talked about a

10   minute ago?

11   A.   Yes.

12   Q.   And you have four -- four communications of some sort from

13   Pan at the very same time.

14             Do you see that?

15   A.   Yes.

16   Q.   And then the last message is empty.  Is that correct?

17   A.   Excuse me.  There's three at the same time.

18   Q.   I said -- did I say four?

19   A.   Yeah.  I'm sorry.

20   Q.   No, glad you corrected me.  Listen.  This is -- it's what

21   you say that's important, not what I say.

22             So you've got three messages at the very same time,

23   and then there is one that is hours later.  Is that correct?

24   A.   Yes.

25   Q.   There's nothing there from Gan.

1   A.  No.

2   Q.  And there's no way of determining whether Gan ever received

3   these messages or read these messages.  Is that right?

4   A.  I don't know that that's necessarily true.  There might be

5   a read receipt, but I would have to dive into it.

6   Q.  But looking at this document, it doesn't -- it's not there.

7   A.  No.

8   Q.  Okay.  And then we'll take a look at page 4 of the same --

9   of the same exhibit.  And that's dated December 13.

10  A.  Yes.

11  Q.  Again, WhatsApp.

12  A.  Yes.

13  Q.  Again, we have two communications purported from Pan at the

14  same time.

15  A.  Yes.

16  Q.  And the first one says:  "There's only this Bank of China."

17          Is that correct?

18  A.  Yes.

19  Q.  Okay.  And then it has the empty message from Pan.

20  A.  Yes.

21  Q.  Not to be overly redundant, there's no -- you don't know

22  why it's an empty message.

23  A.  I don't have a reason.

24  Q.  Okay.  Thank you.

25          I looked at your -- your extraction report.  And I see

1    that -- that would be under, by the way, 304.

2          Can you give me the date of the last -- of the last

3    information extracted in that report?

4    A.  I don't have that information off the top of my head.  I'm

5    sorry.

6    Q.  I know you don't.  If I might -- I'm going to take mine

7    out.

8          MR. SEIDEN:  And if I may step forward, Judge.

9          THE COURT:  Go ahead.

10   BY MR. SEIDEN:

11   Q.  Okay.  I'll give you my copy so we can save a bunch of

12   time.

13   A.  Okay.

14   Q.  Take a look at -- please tell me, if you can, what the last

15   date of an extraction of that particular phone -- of that

16   report was.

17   A.  If you're referring me to the extraction end date, that

18   would --

19   Q.  Yes, sir.

20   A.  -- that would be November 28th, 2018.

21   Q.  Okay.  And what's the first date?

22   A.  Extraction start date, November 28th, 2018.

23   Q.  Okay.  I'm going to -- I'm going to step forward --

24   probably should have asked you this when you had everything in

25   hand -- and I'm going to ask you to look at this document

1    again.  I'm sorry.  I -- actually, it's 304-7, which is I think

2    the last page of that document.

3          I -- I noticed even the extraction report is from

4    November 28, 2018.  What's the last date -- I'm going to reach

5    over.  What's the last date of the call log on there?

6    A.  On -- on this page, the last entry, which is a contacts

7    entry, is April 14th, 2017.

8    Q.  Here are the rest -- is the rest of the document.  See if

9    there's anything on there that shows any call log past April of

10    2017.

11          And while you're looking, that's Mr. Gan's phone that

12    was seized in November of '18, right?

13    A.  Yes.

14    Q.  Okay.  Continue looking, please.

15    A.  On these sheets, I don't see another date.

16    Q.  Okay.  Now, just to be clear -- thank you.  I'm going to

17    take that back from you.

18          Just to be clear, as far as you are aware, when

19    Mr. Gan was arrested, his phone was taken.  Is that correct?

20    A.  Yes.

21    Q.  Okay.  And as far as you're aware, he wasn't told in

22    advance that he was being arrested.

23    A.  Oh, I don't -- I don't have that information.

24    Q.  Okay.  You wouldn't think that would have been the case,

25    though.  Is that right?

1   A.  Yeah.  I'd have no idea.

2   Q.  Okay.  So you get his phone on November -- November of

3   2018.  But the last entry on the dock -- in his phone, the last

4   call log in his phone, was April 2017.  Is that correct?

5   A.  That's the last entry in the pages provided me.  The actual

6   extract may have other data.

7   Q.  Okay.  This is what the government gave you?

8   A.  Yeah -- yes.

9   Q.  Okay.  Now, we're done with this.  I'm going to move to a

10  different area, and I'm going to do this a lot quicker.  Okay?

11          You were also pressed into service for the purposes

12  of -- of surveillance.  Is that correct?

13  A.  Yes.

14  Q.  And you saw the tapes, and we're -- I'm not going to put

15  you through that again.  Okay?

16          But you had occasion to watch -- was that two

17  transfers or three?

18  A.  Three.

19  Q.  -- three transfers of money from an individual -- from

20  individuals to an undercover agent.  Is that correct?

21  A.  Twice to an undercover agent, and one was a dead drop.

22  Q.  A dead drop.  Oh, right.  Put it into a car when nobody was

23  there.

24  A.  Yes.

25  Q.  Okay.  Now, one of those was with a guy with a big beard?

1    A.  Yes.

2    Q.  Turned out to be the son of somebody else?

3    A.  Yes.

4    Q.  Okay.  Now, did you see Mr. Gan in any of those events?

5    A.  No, sir.

6         MR. SEIDEN:  Would you stand up, please, Mr. Gan.

7    BY MR. SEIDEN:

8    Q.  Do you see that man that's standing over there?

9    A.  Yes.

10   Q.  Do you recognize him from any of your observations?

11   A.  On that day or --

12   Q.  On that day.

13   A.  No.

14   Q.  Did you see him on any other day?

15   A.  No.

16        MR. SEIDEN:  Thank you.  Have a seat, please.

17        THE COURT:  All right.  The record will reflect the

18   person standing was the defendant.

19   BY MR. SEIDEN:

20   Q.  On the day that you made those -- that you intercepted

21   those drops, was Mr. Gan present?

22   A.  To my knowledge, no.

23   Q.  Okay.  On any of the intercepts that you had, did you have

24   any information that Mr. Gan had communicated to the people

25   making those drops?

1   A.  I had no information at the time, no.

2   Q.  Okay.  Did you have information at that time that Ms. Lim

3   had communications with the people making those -- I say

4   "drops," but transfers.  I don't know what they were.  How do

5   you refer to them?

6   A.  We call them money pickups.

7   Q.  Okay.

8   A.  But I understand the terminology "drop."  That's fine.

9   Q.  Okay.  I don't live in that world, so -- okay?  So thank

10  you.

11          Did you have any communication from Ms. Lim with

12  respect to those money pickups?

13  A.  I -- my team received information that the defendant was

14  seeking to have these pickups conducted in the Chicago area.

15  Q.  I certainly appreciate that answer, but it doesn't answer

16  my question.

17  A.  Oh, I'm sorry.

18  Q.  Ms. Lim.  I know Ms. Lim was a defendant.  So did you

19  have -- did you experience any communications with Ms. Lim with

20  regard to those pickups?

21  A.  I did not personally.  But that information I think was

22  provided via Ms. Lim.

23  Q.  Okay.  So as you came into information from your fellow

24  agents, you were told that Ms. Lim had made the arrangements in

25  this case with Mr. Gan with regard to those pickups.  Is that

1    right?

2    A.    Yes.

3    Q.    Okay.  So Ms. Lim was -- she was intimately involved in the

4    pickups as far as you -- the information that came to you.

5    A.    She had the part in passing that information to us, yes.

6    Q.    Right.  And you were not privy to any conversation she had,

7    if she had any, with Mr. Gan.  Is that correct?

8    A.    No.

9    Q.    Okay.  This is going to sound silly, I suspect, but I'm

10   about done.

11         I know you can finger -- strike that.

12         Can you fingerprint money?

13   A.    I'm told yes.

14   Q.    You haven't done it, though.

15   A.    I haven't seen an example of it in my career.

16   Q.    All right.  But the money was packaged, that I saw, in

17   plastic.  Is that right?

18   A.    Yes.  Some of it was.  Sorry.

19   Q.    Plastic is a medium upon which a fingerprint can be readily

20   recovered.  Is that correct?

21   A.    Typically, yes.

22   Q.    And not only fingerprints now, but the fingerprint, if a

23   person is a secreter -- I think that's the terminology -- you

24   can actually pick up their DNA from a fingerprint.  Is that

25   right?

1    A.   I don't know about that part of it.

2    Q.   Oh, you're not that -- that scientific on that, right?

3    A.   Not my area.

4    Q.   Okay.  Have you ever heard of that being a case in your --

5    in relation to your work?

6    A.   DNA from a fingerprint?

7    Q.   Yes.

8    A.   I have not heard of that.

9    Q.   Okay.  But the fingerprint certainly can be recovered.  Is

10   that right?

11   A.   From plastic?

12   Q.   Yes.

13   A.   I've seen that, yes.

14   Q.   Do you know whether or not HSI, your group of people,

15   extracted any fingerprints from the plastic upon which -- in

16   which the money was wrapped?

17   A.   I don't know.  It may have happened.

18   Q.   Okay.

19        MR. SEIDEN:  Officer, if you would, remain -- Agent.

20   If you would remain seated there for a minute, I'll

21   double-check with my team.  And I think we're done.

22        (Counsel conferring.)

23        MR. SEIDEN:  Agent, thank you for your time.  If

24   you'll remain seated there, I think counsel may have some

25   questions for you.

1    THE COURT:  All right.  Any redirect?

2    MR. ROTHBLATT:  Yes, Judge, briefly.

3    THE COURT:  All right.

4                REDIRECT EXAMINATION

5    BY MR. ROTHBLATT:

6    Q.  Good morning, Special Agent Daoud.

7    A.  Good morning.

8    Q.  You were asked some questions on cross-examination about

9    encrypted communications.  Do you recall those questions?

10   A.  Yes.

11   Q.  And you testified about end-to-end encryption.  What is

12   end-to-end encryption?

13   A.  End-to-end encryption is -- is referring to the

14   communication as it -- as it passes from one party to the next.

15   It -- as opposed to a stationary piece of information at one

16   end or the other being stored on that device.  It's a different

17   kind of encryption.

18   Q.  Based on your training and experience, do you understand

19   that BlackBerry messages are end-to-end encrypted?

20   A.  I'm not aware of their exact encryption method, but I

21   believe they did have a form of public key encryption.

22   Q.  What about WhatsApp communications?

23   A.  WhatsApp is definitely end-to-end encrypted.

24   Q.  And based on your training and experience, do you

25   understand that law enforcement officials can capture WhatsApp

1    communications in real time?

2    A.   They can't capture them in real time.

3    Q.   Why not?

4    A.   Because of the end-to-end encryption.  Any information that

5    would be intercepted would make no sense.

6    Q.   Do you recall being asked questions on cross-examination

7    about certain communications being marked for deletion?

8    A.   Yes.

9    Q.   And I believe you testified yesterday about certain

10   communications between defendant's phone and the 5188 number,

11   or Pan phone 1, and the 4888 number, Pan phone 2.  Do you

12   recall that testimony?

13   A.   Yes.

14   Q.   And what, if anything, about those communications and

15   whether they were marked for deletion did you observe?

16   A.   I -- what's -- what struck me as interesting is that --

17   that the entries that were deleted were all -- were usually

18   only related to those phone numbers.

19   Q.   And when you say "marked for deletion," what does that

20   mean?

21   A.   That would be like saying that a piece of information

22   put -- had a label put on it, said that we can reuse this space

23   when needed.

24   Q.   And how does the user come into that process?

25   A.   If you were going to delete a text message or an instant

1    message, that would be a manual process unless you reset the

2    entire device.

3    Q.  And do you recall being asked questions on

4    cross-examination about Exhibit 304-9, the WhatsApp

5    communications between Pan and the defendant?

6    A.  Yes.

7    Q.  And what, if anything, did you notice about those

8    communications based on your review of the extraction report?

9    A.  The empty content?

10   Q.  Yes, the empty content in particular.

11        What -- you said that there are several reasons, on

12   cross-examination, why there may be an empty message.  Can you

13   tell the jury what some of those reasons might be.

14   A.  It could be that it was deleted and then the system then

15   reused that disc space.  It could be that it was just an empty

16   message sent.  That occurs occasionally.  These are all ideas

17   that could explain it.

18   Q.  Again, you were asked questions about the extraction report

19   for the phones seized from the defendant.  Do you recall those

20   questions on cross-examination?

21   A.  Yes.

22   Q.  I'm going to direct your attention to Government

23   Exhibit 304-1.

24        MR. ROTHBLATT:  Judge, this has been admitted into

25   evidence.

1          THE COURT:  All right.

2          MR. ROTHBLATT:  I'd ask to publish it.

3     BY MR. ROTHBLATT:

4     Q.  Special Agent Daoud, do you see the "MSISDN" entry?

5     A.  Yes.

6     Q.  And do you see the number next to it, "523313192988"?  Did

7     I read that correctly?

8     A.  Yes.

9     Q.  Can you tell the jury.  What's an MSISDN?

10    A.  It's a Mobile Station International Subscriber Directory

11    Number, or the phone number.

12    Q.  And the 52 number in front of the phone number.  Based on

13    your training and experience, what does the 52 reflect?

14    A.  A Mexico-based number.

15    Q.  I want to direct your attention now to Government

16    Exhibit 304-7.  Do you recall being asked questions about this

17    on cross-examination?

18    A.  Yes.

19    Q.  And what is Government Exhibit 304-7?

20    A.  The communications log.

21    Q.  And you were asked questions on cross-examination about the

22    date range of this particular communications log.  Do you

23    recall those questions?

24    A.  Yes.

25    Q.  Were the communications logs admitted into evidence the

1  totality of the communications logs captured on the extraction

2  report?

3  A.  No.

4  Q.  Were there others?

5  A.  Yes.

6        MR. ROTHBLATT:  Your Honor, may I have a moment?

7        THE COURT:  You may.

8     (Counsel conferring.)

9        MR. ROTHBLATT:  Nothing further, Judge.

10       THE COURT:  Any recross?

11       MR. SEIDEN:  Yes, very briefly.

12                   RECROSS-EXAMINATION

13  BY MR. SEIDEN:

14  Q.  Didn't quite understand something.  When you said that

15  there was a message that was not -- that we said had no

16  message -- you have the line?  You said that one of the ways

17  you could do that is by deletion.  Is that right?

18  A.  There could be a -- you -- yeah.  I mean, theoretically, if

19  you could reset your phone.  Let's say you backed up the

20  message and then --

21  Q.  Yeah, we're not --

22  A.  Okay.

23  Q.  -- talking about rebooting a phone.  We're talking about I

24  got a message, and one part of the message says "[NO MESSAGE]."

25  Can I delete a part of a message?  Or do I have to delete the

1   whole message?

2   A.  The user can mark a whole message for deletion.

3          However, theoretically, the operating system may

4   reclaim that space in part.

5   Q.  I got it.  But it would -- would it reclaim the same space

6   all the time?

7   A.  No.  It's -- there's different approaches.

8   Q.  Okay.

9          MR. SEIDEN:  Thank you.  I -- Agent, once again, I'm

10  done with this.  Thank you again.  Have a good day.

11         THE WITNESS:  Thank you.

12         THE COURT:  Any additional questions?

13         MR. ROTHBLATT:  No, Judge.

14         But I think we failed to bring in the actual physical

15  phones, Government Exhibits 301 and 303 yesterday.  So we would

16  move for those to be admitted into evidence.

17         THE COURT:  Any objection?

18         MR. SEIDEN:  I'm sorry.  I -- I was listening to

19  something else.

20         THE COURT:  Yeah.  Go ahead and state it again.

21         MR. ROTHBLATT:  Yes, Judge.  I think we forgot to

22  physically move Government's Exhibits 301 and 303 into

23  evidence, the phones.  So we'd ask to do that now.

24         MR. SEIDEN:  Can we have a sidebar?

25         THE COURT:  All right.

1    MR. SEIDEN:  Normally I wouldn't care.

2    (At sidebar outside the hearing of the jury.)

3    THE COURT:  Go ahead.

4    MR. SEIDEN:  All hearsay.  So is he going to take the

5    phone out?  If he takes the phone out -- I mean, lay a

6    foundation or --

7    THE COURT:  I thought these were offered yesterday.

8    COURT REPORTER:  Can you move the package off the mic.

9    THE COURT:  I thought these were offered yesterday.  I

10   raised this, and the government thought they had been

11   offered --

12   MR. SEIDEN:  I don't remember it being offered.  Maybe

13   I'm just getting old and senile, but --

14   MR. FRANZBLAU:  I think he -- we think they were

15   offered.  It's out of an abundance of caution.  I think he

16   offered it for identification, but we weren't certain if it was

17   actually moved into evidence.

18   You've stipulated to all the information on it.

19   MR. SEIDEN:  I -- yeah.  I'm not going to -- I don't

20   care what the stipulation is.  I'm not going to agree that the

21   package -- if you want to put the phones in --

22   THE COURT:  All right.  Do you object --

23   MR. SEIDEN:  -- knock yourself out.

24   THE COURT:  Do you object to them opening these

25   packages and then putting them in a clear package with an

1    exhibit sticker on it?

2         MR. SEIDEN:  I do not.

3         THE COURT:  Okay.  I don't think that's going to break

4    the chain of custody at this point.

5         MR. SEIDEN:  You can ask him.  They can ask him if

6    that's his --

7         MS. STEVENS:  They did.

8         THE COURT:  They did.

9         MR. SEIDEN:  Okay.

10        THE COURT:  He went through this already.  So I'll --

11   301 and 303 are admitted in evidence in a separate package.

12       (Government Exhibits 301 and 303 admitted in evidence.)

13        MR. SEIDEN:  I'm not going to win the appeal on the

14   chain of custody, so I'll stipulate to that, Judge.

15        THE COURT:  There may be no appeal.

16        MR. SEIDEN:  Okay.

17        THE COURT:  So okay.  So that will be -- they're both

18   admitted in evidence.

19        MR. SEIDEN:  Okay, Judge.

20        MR. FRANZBLAU:  Thank you, your Honor.

21       (In open court in the hearing of the jury.)

22        MR. SEIDEN:  Your Honor, with that caveat, then we

23   will have no objection.

24        THE COURT:  All right.  301 and 303 admitted, to be

25   packaged in a separate way that identifies them correctly as

1    301 and 303.  They're admitted without objection.

2              All right.  Any additional questions of this witness?

3              MR. FRANZBLAU:  No, your Honor.  United States rests.

4              THE COURT:  All right.  Sir, you're excused.

5              THE WITNESS:  Thank you.

6              THE COURT:  And the government rests its case?

7              MR. FRANZBLAU:  Yes, your Honor.

8              THE COURT:  All right.  Ladies and gentlemen, we'll

9    take a brief break.  And we'll have you back here -- not for

10   closing arguments.  But what I would ask you to do is hand a

11   copy of your preliminary instructions to the court security

12   officer.  If they're back in the jury room, give them to him

13   back there.  But I want to make sure we get 14 copies back.

14             If you have notes on your preliminary jury

15   instructions that you want to transfer to your notepad, do that

16   back in the jury room and then give them to the court security

17   officer.  But I'm going to give you new instructions, and I

18   want to make sure I get 14 back so we don't have the wrong

19   instructions for you.

20             So -- in fact, you can do all that back in the jury

21   room.  I think that would make the most sense.  Go back there,

22   and he'll collect them from you once you're comfortable that

23   you -- you want to give them back and if you have any notes

24   you've transferred them.  Thank you.

25             COURT SECURITY OFFICER:  All rise.

1    (Jury out at 10:15 a.m.)

2         THE COURT:  All right.  Let's have the defendant --

3    government's rested.  Is the defense going to put on any

4    evidence?

5         MR. SEIDEN:  We are not.

6         But before I even address, that we have our motion --

7    Rule 29 motion, your Honor.

8         THE COURT:  All right.  Go ahead.

9         MR. SEIDEN:  And, additionally, we are going to

10   additionally argue as to jurisdictional, on the use of money

11   laundering as an extraterritorial jurisdictional tool.

12        THE COURT:  All right.  And do you have any additional

13   argument on your Rule 29 motion?

14        MR. SEIDEN:  Your Honor, I had learned during the

15   course of the case that you are keenly aware of the testimony

16   that has been going in.

17        We -- actually, it's your -- do you want to do it?

18        MS. STEVENS:  No.  Finish.

19        MR. SEIDEN:  Okay.  We do not perceive that the

20   government has established a burden pursuant -- they have not

21   established a *prima facie* case, first of all, with Count V --

22   going backwards, Count V at all because their witness is

23   particularly -- was particularly clear on that issue with

24   regard to the requirement for licensure in the state of

25   Illinois, that the transaction occurred in Illinois between --

1   and I described the people that it occurred with, and they had

2   indicated they're the ones that would have to be licensed and

3   nobody else.  That's -- that's one.

4           Similarly, transfers -- their -- their witnesses said

5   that there were -- thank you.

6           THE COURT:  Thank you.

7           MR. SEIDEN:  Their witnesses indicated that Mr. Gan

8   made no transfers in the United States, so that takes care of

9   II to IV.

10          Now, then there is the conspiracy, and I believe that

11  the government has failed to establish a *prima facie* case with

12  regard to that.  I understand that you have heard the evidence

13  in the case.  And you know I could argue all day.  I don't

14  think it's necessary, your Honor.  I think you have your arms

15  around it.

16          THE COURT:  All right.  Any response by the

17  government?  Briefly.

18          MR. FRANZBLAU:  Yes, your Honor.  As to Counts I

19  through IV, there has been substantial evidence that the

20  defendant was knowingly causing -- from Mexico causing these

21  transactions to occur inside Illinois.  You have Ms. Lim's

22  testimony, which that testimony alone hits on all of the

23  elements for Counts I through IV.  She's substantially

24  corroborated by recordings of the defendant and, of course, the

25  video recordings of what happened next when these transactions

1    occurred.

2          Then you have recordings during the transactions when

3    the defendant is checking in about how it's going and

4    complaining about how it's going and then recorded

5    conversations after when he's confirming that the transaction's

6    been completed.  So he is all over these transactions in

7    Chicago, deeply enmeshed.  I don't think I need to say more

8    about Counts I through IV.

9          As to Count V, the IDFPR witness testified that if you

10   are outside of Illinois causing these transactions to happen

11   and you're being paid to do it, you would have to register.

12   You'd have to be licensed if that's what you're doing as a

13   business; if you are doing this on behalf of third parties,

14   you're providing a service in return for payment, that you

15   would have to register.

16         So that's exactly what's going on in this case.  You

17   don't have to be a brick-and-mortar business inside Illinois.

18   If you're outside and causing this stuff to happen inside, as

19   he testified very clearly, you need to register with the state.

20         THE COURT:  All right.

21         MR. SEIDEN:  Your Honor, 1956(f) requires -- it

22   requires presence in the United States.  So -- we are arguing

23   it requires presence in the United States.  That would be our

24   argument, your Honor.

25         THE COURT:  All right.  Well, Rule 29(b) allows me to

1  reserve decision, which is what I'm going to do on this. The

2  extraterritorial argument was something made before trial in a

3  motion to dismiss the indictment. I ruled on that in some

4  detail.

5         But I'll reserve decision under Rule -- which I'm

6  allowed to do under Rule 29(b) on this motion. Your --

7  obviously, your arguments are preserved based on your motion

8  you've made right now.

9         MR. SEIDEN: Very well. So then --

10         THE COURT: Okay.

11         MR. SEIDEN: -- then -- so my record is complete, my

12  29(a) will be reserved to a 29(b).

13         THE COURT: Reserved under Rule 29(b). And I can

14  consider it based on the evidence that exists at this moment

15  when I either grant or deny the motion after there's been a

16  verdict.

17     (Counsel conferring.)

18         MR. SEIDEN: Okay. And on the (b), we're also talking

19  about enlargement. We're also going to be resisting the

20  enlargement of 1956 pursuant to Section (2). So that would be

21  part of our argument then.

22         THE COURT: I don't understand.

23         MR. SEIDEN: In other words, they can't enlarge

24  1956 -- we'll make a more -- a cogent argument when we do this

25  at the (b), your Honor. But I want to reserve the entire

1    thing.

2             THE COURT:  Well, the record will show what's

3    reserved.

4             MR. SEIDEN:  Okay.  Very good.

5             THE COURT:  I'm not going to comment on what you have

6    or have not reserved.  You've made your argument in brief,

7    which is what I asked for, a brief argument.  I'm reserving

8    decision.  And that's the ruling.

9             MR. SEIDEN:  Your Honor, with regard to the defense

10   case --

11            THE COURT:  Yes.

12            MR. SEIDEN:  -- it is our intention to rest.  I have

13   communicated with my client.  And, once again this morning, as

14   late as this morning, my client does not choose -- does not

15   wish to testify.

16            I believe that the Court will want to do something

17   with regard to that.

18            THE COURT:  That's correct.

19            And by the way, he was not present for our instruction

20   conference this morning.  You waive his presence, correct?

21            MR. SEIDEN:  We waived it last night, and we revisited

22   again this morning.  We're fine.

23            THE COURT:  All right.  Very good.

24            Why don't you have your client come up here.  And,

25   actually, will he be -- will a translator be able to work with

1   him when he's up here?

2              MR. SEIDEN:  Sure.

3              THE COURT:  Okay.

4              All right, sir.  Please raise your right hand.

5         (Defendant duly sworn.)

6              THE DEFENDANT:  Yes.

7              THE COURT:  All right.  Sir, you have a right to

8   testify if you want to.

9              Do you understand that?

10             THE DEFENDANT:  Yes.

11             THE COURT:  You have a constitutional right not to

12  testify.

13             Do you understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  If you decide not to testify, I'll

16  instruct the jury that no inference or suggestion of guilt can

17  be drawn from the fact you did not testify.

18             Do you understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Has your lawyer explained these rights to

21  you?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Have you discussed this -- this issue with

24  your lawyer?

25             THE DEFENDANT:  Yes.

1    THE COURT:  Do you have any questions for me?

2    THE DEFENDANT:  No.

3    THE COURT:  Do you want to talk to your lawyer

4  privately on this issue any more?

5    THE DEFENDANT:  We have discussed already.

6    THE COURT:  Do you wish to discuss it any further with

7  your lawyer?

8    THE DEFENDANT:  No.  We have discussed this morning.

9    THE COURT:  All right.  Sir, then my question to you

10  is, do you want to testify or not?

11    THE DEFENDANT:  I'm not going to testify.

12    THE COURT:  All right.  I find that the defendant --

13    Well, are there any additional questions the

14  government believes I should ask?

15    MR. FRANZBLAU:  No, your Honor.

16    THE COURT:  Are there any additional questions defense

17  agrees I should ask?

18    MS. STEVENS:  No, your Honor.

19    THE COURT:  Or believes I should ask.

20    MS. STEVENS:  No, your Honor.

21    THE COURT:  All right.  I find the defendant has

22  knowingly waived his right to testify.  And that completes the

23  colloquy.

24    All right.  You can have a seat, sir.

25    THE DEFENDANT:  Thank you.

1     THE COURT:  Yes, sir?  Mr. Seiden.

2     MR. SEIDEN:  You're going to call the jury out, and

3   I'll rest?

4     THE COURT:  Yeah.  We'll call them out.  You can

5   formally rest in front of the jury.  I want to take a minute

6   and see how far we are away from getting the copies of

7   instructions made so I can tell them how long our next break

8   will be.  But I think that should all -- we should do a formal

9   resting on the record -- we have to -- in front of them.

10     All right.  So let's take a five-minute break right

11   now for me to find out where we're at on copying.

12     MR. FRANZBLAU:  Thank you, Judge.

13     THE COURT:  And is the government ready to proceed

14   after that?

15     MR. FRANZBLAU:  Yes.

16     MR. ROTHBLATT:  Yes.

17     THE COURT:  With closings.  All right.

18     MS. STEVENS:  Thank you, your Honor.

19     THE COURT:  So you ought to set up if you have --

20     MR. ROTHBLATT:  Will do, Judge.

21     THE COURT:  -- anything you're going to be using --

22     Off the record.

23   (Off-the-record discussion.)

24   (Recess at 10:25 a.m., until 10:30 a.m.)

25     THE COURT:  All right.  Parties ready to proceed?

1        MR. FRANZBLAU:  Yes, Judge.

2        MR. SEIDEN:  We are.

3        THE COURT:  All right.  We have instructions that we

4   will -- final set.  We'll give one to defense, one to the

5   government.

6        MR. SEIDEN:  Thank you.

7        THE COURT:  A verdict form for each of you.

8        I think the interpreters wanted a --

9        MS. STEVENS:  Your Honor --

10       MR. SEIDEN:  We need one for the -- thank you.

11       LAW CLERK:  It's coming.

12       MR. SEIDEN:  And keep that together.

13       THE COURT:  All right.  Then let's bring in the jury.

14       And do you want to give the instructions to Dan.

15  He'll hand them out to them when they come in.

16       Dan, we will put on your chair 14 sets of

17  instructions.  You can hand it to them as they come in.  Thank

18  you.

19       COURT SECURITY OFFICER:  All rise.

20     (Jury in at 10:36 a.m.)

21       THE COURT:  All right.  Please be seated, ladies and

22  gentlemen.

23       All right.  The government has rested its case.

24       Mr. Seiden?

25       MR. SEIDEN:  Your Honor, subject to the admission, if

1 we -- so that we -- subject to the admission of any evidence

2 that we will suggest, at this time the defense will rest.

3      THE COURT:  All right.  Any rebuttal case by the

4 government?

5      MR. FRANZBLAU:  No, your Honor.

6      THE COURT:  All right.  Ladies and gentlemen, you've

7 heard all the evidence you're going to hear in this case.

8      Ms. Krueger, you had mentioned to the court security

9 officer you wanted to make sure there are ways that you can

10 participate fully and hear what's going on in the jury room

11 during deliberations.  We're going to make arrangements for

12 that.  I'll address that shortly.  But rest assured, you'll be

13 able to fully participate and hear what everyone else is saying

14 too.  We'll make arrangements for that.

15      Ladies and gentlemen, you've all received a copy of

16 the final jury instructions.  I'm going to read those to you.

17 Many are similar to the ones that I read to you at the

18 beginning of the case; some are different.  Each instruction is

19 important.  You'll have a copy of these instructions back with

20 you in the jury room.  Again, it's not a memory test.

21      But I'm going to read them to you now.  And after

22 that, we'll have the government's closing argument.

23      Members of the jury, I'll now instruct you on the law

24 that you must follow in deciding this case.  Each of you has a

25 copy of these instructions to use in the jury room.  You must

1  follow all of my instructions about the law, even if you

2  disagree with them.  This includes the instructions I gave you

3  before the trial, any instructions I gave you during the trial,

4  and the instructions I'm giving now.

5       As jurors, you have two duties.  Your first duty is to

6  decide the facts from the evidence that you saw and heard here

7  in court.  This is your job, not my job or anyone else's job.

8       Your second duty is to take the law as I give it to

9  you, apply it to the facts, and decide if the government has

10 proved the defendant guilty beyond a reasonable doubt.

11      You must perform these duties fairly and impartially.

12 Do not let sympathy, prejudice, fear, or public opinion

13 influence you.  In addition, do not let any person's race,

14 color, religion, national ancestry, or gender influence you.

15      You must not take anything I said or did during the

16 trial as indicating what I think of the evidence or what I

17 think your verdict should be.

18      The charges against the defendant are in a document

19 called an indictment.  You will have a copy of the indictment

20 during your deliberations.

21      The indictment in this case charges that the defendant

22 committed the crimes of conspiracy to commit money laundering,

23 money laundering, and operating an unlicensed money

24 transmitting business under Illinois law.  The defendant has

25 pleaded not guilty to the charges.

1    The indictment is simply the formal way of telling the

2    defendant what crimes he is accused of committing.  It is not

3    evidence that the defendant is guilty.  It does not even raise

4    a suspicion of guilt.

5    The defendant is presumed innocent of each and every

6    one of the charges.  This presumption continues throughout the

7    case.  It is not overcome unless, from all the evidence in the

8    case, you're convinced beyond a reasonable doubt that the

9    defendant is guilty as charged.

10   The government has the burden of proving the

11   defendant's guilt beyond a reasonable doubt.  This burden of

12   proof stays with the government throughout the case.

13   The defendant is never required to prove his

14   innocence.  He is not required to produce any evidence at all.

15   You must make your decision based only on the evidence

16   you saw and heard in court.  Do not consider anything you may

17   have seen or heard outside of court, including anything from

18   the newspaper, television, radio, the Internet, or any other

19   source.

20   The evidence includes only what the witnesses said

21   when they were testifying under oath, the exhibits that I

22   allowed into evidence, and the stipulations the lawyers agreed

23   to.  A stipulation is an agreement that certain facts are true

24   or that a witness would have given certain testimony.

25   Nothing else is evidence.  The lawyers' statements and

1 arguments are not evidence.  If what a lawyer said is different

2 from the evidence as you remember it, the evidence is what

3 counts.  The lawyers' questions and objections, likewise, are

4 not evidence.

5 A lawyer has a duty to object if he thinks a question

6 or evidence is improper.  If I sustained objections to

7 questions the lawyers asked, you must not speculate on what the

8 answers might have been.  If I struck testimony or an exhibit

9 from the record or told you to disregard something, you must

10 not consider it.

11 You may have heard the terms "direct evidence" and

12 "circumstantial evidence."  Direct evidence is evidence that

13 directly proves a fact.  Circumstantial evidence is evidence

14 that indirectly proves a fact.

15 For example, direct evidence that it was raining

16 outside is testimony by a witness that it was raining.

17 Circumstantial evidence that it is raining outside is the

18 observation of someone entering a room carrying a wet umbrella.

19 You are to consider both direct and circumstantial

20 evidence.  The law does not say that one is better than the

21 other.  It is up to you to decide how much weight to give to

22 any evidence, whether direct or circumstantial.

23 Give the evidence whatever weight you decide it

24 deserves.  Use your common sense in weighing the evidence, and

25 consider the evidence in light of your own everyday experience.

1    People sometimes look at one fact and conclude from it

2  another fact exists.  That's called an inference.  You're

3  allowed to make reasonable inferences so long as they're based

4  on the evidence.

5    Part of your job as jurors is to decide how believable

6  each witness was and how much weight to give each witness's

7  testimony.  You may accept all of what a witness said or part

8  of it or none of it.

9    Some factors you may consider include:

10    The intelligence of the witness;

11    The witness's ability and opportunity to see, hear, or

12  know the things the witness testified about;

13    The witness's demeanor -- I'm sorry.

14    The witness's memory;

15    The witness's demeanor;

16    Whether the witness had any bias, prejudice, or other

17  reason to lie or slant the testimony;

18    The truthfulness and accuracy of the witness's

19  testimony in light of other evidence presented; and

20    Inconsistent or consistent statements or conduct by

21  the witness.

22    Do not make any decision simply by counting the number

23  of witnesses who testified about a certain point.  What is

24  important is how truthful and accurate the witnesses were and

25  how much weight you think their testimony deserves.

1       If you took notes during the trial, you may use them

2  during deliberations to help you remember what happened during

3  the trial.  You should use your notes only as aids to your

4  memory.  The notes are not evidence.  All of you should rely on

5  your independent recollections of the evidence, and you should

6  not be unduly influenced by the notes of other jurors.  Notes

7  are not entitled to any more weight than the memory or

8  impressions of each juror.

9       The defendant has an absolute right not to testify or

10  present evidence.  You may not consider it in -- you may not

11  consider in any way the fact that the defendant did not testify

12  or present evidence.  You should not even discuss it in your

13  deliberations.

14       It is proper for an attorney to interview any witness

15  in preparation for trial.

16       You've heard testimony from witnesses Wei Li and Seok

17  Pheng Lim, who expect a benefit in return for their testimony

18  and cooperation with the government.

19       You also heard testimony from Seok Pheng Lim -- heard

20  testimony that Seok Pheng Lim has pled guilty to one of the

21  crimes the defendant is charged with committing.  You may not

22  consider Lim's guilty plea as evidence against the defendant.

23       You must give Wei Li and Seok Pheng Lim's testimony

24  whatever weight you believe is appropriate, keeping in mind you

25  must not -- you must consider that testimony with caution and

1    great care.

2          You've heard a witness, namely, HSI Special Agent Jill

3    Dennewitz, who gave opinions and testimony about how drug

4    traffickers and money launderers operate and about her

5    interpretations of certain transcripts.  You do not have to

6    accept this witness's opinions or testimony.  You should judge

7    this witness's opinions and testimony the same way you judge

8    the testimony of any other witness.  In deciding how much

9    weight to give these opinions and testimony, you should

10   consider the witness's qualifications, how she reached her

11   opinions and conclusions, and the factors I've described for

12   determining the believability of testimony.

13         During the trial, Mandarin and Spanish language

14   recordings, application communications, and text messages were

15   admitted into evidence.  You were also given English

16   translations of those recordings, communications, and text

17   messages so you can consider the contents of the recordings,

18   communications, and text messages.  You may not rely on any

19   knowledge you may have of the Mandarin and Spanish languages.

20   Rather, your consideration of the transcriptions should be

21   based on the evidence introduced at trial.

22         Portions of recorded conversations have been deleted

23   as non-pertinent.  You should not infer or speculate that

24   important information has been withheld from you either by the

25   government or the defendant.

1     You've heard recorded conversations and seen video

2  recordings.  This is proper evidence you should consider

3  together with and in the same way you consider the other

4  evidence.

5     You were also given transcripts of the conversations

6  on the recordings to help you follow the recordings as you

7  listened to them.  The recordings of the conversations in

8  English are the evidence of what was said and who said it.  The

9  transcripts of the conversations in English are not evidence.

10 If you noticed any differences between what you heard in the

11 conversations and what you read in the transcripts, your

12 understanding of the recording is what matters.  In other

13 words, you must rely on what you heard, not what you read.  And

14 if you could not hear or understand certain parts of the

15 recordings, you must ignore the transcripts as far as those

16 parts are concerned.

17    I'll be providing you with the recordings of the

18 conversations in English and a laptop computer with

19 instructions on its use.  It's up to you to decide whether to

20 listen to the recordings during your deliberations.  You may,

21 if you wish, rely on your recollections of what you heard

22 during the trial.

23    You'll also get copies of the videos that were shown

24 during trial.  You can play them on the computer also or choose

25 to rely on your memory of what was in those videos.

1   Certain charts and graphs were shown to you to help

2   explain other evidence that was admitted.  These charts and

3   graphs are not themselves evidence or proof of any facts, so

4   you will not have these particular charts and graph -- graphics

5   during your deliberations.

6   And when I said earlier "graphs," I meant "graphics."

7   If you do not correctly reflect -- if they do not

8   correctly reflect the facts shown by the evidence, you should

9   disregard the charts and graphics and determine the facts from

10  the underlying evidence.

11  You should not speculate why any other person whose

12  name you heard during the trial is not currently on trial

13  before you.

14  The indictment charges that the crime happened "on or

15  about" certain dates.  The government must prove that the crime

16  happened reasonably close to those dates.  The government is

17  not required to prove that the crime happened on those exact

18  dates.

19  The defendant has been accused of more than one crime.

20  The number of charges is not evidence of guilt and should not

21  influence your decision.

22  You must consider each charge separately.  Your

23  decision on one charge, whether it's guilty or not guilty,

24  should not influence your decision on any other charge.

25  A person acts knowingly if he realizes what he is

1   doing and is aware of the nature of his conduct and does not

2   act through ignorance, mistake, or accident.  In deciding

3   whether the defendant acted knowingly, you may consider all of

4   the evidence, including what the defendant did or said.

5         A defendant's presence at the scene of a crime and

6   knowledge that a crime is being committed is not sufficient by

7   itself to establish the defendant's guilt.

8         If a defendant performed acts that advanced the crime

9   but had no knowledge the crime was being committed or was about

10  to be committed, those acts are not sufficient by themselves to

11  establish the defendant's guilt.

12        A defendant's association with persons involved in a

13  crime is not sufficient by itself to prove his participation in

14  the crime.

15        Count I of the indictment charges the defendant with

16  conspiracy.  In order for you to find the defendant guilty of

17  this charge, the government must prove both of the following

18  elements beyond a reasonable doubt:

19        1. The conspiracy as charged in Count I existed,

20  namely, that:

21              a. The defendant and others conspired to:

22                    i. knowingly conduct a financial

23  transaction affecting interstate and foreign commerce;

24                    ii. which transaction involved the

25  proceeds of unlawful activity, namely, buying, selling,

importation, and otherwise dealing in a controlled substance,

knowing that the transaction was designed, in whole or in part,

to conceal and disguise the nature, location, source,

ownership, and control of the proceeds of that unlawful

activity; and

           iii. that while conducting such financial

transaction knew that the property involved in the transaction

represented the proceeds of some form of unlawful activity; or

       b. Defendant and others conspired to:

           i. transport, transmit, and transfer a

monetary instrument and funds involving the proceeds of

unlawful activity, namely, buying, selling, importation, and

otherwise dealing in a controlled substance, from a place in

the United States to or through a place outside the United

States;

           ii. knowing that the monetary instrument and

funds involved in the transportation, transmission, and

transfer represented the proceeds of some form of unlawful

activity; and

           iii. knowing that such transportation,

transmission, and transfer was designed, in whole or in part,

to conceal and disguise the nature, location, source,

ownership, and control of the proceeds.

    And:

    2. The defendant knowingly became a member of the

1 conspiracy with an intent to advance the conspiracy.

2      If you find from your consideration of all the

3 evidence the government has proved each of these elements

4 beyond a reasonable doubt, then you should find the defendant

5 guilty.  If, on the other hand, you find from your

6 consideration of all the evidence that the defendant [*sic*] has

7 proved -- has failed to prove any one of these elements beyond

8 a reasonable doubt, then you should find the defendant not

9 guilty.

10      And when the -- beginning of that instruction, so it's

11 clear, it's -- the second sentence says, "In order for you to

12 find the defendant guilty of this charge, the government must

13 prove both of the following elements beyond a reasonable

14 doubt," it is -- 1. is "The conspiracy as charged in Count I

15 existed," with all the information below it, two separate ways

16 of violating it.  And then 2. over on the second page is the

17 second element that has to be proven.  1. has several ways of

18 being proven, and then number 2. has to be proven.  And both of

19 those must be proven beyond a reasonable doubt before you can

20 find the defendant guilty.  And if the government fails to

21 prove both of those elements beyond a reasonable doubt, you

22 must find the defendant not guilty.

23      All right.  A conspiracy is an express or implied

24 agreement between two or more persons to commit a crime.

25 Conspiracy may be proven even if its goals were not

1  accomplished.

2       In deciding whether the charged conspiracy existed,

3  you may consider all the circumstances, including the words and

4  acts of each of the alleged participants.

5       To be a member of a conspiracy, the defendant does not

6  need to join it at the beginning, and he does not need to know

7  all of the other members or all the means by which the illegal

8  goals of the conspiracy were to be accomplished.  The

9  government must prove beyond a reasonable doubt the defendant

10 was aware of the illegal goals of the conspiracy and knowingly

11 joined the conspiracy.

12      The defendant is not a member of the conspiracy just

13 because he knew and/or associated with people who were involved

14 in a conspiracy, knew there was a conspiracy, and/or was

15 present during conspiratorial discussions.

16      In deciding whether the defendant joined the charged

17 conspiracy, you must base your decision only on what the

18 defendant did or said.  To determine what the defendant did or

19 said, you may consider the defendant's own words or acts.  You

20 may also use the words or acts of other persons to help you

21 decide what the defendant did or said.

22      A government agent cannot be a co-conspirator.

23      Evidence has been introduced of recorded conversations

24 and other communications in which one participant was --

25      (Sotto voce discussion between law clerk and the Court.)

1    THE COURT:  Page 25.  Oh, I'm sorry.  If I skipped

2    page 24, I'll read it now.

3        A conspiracy is an express or implied agreement

4    between two or more persons to commit a crime.  A conspiracy

5    may be proven even if its goals were not accomplished.

6        In deciding whether the charged conspiracy existed,

7    you may consider all of the circumstances, including the words

8    and acts of each of the alleged participants.

9        I believe I read 25.

10        Let's go off the record for a minute.

11    (Off-the-record discussion.)

12        THE COURT:  Back on the record.

13        To be a member of a conspiracy, the defendant does not

14    need to join it at the beginning and does not need to know all

15    the other members or all the means by which the illegal goals

16    of the conspiracy were to be accomplished.  The government must

17    prove beyond a reasonable doubt that the defendant was aware of

18    the illegal goals of the conspiracy and knowingly joined the

19    conspiracy.

20        The defendant is not a member of a conspiracy just

21    because he knew and/or associated with people who were involved

22    in the conspiracy, knew there was a conspiracy, and/or was

23    present during the conspiratorial discussions.

24        In deciding whether the defendant joined the charged

25    conspiracy, you must base your decision only on what the

1   defendant did or said.  To determine what the defendant did or

2   said, you may consider the defendant's own words or acts.  You

3   may also use the words or acts of other persons to help you

4   decide what the defendant did or said.

5           All right.  On to page 26.

6           A government agent cannot be a co-conspirator.

7           Evidence has been introduced of recorded conversations

8   and other communications in which one person was, at the time

9   of the communication, communicating [*sic*] with the government.

10  You may consider that person's statement in these

11  communications only for a limited purpose.  Specifically, you

12  may consider that person's statement only to help you

13  understand what other people in the communications were talking

14  about.

15          With regard to Seok Pheng Lim, this instruction

16  applies to recorded communications in which she participated

17  beginning May 3rd, 2018, at which time she began cooperating

18  with the government.

19          MR. FRANZBLAU:  Judge, excuse me.  I'm sorry to

20  interrupt you.  I think that you may have misread one word in

21  the first sentence of the second paragraph.

22          THE COURT:  All right.  Then I'll reread -- the first

23  sentence of the second paragraph?

24          MR. FRANZBLAU:  Yeah, beginning with "Evidence has

25  been introduced."

1    THE COURT:  All right.  I'll reread it.  I apologize.

2    Evidence has been introduced of recorded conversations

3 and other communications in which one person was, at the time

4 of the communication, cooperating with the government.

5    All right.  And the rest of the instruction has been

6 read to you.

7    All right.  On page 27.

8    Count I of the indictment charges that the defendant

9 conspired to commit two different offenses as set forth in the

10 indictment.  In other words, it's charged that defendant

11 conspired to commit different, separate substantive crimes or

12 offenses.

13    The government is not required to prove the defendant

14 conspired to commit both of these offenses.  However, the

15 government is required to prove beyond a reasonable doubt that

16 the defendant conspired with one or more people to commit at

17 least one of these offenses -- one of those offenses.

18    To find that the government has proven this, you must

19 unanimously agree upon which of the different offenses the

20 defendant conspired to commit.  If you cannot agree in that

21 manner, you must find the defendant not guilty.

22    As it applies to Counts I through IV, the term

23 "proceeds" is defined as any property derived from or obtained

24 or retained, directly or indirectly, through some form of

25 unlawful activity, including the gross receipts of such

1  activity.

2         It is a felony under federal law for any person,

3  without authorization, to knowingly or intentionally

4  manufacture, distribute, or dispense, or possess with intent to

5  manufacture, distribute, or dispense, a controlled substance.

6         Heroin, cocaine, crystal methamphetamine, and

7  marijuana are controlled substances.

8         As it applies to Counts I through IV, the term

9  "financial transaction" means a transfer, delivery, or other

10  disposition involving one or more monetary instruments, which

11  in any way or degree affects interstate commerce or a transfer

12  between accounts, exchange of currency, involving the use of a

13  financial institution which is engaged in or the activities of

14  which affect interstate ... commerce.

15         The term "monetary instruments" includes currency of

16  the United States.

17         The term "financial institution" includes, for

18  example, commercial banks.

19         "Interstate commerce" means trade, transactions,

20  transportation, or communication between any point in a state

21  and any place outside of that state, or between two points

22  within a state through a place outside the state.  "Foreign

23  commerce" means trade, transactions, transportation, or

24  communication between a point in one country and a place

25  outside the country -- outside that country, or between two

1  points within a country through a place outside that country.

2       When an individual or financial institution in

3  Illinois is engaged in commerce outside of that state, or when

4  an individual or financial institution in Illinois purchases

5  goods or services -- services which come from outside that

6  state, then the activities of that individual and financial

7  institution affect interstate commerce.

8       The government must prove that it was foreseeable that

9  defendant's acts would affect interstate or foreign commerce.

10  The government need not prove the defendant knew or intended

11  that his actions would affect interstate or foreign commerce.

12       The term "conceal or disguise" means to hide the

13  nature, the location, the source, the ownership, or the control

14  of the proceeds of specified unlawful activity.

15       Counts II, III, and IV of the indictment charge the

16  defendant with money laundering by concealment.  In order for

17  you to find the defendant guilty of each of these charges, the

18  government must prove each of the following elements beyond a

19  reasonable doubt for each count:

20       (1) The defendant knowingly conducted or attempted to

21  conduct a financial transaction; and

22       (2) Some or all of the property involved in the

23  financial transaction was proceeds of the buying and selling or

24  otherwise dealing in controlled substances; and

25       (3) The defendant knew that the property involved in

1 the financial transaction represented proceeds of some form of

2 unlawful activity; and

3       (4) The defendant knew that the transaction was

4 designed, in whole or in part, to conceal or disguise the

5 nature, the location, the source, the ownership, or the control

6 of the proceeds involved.

7       If you find from your consideration of all the

8 evidence the government has proved each of these elements

9 beyond a reasonable doubt as to the charge you're considering,

10 then you should find the defendant guilty of the charge -- of

11 that charge.

12       If, on the other hand, you find from your

13 consideration of all the evidence that the government has

14 failed to prove any one of these elements beyond a reasonable

15 doubt as to the charge you are considering, then you should

16 find the defendant not guilty of that charge.

17       As to Counts II through V, any person who knowingly

18 aids, counsels, commands, induces, or procures the commission

19 of an offense may be found guilty of that offense if he

20 knowingly participated in the criminal activity and tried to

21 make it succeed.

22       If a defendant knowingly causes the acts of another,

23 then that defendant is responsible for those acts as though he

24 personally committed them.

25       Count V of the indictment charges the defendant with

operating an unlicensed money transmitting business.  In order for you to find the defendant guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:

(1) The defendant knowingly conducted, controlled, managed, supervised, directed, or owned all or part of a money transmitting business; and

(2) Which business affected interstate or foreign commerce in any manner or degree; and

(3) Which business was operated in Illinois; and

(4) Which business was required to be licensed in Illinois;

(5) Which business was operated without such required license; and

(6) Illinois law punished the lack of license as a misdemeanor or a felony.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant not guilty of that charge.

1     The term "money transmitting" includes transferring

2     funds on behalf of the public by any and all means, including,

3     but not limited to, transfers within this country or to

4     locations abroad by wire, check, draft, facsimile, or courier.

5           Illinois state law requires a license to do business

6     as a money transmitter.  It is a felony to do business as a

7     money transmitter without a license.

8           Under Illinois law, a "money transmitter" means a

9     person who is located in or doing business in Illinois and who

10    directly or through authorized sellers does any of the

11    following in this state:

12          (1) Sells or issues payment instruments;

13          (2) Engages in the business of receiving money for

14    transmission or transmitting money; or

15          (3) Engages in the business of exchanging, for

16    compensation, money of the United States government or a

17    foreign government to or from money of another government.

18          "Under Illinois law, 'transmitting money' means the

19    transmission of money by any means, including transmissions to

20    or from locations within the United States or to and from

21    locations outside the United States by payment instrument,

22    facsimile or electronic transfer, or otherwise, and includes

23    bill payment services."

24          The government has the burden of proving the defendant

25    was not entrapped by government agents and informants.  The

1    government must prove beyond a reasonable doubt either:

2            (1) Neither government agents nor government

3    informants induced the defendant to commit the offense; or

4            (2) The defendant was predisposed to commit the

5    offense before he had contact with government agents or

6    informants.

7            I'll now define what I mean by the terms "induce" and

8    "predisposed."

9            A government agent or informant "induces" a defendant

10   to commit a crime: (1) if the agent or informant solicits the

11   defendant to commit the crime and (2) does something in

12   addition that would influence a person to commit a crime that

13   the person would not commit if left to his own devices.  This

14   other conduct -- conduct may consist of repeated attempts at

15   persuasion; coercive tactics; pleas based on need, sympathy, or

16   friendship; or any other conduct that creates a risk that a

17   person who would not commit the crime is left -- if left to his

18   own devices will do so in response to the efforts of the agent

19   or informant.

20           A defendant is "predisposed" to commit the crime --

21   charged crime if, before he was approached by a government

22   agent or informant, he was ready and willing to commit the

23   crime and likely would have committed it without the

24   intervention of an agent or informant, or he wanted to commit

25   the crime but had not yet found the means.

1      Predisposition requires more than a mere desire, urge,

2  or inclination to engage in the charged crime.  Rather, it

3  concerns the likelihood the defendant would have committed the

4  crime if the agent or informant had not approached him.

5      In deciding whether the government has met its burden

6  of proving that the defendant was predisposed to commit the

7  crime, you may consider the defendant's character or

8  reputation; whether the government initially suggested the

9  criminal activity; whether the defendant engaged in the

10  criminal activity for profit; whether the defendant showed

11  any -- showed a reluctance to commit the crime that was

12  overcome by persuasion by the agent or informant; and the

13  nature of the inducement or persuasion that was used.

14      These last instructions I'm going to read to you after

15  the closing arguments.

16      So with that, is the government ready to give its

17  closing argument?

18      MR. ROTHBLATT:  Yes, Judge.

19      THE COURT:  You may proceed.

20      And, Mr. Rothblatt, do you want this hooked into the

21  computer or --

22      MR. ROTHBLATT:  Yes, please, Judge, to the desk here.

23      THE COURT:  It's at the government table or --

24      MR. ROTHBLATT:  Yes.

25      THE COURT:  You have it there.  Okay.

1      MR. ROTHBLATT:  May I proceed, Judge?

2      THE COURT:  You may.

3    (Closing arguments of counsel not herein transcribed.)

4      THE COURT:  All right, ladies and gentlemen.  We're

5    going to take a brief recess, and then you're going to come

6    back.  I'm going to give you the final instructions, and then

7    we'll have you go back and you'll begin to deliberate.  But I

8    need to take a short recess before that occurs.

9      So, once again, you haven't received the last of the

10   instructions, so don't discuss the case among yourselves or

11   with anyone else while you're back there.

12     I don't expect this to last more than five or ten

13   minutes, but, once again, my word has been broken many times.

14   But I'm going to try and make it five to ten minutes, and then

15   we'll come out for the final two or three instructions.

16     Thank you.

17     COURT SECURITY OFFICER:  All rise.

18   (Jury out at 2:25 p.m.)

19   (Defendant exits the courtroom.)

20     THE COURT:  All right.  Please be seated.

21     In looking through the last of the instructions, I

22   don't see in here the *Silvern* instruction, the 7.03.

23     MR. SEIDEN:  Why would we need that now?

24     THE COURT:  Well, that is given before -- I typically

25   give it before the jury goes out.  It requires -- it tells them

1   they need a unanimous verdict.  It's a critical instruction.

2               MR. ROTHBLATT:  Yeah, Judge.  That should be in there.

3               MR. FRANZBLAU:  That was a major oversight.

4               THE COURT:  And so I've asked my law clerk -- that's

5   the only reason I took a recess, by the way.  I've asked my law

6   clerk to print it up.

7               But, Mr. Seiden, I give this routinely in every civil

8   and criminal case.  It's the last instruction typically that's

9   read to a jury.  It's reread if they're having some difficulty

10  reaching unanimous verdict.

11              MR. SEIDEN:  When I see that, it's usually a primer or

12  a *Silvern* instruction when they can't reach a verdict.

13              THE COURT:  Well, it's -- actually, the Seventh

14  Circuit recommends giving it now.

15              MR. SEIDEN:  Okay.

16              THE COURT:  And I always do.  And it's an oversight by

17  me too that I should have seen this.  But I -- what I'm going

18  to do is read that to the jury.  We're going to hand -- excuse

19  me -- hand out 12 copies of it to the jury so they have it,

20  just say it's an additional instruction to add to their pack.

21              And I'll make sure when this is printed up -- because

22  there's language in there about the defense.  So let's make

23  sure we have the correct language in there before we give it to

24  the jury.

25              MR. SEIDEN:  Very well.

1    THE COURT:  But it's 7.03.  You might want to all look

2  it up.  And if you -- there's a couple brackets there.  See if

3  there's any particular language you want there.

4    MR. FRANZBLAU:  Absolutely.  Thank you, Judge.

5    THE COURT:  All right.  Okay.

6    Off the record.

7  (Off-the-record discussion.)

8    THE COURT:  All right.  Then let's get 7.03 and make

9  sure it's read to the jury.

10    MR. FRANZBLAU:  Thank you, Judge.

11    THE COURT:  Okay.

12  (Recess at 2:28 p.m., until 2:31 p.m.)

13    THE COURT:  All right.  In the original pack of

14  instructions, we did not include the 7.0 -- what is it?  7 --

15    MS. STEVENS:  3?

16    MR. SEIDEN:  7.03.

17    MS. STEVENS:  7.02?  I forget.

18    THE COURT:  (Continuing) -- Pattern 7.03, which is

19  also known as a *Silvern* instruction.

20    We've now included it.  I've run the language by both

21  the government and defense.  This is word for word what's in

22  the pattern instruction.  They've all agreed to that language.

23    And so when the jury comes back -- we'll make multiple

24  copies of this, by the way.  We'll give one to each juror.  And

25  then when they come back, I'm going to read pages 40 and 41 of

1   the set of instructions they have.  I'll read this last

2   instruction, which I'll tell them should be a supplement to

3   what they have in their packet.

4        I'm not going to read the verdict form again.  They

5   have -- they've seen it.  I read it to them at the beginning.

6   I'll tell them the verdict form is -- will be given, and I'll

7   hand it to the court security officer to give it to him.

8        I'm going to swear the court reporter/interpreter for

9   Ms. Krueger and give her instructions and so both the jury

10  knows also what Ms. Krueger -- or Ms. Dillon's role --

11  Ms. Dillon's role is back there.

12       And then I'm going to -- after that is done, I'll

13  excuse them and ask Mr. Rodriguez and Mr. Munier -- I believe

14  that's how it's pronounced -- to remain in the courtroom.  They

15  are our alternate jurors.  I'll dismiss them, tell them not to

16  discuss the cases in case they need to be recalled if one of

17  our 12 jurors becomes ill or unable to participate in

18  deliberations.

19       MR. SEIDEN:  So I can't give them a watch out there in

20  the hall?

21       THE COURT:  You cannot.  You cannot because they are

22  potentially going to become jurors in the case --

23       MR. SEIDEN:  I know.

24       THE COURT:  -- if the others can't.

25       That's the procedure we're going to follow.  Any

1  objection to anything I've just said?

2          MR. FRANZBLAU:  No, your Honor.

3          MS. STEVENS:  No, your Honor.

4          MR. SEIDEN:  No.

5          MS. STEVENS:  But I do have something to put on the

6  record.  I know we spoke off the record about --

7          THE COURT:  By the way, you're waiving your client's

8  presence for this portion?

9          MR. SEIDEN:  I am.

10          MS. STEVENS:  Yes.

11          THE COURT:  Okay.

12          MS. STEVENS:  I know we spoke off the record about the

13  situation with the hard-of-hearing juror.

14          THE COURT:  Yes.

15          MS. STEVENS:  And we had some discussions about making

16  sure that neither --

17          THE COURT:  Yes.

18          MS. STEVENS:  -- the hard-of-hearing juror nor any

19  other juror could go back and look at any of the transcripts

20  from --

21          THE COURT:  Yeah.

22          MS. STEVENS:  -- the trial.

23          THE COURT:  Ms. Dillon has -- is going to reboot the

24  computer, if I'm saying it correctly, or, if not reboot it,

25  open a new file --

1          MS. STEVENS:  Perfect.

2          THE COURT:  -- which means all of the transcriptions

3     from the trial itself are not available to either Ms. Krueger

4     or any other juror.  They can't look, nor can she, at prior

5     testimony.

6          MS. STEVENS:  Perfect.  Thank you.

7          THE COURT:  Okay.

8          MR. SEIDEN:  The 29 will be entered and continued

9     until --

10         THE COURT:  Pardon me?

11         MR. SEIDEN:  29(b) will be entered and continued at

12    this point?

13         THE COURT:  That's correct.

14         MR. SEIDEN:  Okay.

15         THE COURT:  You're renewing it right now?

16         MR. SEIDEN:  No.

17         MS. STEVENS:  Yeah.

18         MR. SEIDEN:  No, no, no.  I just want to make sure

19    that we don't forget it.  It's --

20         THE COURT:  Yeah.  It's been entered and continued.

21    I'll deal with it --

22         MR. SEIDEN:  You won't forget it.  I want to make sure

23    that it is of record, that it will be after the --

24         THE COURT:  After the verdict.  If necessary, I'll

25    consider it at that time.

1          All right.  We have our --

2          LAW CLERK:  Copies for everybody.

3          THE COURT:  -- copies for everyone.  Why don't you put

4    them over for Dan to hand out.  And we'll bring in the jury.

5          And the government has a clean computer?

6          MR. ROTHBLATT:  Yes.  Defense checked it as well.

7          THE COURT:  Okay.  Very good.

8          COURT SECURITY OFFICER:  All rise.

9      (Jury in at 2:38 p.m.)

10         THE COURT:  All right.  Please be seated, ladies and

11   gentlemen.

12         The court security officer has one additional

13   instruction I want to give you.  You should have 14 copies

14   there.  If you can hand them out, please.

15         This is one additional instruction I'll be reading you

16   that was not in the original packet.

17         All right.  Does everyone have a copy?  Please raise

18   your hand if you don't have a copy of the instruction I just

19   handed out.  We're missing one?  All right.  Here's an extra

20   one in the front row, so we'll hand it back to you.  Thank you.

21         All right.  I'd ask you to turn to page 40 of your

22   instruction packet.

23         All right.  Once you're all in the jury room, the

24   first thing you should do is choose a foreperson.  The

25   foreperson should see to it that your discussions are carried

1  on in an organized way and that everyone has a fair chance to

2  be heard.  You may discuss the case only when all jurors are

3  present.

4          Once you start deliberating, do not communicate about

5  the case or your deliberations with anyone except other members

6  of your jury.  You may not communicate with others about the

7  case or your deliberations by any means, including oral or

8  written communication, or any electronic communication, such as

9  by phone, text, instant messenger, or the Internet or any

10 websites.

11         If you need to communicate with me while you're

12 deliberating, send a note through the court security officer.

13 The note should be signed by the foreperson or by one or more

14 members of the jury.  To have a complete record of this trial,

15 it's important you do not communicate with me except by a

16 written note.  I may have to talk to the lawyers about your

17 message, so it may take me some time to get back to you.  You

18 may continue your deliberations while you wait for my answer.

19         Please be advised that transcripts of trial testimony

20 are not available to you.  You must rely on your collective

21 memory of the testimony.

22         If you send me a message, do not include the breakdown

23 of any votes you may have conducted.  In other words, don't

24 tell me you're split 6-6 or 8-4 or whatever your vote happens

25 to be.

1    A verdict form has been prepared for you.  You will

2  take this form with you to the jury room.  When you've reached

3  unanimous agreement, your foreperson will fill in, date, and

4  sign the verdict form.  Each of you will sign it.

5    Advise the court security officer once you've reached

6  a verdict.  When you come back to the courtroom, I'll read the

7  verdict aloud.

8    And, finally, the handout I gave you, I'm going to

9  read that.

10    The verdict must represent the considered judgment of

11  each juror.  Your verdict, whether it is guilty or not guilty,

12  must be unanimous.  You should make every reasonable effort to

13  reach a verdict.  In doing so, you should consult with each

14  other, express your own views, and listen to your fellow

15  jurors' opinions.  Discuss your differences with an open mind.

16  Do not hesitate to reexamine your own view and change your

17  opinion if you come to believe it is wrong.  But you should not

18  surrender your honest beliefs about the weight or effect of

19  evidence solely because of the opinions of your fellow jurors

20  or just so there can be a unanimous verdict.

21    The 12 of you should give fair and equal consideration

22  to all the evidence.  You should deliberate with the goal of

23  reaching an agreement that is consistent with the individual

24  judgment of each juror.

25    You are the impartial judges of the facts.  Your sole

1   interest is to determine whether the government has proved its

2   case beyond a reasonable doubt.

3            Please swear the court security officer.

4            THE CLERK:  Can you raise your right hand, please.

5        (Court security officer duly sworn.)

6            COURT SECURITY OFFICER:  I do.

7            THE COURT:  All right.  And, Ms. Dillon, please raise

8   your right hand.

9            I'm going to -- you are going to be allowed to be

10  present during jury deliberations solely for the purpose of

11  aiding communications between Ms. Krueger and the other jurors.

12           Ms. Dillon is not a juror and therefore cannot offer

13  opinions or recollections concerning testimony, evidence, or

14  trial proceedings, and no one should ask Ms. Dillon for

15  recollections or opinions concerning any aspect of the trial.

16           Do you promise to follow those directions?

17           MS. DILLON:  I do.

18           THE COURT:  All right.  The -- Ms. Krueger's iPad

19  will not have any testimony on it from the trial.  And

20  Ms. Dillon, as I've just said, is not to be a participant in

21  your deliberations.  She's merely there to assist Ms. Krueger

22  in hearing and transcribing questions and conversations among

23  the jurors themselves.  That is her sole purpose to be back in

24  the jury room.

25           Secondly, you will have a computer in the jury room to

1    allow you to hear -- and there will be directions, I believe,

2    but at least there will be a computer that should be -- someone

3    of the 12 should know how to work it, and, if not, send a note

4    out and we'll make sure you get directions.  That'll have --

5    where you'll have the ability to play any tapes that were

6    played in court, English-speaking tapes, and any videos that

7    you'd want to -- that -- if you choose to listen to them or

8    watch them.

9            The transcription binders of the transcripts,

10   you're -- you should take those back to the jury room.  You can

11   use those during your deliberations.

12           All other evidence that was introduced will be brought

13   back to you shortly, and you can use it and review it for your

14   deliberations.

15           You'll also get a copy of the indictment.  That will

16   be given back to you.

17           Finally, you'll get a verdict form, which I'm going to

18   give to the court security officer.  And he can take that and

19   hand it to one of the jurors so that it can be used during

20   deliberations.

21           Timing.  You can leave at 4:30 if it's your choice.

22   You can -- you can stay until 5:00, but that's about the limit

23   of how late you can stay today if you haven't reached a

24   verdict.

25           If you haven't, you'll come in tomorrow, continue your

1 deliberations. I'd like you in by 9:00 unless that creates an

2 impossible problem. And if there is, let the court security

3 officer know, and we'll start a little bit later. But -- and

4 you're free to start earlier if you all collectively agree that

5 starting earlier is something you want to do.

6 If you are still deliberating, lunch will again be --

7 you'll again go down as a group to the second floor. Court

8 security officer will buy you lunch. And you can eat lunch in

9 the jury room, and you can continue to deliberate while you're

10 eating lunch.

11 All right. I believe that is all of the instructions

12 I wanted to give you. With that, I'm going to ask you to go

13 back to the jury room. And I'd ask Mr. Rodriguez and

14 Mr. Munier to remain in the courtroom.

15 COURT SECURITY OFFICER: All rise.

16 (Jury out at 2:46 p.m.)

17 THE COURT: Please be seated.

18 Mr. Rodriguez and Mr. Munier, you were the 13th and

19 14th jurors selected. A criminal jury involves 12 people. We

20 have alternates in case some jurors are -- have to be excused

21 because of illness or other types of problems.

22 So I'm going to discharge you at this time. You won't

23 be deliberating on this case. But I'm going to ask you not to

24 discuss the case with anyone and keep the same instructions

25 I've had with you before because if one of the 12 jurors cannot

1   deliberate and reach a verdict for some reason, illness or some

2   other event, you'll be receiving a call from my courtroom

3   deputy to come back in, and you will join the jury to begin

4   deliberations anew.

5           If you receive no such call, you're free to call my

6   courtroom deputy, and she'll tell you what the verdict was and

7   how it was reached.

8           But please don't discuss the case with anyone until

9   you learn that there has been a verdict or you're called back

10  to discuss the case fully with the jury that's already going to

11  be deliberating.

12          I want to thank you for your service.  You paid close

13  attention to the case.  It's frustrating, I'm sure, to sit

14  through all this evidence and not have the ability to

15  deliberate.  But it is the way criminal cases are run because

16  we -- if we didn't have -- if we just went with 12 jurors and

17  one of them got sick, we'd have to start the case all over

18  again.  And so I hope you understand the reason for the need

19  for alternate jurors.

20          You're free to go back to the jury room to gather your

21  belongings.  I'm going to ask you to stop at my courtroom

22  deputy's office on your way out to give her contact information

23  so she can reach you.  And, if need be, you can reach out to

24  her about a verdict if one is reached.

25          And, again, I want to thank you for your service.

1        And please don't discuss anything other than you've

2    been discharged as an alternate juror when you go back to the

3    others.  Thank you.

4        And you can give your materials to -- give them to the

5    court security officer.

6        (Alternate jurors exit the courtroom.)

7        THE COURT:  All right.  Were the instructions to

8    the -- to Ms. Dillon adequate, or does anyone wish further

9    instructions in front of the jury?

10        MR. FRANZBLAU:  The government's position, they were

11    adequate.

12        THE COURT:  Defense?

13        MS. STEVENS:  Defense position, they were adequate.

14        THE COURT:  All right.  Anything else then we need to

15    discuss?

16        I'm going to stay on the record until I have a --

17    something from the defense that they have reviewed all of the

18    exhibits going back to the jury room and --

19        MS. STEVENS:  I have reviewed the exhibits that are in

20    the cart going back to the jury room.  They are all the

21    exhibits that were put into evidence.  I believe Mr. Schwartz

22    reviewed the computer to make sure it wasn't -- I don't know --

23    connected to the Internet or anything else.

24        THE COURT:  All right.  And how about the indictment?

25    Have you reviewed a copy -- redacted form of the indictment?

1        MR. SEIDEN:  Yes.

2        THE COURT:  All right.  And is that in the cart?

3        MR. ROTHBLATT:  It is, Judge.

4        MS. STEVENS:  It is.

5        MR. FRANZBLAU:  Yes.

6        THE COURT:  All right.  And there's no objection to

7    the redacted form, correct?

8        MS. STEVENS:  Glenn?

9        MR. SEIDEN:  No, your Honor.

10        THE COURT:  Okay.  All right.  Anything else then we

11    need to discuss while we're on the record?

12        MR. FRANZBLAU:  Nothing from the government.

13        THE COURT:  Well, I will ask this.  When a verdict

14    comes in, whether it's today, tomorrow, Friday, whatever it is,

15    I typically go back after the verdict has been -- I always poll

16    a jury.  They'll be polled.  You don't have to ask for it.  I

17    will --

18        MR. SEIDEN:  We don't have to ask?  Okay.

19        THE COURT:  I typically go back and thank the jurors

20    for their service.  And then if the lawyers agree on the record

21    they won't be -- use anything they learn in discussions with

22    the jury to impeach the verdict, I allow lawyers to go back

23    after I'm done talking to them to speak to the jury.

24        MR. SEIDEN:  Impeachment?

25        THE COURT:  Yeah.  Yeah.  If you waive it on the

1  record, I'll let -- and you don't have to make that decision

2  now.  We can wait till the verdict comes in.  But lawyers often

3  find it helpful to talk to jurors after to see whatever the

4  jurors want to talk about.

5       They don't have to talk about deliberations.  They can

6  talk about evidence.  They can talk about style.  They can talk

7  about whatever they want, or they can choose not to.  But I

8  give the jurors the option, and many lawyers find it to be a

9  useful exercise to learn, you know, what jurors think about the

10  case and their performance.

11       Think about it.  And if one party doesn't want to

12  agree to it, they don't have to go back.  I'll let either party

13  that agrees go back if they want to.  If neither side wants to

14  go back, then you won't.

15       But this one -- I allow attorneys that opportunity

16  because when I was a lawyer, I wish I could have talked to

17  jurors after a verdict.  So I figured I get to do that now.  So

18  give it some thought.

19       But I'm going to ask the parties at the time of the

20  verdict -- right after the verdict what their position is, and

21  you can think about that.

22       I don't allow parties to go back.  I don't allow the

23  case agent.  I don't allow the defendant.  It's too personal.

24  So I let lawyers only go back.

25       Okay.  Anything else we need to put on the record?

1            MR. FRANZBLAU:  Nothing from the government.

2            MR. SEIDEN:  Nothing, your Honor.

3            THE COURT:  Okay.  Off the record.

4      (Off-the-record discussion.)

5      (Concluded at 2:51 p.m.)

6                C E R T I F I C A T E

7      I certify that the foregoing is a correct transcript of the

8  record of proceedings in the above-entitled matter.

9

10  */s/ LAURA R. RENKE*                    *May 22, 2020*
    LAURA R. RENKE, CSR, RDR, CRR

11  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25