**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **18 cr 781** |
| **v.** | ) | |
| | ) | **Honorable Thomas M. Durkin** |
| **XIANBING GAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT GAN'S COMBINED RULE 29 AND 33 MOTION**

Glenn Seiden
Brooke L. Stevens
Aaron Schwartz
SEIDEN LAW GROUP, P.C.
333 South Wabash Avenue, Suite 2700
Chicago, Illinois 60604
312.236.3060
gseiden@seidengroup.law
bstevens@seidengroup.law
aschwartz@seidengroup.law

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................i

TABLE OF AUTHORITIES................................................................................................. iii

PRELIMINARY STATEMENT .........................................................................................1

FACTUAL BACKGROUND................................................................................................3

LEGAL STANDARD .........................................................................................................4

ARGUMENT.......................................................................................................................4

    I.   The Convictions Rest Upon Conduct That Does Not Apply Extraterritorially; Jurisdiction Is Not Proper in The United States. ...............................................................5

        A.   Gan's Conduct Falls Outside of the Explicit Limits of the MLCA. ........................8

        B.   The MLCA Does Not Apply to Gan's Wholly Extraterritorial Conduct..................8

        C.   Aiding and Abetting Cannot Be Used to Enlarge the MLCA's Clearly Delaminated Extraterritorial Reach. ........................................................................10

    II.   The Convictions on Counts II-V Violate Gan's Due Process Rights. ...........................12

        A.   The Convictions Violate Gan's Due Process Rights under International Law........14

            i.   Gan's Extraterritorial Conduct Had No Substantial Effect on the United States and Did Not Impact the Security of the United States or Any Other Interest. ............................................................................................16

            ii.   Gan's Convictions Are Unreasonable...............................................................22

        B.   No Substantial Nexus Exists Between Gan's Conduct and the United States.........23

    III.   The Aiding and Abetting Charges Fail as a Matter of Law Because No Underlying Crime Was Committed. .................................................................................23

    IV.   The Jury Instructions as to Aiding and Abetting Were Faulty and Require Dismissal or a New Trial.................................................................................................25

    V.   The Substantive Money Laundering Charges Fail as a Matter of Law..........................26

        A.   None of the Superseding Indictment's Alleged "Financial Transactions" Were Designed to Conceal the Specified Attributes Under the MLCA. .................26

            i.   The Particular Charged Transactions Were a Mere Receipt of Currency. .......27

       ii.   The "Money Pickups" Were Not Designed to Conceal the Specified Attributes Under the MLCA. .............................................................28

VI.  The Government Failed to Prove Lack of Entrapment Beyond a Reasonable Doubt. ...................................................................................................31

     A.   The Government Induced Gan into Carrying Out the Conduct at Issue and Used Pleas of Friendship in Order to Do So. .............................................31

     B.   Gan Was Not Predisposed to Commit Any Criminal Acts. ......................34

        i.   Gan Was Neither Situationally Capable Nor Ready and Willing to Engage in Charged Conduct Absent Government Action and Solicitation. ......................................................................................35

        ii.   The Government Initially Suggested the Criminal Activity. ..........................36

        iii.  While Gan Engaged in the Conduct for Profit, He Only Did So After He Was Overcome By Government Persuasion. ......................................37

        iv.  Gan Was Reluctant to Engage in the Alleged Criminal Conduct and the Government Repeatedly Steered Him to Transactions Involving "Black Money" While Gan Repeatedly Suggested "White Money." ..........................37

        v.   The Nature of the Government Inducement Significantly Lowers the Bar of Predisposition. ....................................................................37

VII. Gan Was Not Required to Be Licensed Under Illinois Law as a Money Transmitter, An Essential Element of 18 U.S.C. § 1960, as Charged in Count V ..........38

CONCLUSION ...............................................................................................40

CERTIFICATE OF SERVICE ..............................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Abelesz v. OTP Bank*,
  692 F.3d 638 (7th Cir. 2012) ............................................................. 19

*Ajoku v. United States*,
  134 S. Ct. 1872 (2014).................................................................... 25

*Benz v. Compania Naviera Hidalgo, S.A.*,
  353 U.S. 138 (1957) ............................................................... 2, 3, 5

*Cedeno v. Intech Grp., Inc.*,
  733 F. Supp. 2d 471 (S.D.N.Y. 2010)................................................... 7

*Cuellar v. United States*,
  553 U.S. 550 (2008)................................................................ Passim

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991) ............................................................... 2, 3, 5

*Europe & Overseas Commodity Traders, SA v. Banque Paribas London*,
  147 F.3d 118 (2d Cir. 1988)............................................................ 23

*F. Hoffmann-La-Roche Ltd. v. Empagran*,
  542 U.S. 155 (2004)................................................................. 2, 14

*Foley Bros., Inc. v. Filardo*,
  336 U.S. 281 (1949)................................................................... 5

*Gebardi*,
  287 U.S. ....................................................................... 10, 11

*Giaccio v. Pennsylvania*,
  382 U.S. 399 (1966)................................................................. 12

*In re Hijazi*,
  589 F.3d 401 (7th Cir. 2009) ................................................... Passim

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)................................................................. 13

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011)................................................................. 13

*Kash v. U.S.*,
    112 Fed. Appx. 518 (7th Cir. 2004) ........................................................................ 24

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) .............................................................................................. 2, 5, 8

*Matter of Warrant to Search Certain E-Mail Account Controlled and Maintained by Microsoft*
    *Corp.*,
    829 F.3d 197 (2d Cir. 2016) ...................................................................................... 2

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007) ................................................................................................ 2, 5

*Morrison v. Nat'l Australia Bank, Ltd.*,
    561 U.S. 247 (2010) ........................................................................................ 5, 7, 8, 9

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016) ............................................................................................ 8, 9

*Russell v. United States*,
    134 S. Ct. 1872 (2014) ............................................................................................. 25

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ................................................................................................ 3, 5

*Sherman v. United States*,
    356 U.S. 369 (1958) ................................................................................................. 33

*Small v. United States*,
    544 U.S. 385 (2005) ................................................................................................... 3

*Smith v. United States*,
    507 U.S. 197 (1993) ................................................................................................... 5

*United States. v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ......................................................................................... 9

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2014) ..................................................................................... 18

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013) ................................................................................. 12

*United States v. Amen*,
    831 F.2d 373 (2d Cir. 1987) ..................................................................................... 11

iv

*United States v. Approx. $25,829,681.80 in Funds*, No.,
  1999 WL 1080370 (S.D.N.Y. Nov. 30, 1999) ........................................................... 6

*United States v. Belzer*,
  743 F.2d 1213 (7th Cir. 1984) ................................................................................ 34

*United States v. Blitch*,
  773 F.3d 837 (7th Cir. 2014), *as amended on denial of reh'g and reh'g en banc* .................... 31

*United States v. Bodmer*,
  342 F. Supp. 2d 176 (S.D.N.Y. 2004) ..................................................................... 11

*United States v. Brehm*,
  691 F.3d 547 (4th Cir. 2012) ................................................................................. 18

*United States v. Budovsky*,
  2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) ........................................................ 19

*United States v. Cabrales*,
  524 U.S. 1 (1998) ................................................................................................ 27

*United States v. Cardales*,
  168 F.3d 548 (1st Cir. 1999) ................................................................................. 13

*United States v. Castle*,
  925 F.2d 831 (5th Cir. 1991) ................................................................................. 10

*United States v. Columbo-Colella*,
  604 F.2d 356 (5th Cir. 1979) .......................................................................... 15, 20

*United States v. Conley*,
  826 F.Supp. 1536 (W.D.Pa.1993) ........................................................................ 27

*United States v. Davis*,
  905 F.2d 245 (9th Cir. 1990) .......................................................................... 13, 18

*United States v. Dimeck*,
  24 F.3d 1239 (10th Cir. 1994) .............................................................................. 30

*United States v. Dimitrov*,
  546 F.3d 409 (7th Cir. 2008) ................................................................................. 39

*United States v. Dixon*,
  658 F.2d 181 ...................................................................................................... 24

*United States v. Doig,*
    950 F.2d 411 (7th Cir. 1991) ................................................................ 11

*United States v. Doughty,*
    460 F.2d 1360 (7th Cir. 1972) ............................................................. 24

*United States v. Esterman,*
    324 F.3d 565 (7th Cir. 2003) .......................................................... 27, 30

*United States v. Evans,*
    924 F.2d 714 (7th Cir. 1991) ............................................................... 31

*United States v. Firtash,*
    392 F. Supp. 3d 872 (N.D. Ill. 2019) ............................................ 7, 9, 21

*United States v. Freed,*
    921 F.3d 716 (7th Cir. 2019) ......................................................... 24, 25

*United States v. Garcia Sota,*
    948 F.3d 356 (D.C. Cir. 2020) ............................................................ 12

*United States v. Garcia,*
    533 F. App'x 967 (11th Cir. 2013) ........................................................ 6

*United States v. Garcia-Emanuel,*
    14 F.3d 1469 (10th Cir. 1994) ....................................................... 27, 31

*United States v. Hall,*
    608 F.3d 340 (7th Cir. 2010) ............................................................... 34

*United States v. Hayes,*
    12 MJ 3229, 2015 WL 1740830 (S.D.N.Y. Mar. 20. 2015) ................... 13

*United States v. Hijazi,*
    845 F. Supp. 2d 874 (C.D. Ill. 2011) .......................................... 14, 15, 18

*United States v. Hill,*
    279 F.3d 731 (9th Cir. 2002) ............................................................... 12

*United States v. Hollingsworth,*
    27 F.3d 1196 (7th Cir. 1994) ......................................................... 34, 36

*United States v. Hoskins,*
    902 F.3d 69 (2d Cir. 2018) .......................................................... Passim

*United States v. Huezo,*
   546 F.3d 174, 2008 WL 4553150 (2d Cir. Oct.14, 2008).........................................27

*United States v. Javino,*
   960 F.2d 1137 (2d Cir. 1992)..................................................................................23

*United States v. Kashamu,*
   15 F. Supp. 3d 854 (N.D. Ill. 2014) ........................................................................15

*United States v. Kramer,*
   73 F.3d 1067 (11th Cir. 1996) .................................................................................27

*United States v. Li,*
   856 F. Supp. 421 (N.D. Ill. 1994) ...........................................................................27

*United States v. Lloyds TBS Bank PLC,*
   639 F. Supp. 2d 314 (S.D.N.Y. 2009)................................................................21, 23

*United States v. Lopeztegui,*
   230 F.3d 1000 (7th Cir. 2000) .............................................................................34, 36

*United States v. Lovett,*
   964 F.2d 1029 (10th Cir.1992) ................................................................................31

*United States v. Majors,*
   196 F.3d 1206 (11th Cir. 1999) ...............................................................................30

*United States v. Marquardt,*
   786 F.2d 771 (7th Cir. 1986) .....................................................................................4

*United States v. Martinez-Hidalgo,*
   993 F.2d 1052 (3d Cir. 1993)...................................................................................13

*United States v. Mayfield,*
   771 F.3d 417 (7th Cir. 2014) .............................................................................Passim

*United States v. McGill,*
   754 F.3d 452 (7th Cir. 2014) ..............................................................................32, 33

*United States v. Mostafa,*
   965 F. Supp. 2d 451 (S.D.N.Y. 2013)......................................................................18

*United States v. Motley,*
   940 F.2d 1079 (7th Cir. 1991) .................................................................................24

*United States v. Murphy*,
  768 F.2d 1518 (7th Cir. 1985) ............................................................... 24

*United States v. Ness*,
  565 F.3d 73 (2d Cir. 2009).................................................................... 30

*United States v. Nippon Paper Indus. Co.*,
  109 F.3d 1 (1st Cir. 1997)..................................................................... 14

*United States v. Noriega*,
  683 F. Supp. 1373 (S.D. Fl. 1988) ....................................................... 13

*United States v. Perlaza*,
  439 F.3d 1149 (9th Cir. 2006) .............................................................. 20

*United States v. Peterson*,
  812 F.2d 486 (9th Cir. 1987) ................................................................ 18

*United States v. Pillado*,
  656 F.3d 754 (7th Cir. 2011) ........................................................... 32, 35

*United States v. Pino-Perez*,
  870 F.2d 1230 (7th Cir. 1989) .............................................................. 10

*United States v. Prescott*,
  42 F.3d 1165 (8th Cir.1994) ................................................................. 27

*United States v. Reed*,
  875 F.2d 107 (7th Cir. 1989) .................................................................. 4

*United States v. Rezko*,
  2008 WL 4890232 (N.D. Ill. Nov. 12, 2008) .................................... 27, 28

*United States v. Roberts*,
  650 F. Supp. 2d 219 (E.D.N.Y. 2009) .................................................. 30

*United States v. Sidorenko*,
  102 F. Supp. 3d 1124 (N.D. Cal. 2015) ........................................... 17, 20

*United States v. Stallworth*,
  656 F.3d 721 (7th Cir. 2011) ................................................................ 34

*United States v. Stein*, Crim. A.,
  1994 WL 285020 (E.D. La. June 23, 1994)......................................... 5, 7

*United States v. Stewart,*
    902 F.3d 664 (7th Cir. 2018) .................................................................. 29

*United States v. Thayer,*
    204 F.3d 1352 (11th Cir.2000) .............................................................. 30

*United States v. Vega,* CRIM. 10-0226-WS,
    2011 WL 3757883 (S.D. Ala. Aug. 25, 2011) ................................... 7, 25

*United States v. Velastegui,*
    199 F.3d 590 (2d Cir. 1999) ................................................................. 38

*United States v. Willey,*
    57 F.3d 1374 (5th Cir.1995) ................................................................. 30

*United States v. Yakou,*
    428 F.3d 241 (D.C. Cir. 2005) .............................................................. 11

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ............................................................. 13, 18

**Statutes**

18 U.S.C. § 2 ........................................................................... 10, 11, 24, 25

18 U.S.C. § 371 ................................................................................... 10

18 U.S.C. § 1035 ................................................................................ 25

18 U.S.C. § 1956 .................................................................................. 6

18 U.S.C. § 1956(a) ...................................................................... 3, 4, 26

18 U.S.C. § 1956(f) ..................................................................... 5, 6, 7, 8

18 U.S.C. § 1956(h) .............................................................................. 3

18 U.S.C. § 1960(a) ................................................................... 2, 4, 38, 39

29 U.S.C. § 666 ................................................................................... 11

205 ILCS 657/90(h) .......................................................................... 4, 38

§ 1960(b) .......................................................................................... 38

**Rules**

Fed. R. Crim. P. 12(b)(1) ................................................................................. 3

Fed. R. Crim. P. 29(c) ................................................................................... 1, 4

Fed. R. Crim. P. 33 ....................................................................................... 1, 4

**Other Authorities**

Restatement (Third) of Foreign Relations Law, § 403(2) ................................ 16, 14, 15, 22

S. Rep. No. 99–433 at 14 ............................................................................... 10, 21, 27

## PRELIMINARY STATEMENT

Defendant, XIANBING GAN ("Gan"), moves this Honorable Court for the entry of an Order granting him a judgment of acquittal pursuant to FED. R. CRIM. P. 29(c) or, alternatively, for a new trial pursuant to FED. R. CRIM. P. 33.

Gan moves to dismiss his convictions on Counts II-V of the Superseding Indictment. The Superseding Indictment and the evidence presented at trial do not support jurisdiction in the United States and therefore Counts II-V must be dismissed as an improper exercise of extraterritorial jurisdiction. Gan is a Chinese national who, at all relevant times, resided in Mexico. He is not now, and has never been, a citizen or resident of the United States. During the relevant time period, Defendant did not even set foot into the United States. He was arrested in the instant matter during a layover at the airport in Los Angeles, California, while travelling from Mexico to China. Counts II through V fail to allege a single illicit act by Gan that either occurred in the United States or affected the United States.

Gan was acquitted by a jury on Count I of the Indictment for Conspiracy. The alleged and acquitted conspiratorial conduct in Count I was the glue binding this case together. Without that conspiratorial conduct, the remaining counts of the Superseding Indictment fail as a matter of law. First, the charges against Gan are based upon extraterritorial conduct falling outside the reach of the U.S. laws for which he is charged. Second, the convictions are a violation of Gan's due process rights because the United States has no legitimate interest in prosecuting the charged conduct. Third, the aiding and abetting charges fail as a matter of law because there was no underlying criminal conduct. Fourth, the jury instructions as to aiding and abetting were Constitutionally defective. Fifth, the evidence presented at trial fails to show that the purpose of the alleged financial transactions was to "conceal or disguise" the nature, location, source, ownership, or control of the

1

proceeds, as set forth in *Cuellar v. United States*, 553 U.S. 550 (2008). Sixth, no reasonable juror could have found that the Government proved lack of entrapment beyond a reasonable doubt. Seventh, Gan was not required to be licensed as a money transmitter for purposes of culpability under 18 U.S.C. § 1960(a).

The Supreme Court and the Seventh Circuit, as well as other Circuit Courts, have cautioned against the scenario presented to this Court—prosecutions of foreign citizens raising important and delicate issues. In *F. Hoffmann-La-Roche Ltd. v. Empagran*, 542 U.S. 155, 164-165 (2004), the Supreme Court stated as follows:

> [T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations. (citations omitted). This rule of construction reflects principles of customary international law – law that [we must assume] Congress ordinarily seeks to follow. (citations omitted). This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potential conflicting laws of different nations work together in harmony – a harmony particularly needed in today's highly interdependent commercial world.

Similarly, the Supreme Court stated that the presumption against extraterritorial application of United States law reflected the "presumption that United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007). Likewise, in *EEOC v. Arabian Am. Oil Co*., 499 U.S. 244 (1991), the Supreme Court held that the presumption against extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *See also Kiobel v. Royal Dutch Petroleum Co*., 569 U.S. 108, 115-6 (2013) (citing *Benz v. Compania Naviera Hidalgo, S.A*., 353 U.S. 138, 147 (1957) ("The presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches.")); *Matter*

*of Warrant to Search Certain E-Mail Account Controlled and Maintained by Microsoft Corp.*, 829 F.3d 197 (2d Cir. 2016) (applying presumption against extraterritorial application of U.S. law to hold that the Stored Communication Act ("SCA") does not authorize a U.S. Court to enforce a SCA warrant against a U.S. service provider for customer communications located outside the U.S.). The Seventh Circuit, in *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009), observed that multiple Supreme Court decisions stood for the (rebuttable) presumption against United States laws with extraterritorial effect. *Id.* at 409, citing *Small v. United States*, 544 U.S. 385 (2005); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993); *Arabian Am. Oil*, 499 U.S. 244; *Benz*, 353 U.S. 138.

This Court should be concerned with the Government's extension of extraterritorial application of United States laws in this case, and the potential impingement upon the sovereign rights of other nations. The convictions lack the required nexus, either geographically or from the perspective of a cognizable United States interest, to the charged conduct. This Court should dismiss all remaining counts.

## FACTUAL BACKGROUND

On November 15, 2018, Gan was charged by Indictment with conspiracy to conduct and knowingly conducting a financial transaction involving the proceeds of unlawful activity under The Money Laundering and Control Act ("MLCA"). (ECF #1). On May 24, 2019, Gan filed a Notice of Entrapment Defense pursuant to FED. R. CRIM. P. 12(b)(1). (ECF #49).

Shortly thereafter, on June 26, 2019, the Government filed a Superseding Indictment, charging Gan with one count of knowingly conspiring to conduct a financial transaction involving the proceeds of unlawful activity and transporting, transmitting, and transferring a monetary instrument and funds involving the proceeds of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1956(a)(2)(B)(i), all in violation of 18 U.S.C. § 1956(h) (Count

I), three counts of knowingly conducting a financial transaction involving the proceeds of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 2 (Counts II through IV), and one count of operating a money transmitting business without a license in violation of 205 ILCS 657/90(h) and 18 U.S.C. §§ 1960(a) and 2. (ECF #53).

On or about October 14, 2019, Gan filed a Motion to Dismiss the Superseding Indictment on grounds that the prosecution did not comport with extraterritorial jurisdiction, which motion was denied. (ECF #77, 79, 83). On or about February 27, 2020, Defendant was acquitted by a jury of Count I of the Superseding Indictment, and was found guilty on Counts II-V. (ECF # 117, 119).

## LEGAL STANDARD

When reviewing a motion for judgment of acquittal pursuant to FED. R. CRIM. P. 29(c), the Seventh Circuit mandates that the court determine:

> Whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendants] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government … bearing in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences (internal quotations omitted).

> *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989), *quoting United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir. 1986).

In short, the Court views evidence in a light favorable to the Government and cannot second-guess the jury's credibility determinations or findings of fact. Instead, the Court assesses the record to determine if all the admissible evidence supports the defendant's adjudication of guilt beyond a reasonable doubt. *Id*. Motions for a new trial under FED. R. CRIM. P. 33 are granted where the defendant demonstrates that the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Reed*, 875 F.2d at 113.

## ARGUMENT

I.      **The Convictions Rest Upon Conduct That Does Not Apply Extraterritorially; Jurisdiction Is Not Proper in The United States.**

Counts II-V establish no legal or factual basis for prosecuting Gan in the United States. While "United States law governs domestically, [it] does not rule the world." *Microsoft v. AT&T*, 550 U.S. at 454. This premise leads to the presumption against extraterritoriality, a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank, Ltd.* 561 U.S. 247 (2010) (citing *Arabian Am. Oil*, 499 U.S. at 248); *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 284-285 (1949). This presumption exists to avoid international discord resulting when United States law is applied to conduct in foreign countries, *Kiobel*, 569 U.S. 108; *Arabian Am. Oil*, 499 U.S. 244; *Benz*, 353 U.S. 138, and "applies regardless of whether there is a risk of conflict between the American statute and a foreign law," *Morrison*, 561 U.S. at 255 (citing *Sale*, 509 U.S. at 173-174, reflecting the notion that "Congress generally legislates with domestic concerns in mind." *Smith v. United States*, 507 U.S. 197 (1993).

The MLCA explicitly addresses the question of extraterritoriality, stating in relevant part that a money laundering prosecution is appropriate if, "the [prohibited] conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States." 18 U.S.C. § 1956(f)(1). Gan is not a United States citizen, and he did not engage in conduct occurring, even in part, in the United States. As such, the MLCA does not apply extraterritorially.[1]

Courts finding extraterritorial jurisdiction under 18 U.S.C. § 1956(f)(1) have done so where the transfer of funds was initiated by the defendant within the United States. *United States v. Stein*, Crim. A. No. 93-375, 1994 WL 285020, at *5 (E.D. La. June 23, 1994) (defendant, not

---

[1] Gan's counsel has been unable to locate any case where jurisdiction under 18 U.S.C. § 1956(f)(1) was premised on similar conduct, i.e. Government agents physically receiving money within the United States, while the Defendant is located abroad.

Government agents, initiated a transfer from within the United States to a place outside the United States); *United States v. Garcia*, 533 F. App'x 967, 982 (11th Cir. 2013) (defendant was a part of a conspiracy and funds were transferred by co-conspirators within the United States); *United States v. Approx. $25,829,681.80 in Funds*, No. 98 Civ. 2682, 1999 WL 1080370 (S.D.N.Y. Nov. 30, 1999) (defendant initiated a funds transfer from within the United States, thus, "the parties initiating the fund transfers 'acted electronically' within the United States, and such action is sufficient to constitute 'conduct' for purposes of 18 U.S.C. § 1956").

Here, testimony confirms that Gan did not initiate or receive any transfer in the United States. (Tr. 276-278, 324, 1055-56, 1073, 1077-78, 1321)[2]. Indeed, the charged conduct is the *receipt* of funds by Government agents. (Tr. 278) (ECF #53, pp. 5-7). Finding jurisdiction here when Gan was acquitted of the conspiracy charge would extend 18 U.S.C. § 1956(f)(1) jurisprudence far beyond its previous use in any reported case. In essence, such an extension would allow Government agents to merely receive proceeds in the United States, and attach conduct occurring wholly abroad, over a foreign citizen never setting foot on U.S. soil. The United States would then be able claim jurisdiction over any such case no matter how attenuated (or, in this case, nonexistent) the connection to U.S. contacts. That is not the law, and to change that would be an overreach of significant proportions.

In *Cedeno*, the Court held that the mere use of U.S. bank accounts was insufficient to create U.S. jurisdiction over money laundering charges.

> Plaintiffs attempt to sidestep *Morrison* by arguing that their complaint alleges predicate acts of money laundering that involved transfers into and out of this District by U.S. banks. But as the Court noted in *Morrison*, "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States and the presumption against extraterritoriality "would be a craven

---

[2] Throughout this brief, the jury trial transcripts are referred to and cited as Tr. with the transcript page number.

watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case."

*Cedeno v. Intech Grp., Inc*., 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010), quoting *Morrison*, 561 U.S. at 266.

Gan did not physically receive money originating in the United States nor did he physically transfer money in and out of United States bank accounts. *United States v. Hoskins*, 902 F.3d 69, 93 (2d Cir. 2018) (construing conduct occurring "in part" in the United States to mean "*when the foreign national takes some act in furtherance…within the territory of the United States*") (emphasis added). Section 1956(f) does not apply to actions of non-U.S. citizens wholly outside the United States. *Stein*, 1994 WL 285020 at *5 (quoting S. Rep. No. 99-433, at 14). Only where "money was transferred into the United States to reimburse a co-conspirator operating within U.S. territory, and …'other transfers were destined for the benefit of third parties located within the United States'" has it been found to apply. *United States v. Firtash*, 392 F. Supp. 3d 872, 887 (N.D. Ill. 2019). Here, there are no co-conspirators tying Gan's conduct to within the United States.

As demonstrated more thoroughly *infra*, the conduct by Government agents receiving proceeds cannot, as a matter of law, be attributable to Gan—a concession made by the Government in the Southern District of Alabama in a similar case. *United States v. Vega*, CRIM. 10-0226-WS, 2011 WL 3757883, at *2 (S.D. Ala. Aug. 25, 2011) ("the government concedes that the defendant 'may not be accountable for participating in a substantive offense' [as an aider or abettor] or conspiring to commit an offense with an undercover agent"). But that is precisely what the facts of this case are. Indeed, the Government's case has crumbled absent conspiratorial conduct in the United States as alleged, and acquitted, in Count I.

No reported United States case has extended the bounds of money laundering jurisdiction to find that Government agents receiving proceeds in the United States is sufficient to obtain

jurisdiction over a defendant acting wholly extraterritorially in a foreign jurisdiction. This Court should not extend money laundering jurisdiction in this manner and should reject the substantive money laundering counts as purely extraterritorial acts.

### A. Gan's Conduct Falls Outside of the Explicit Limits of the MLCA.

There is no doubt that Congress intended for the MLCA to apply extraterritorially. *See* 18 U.S.C. § 1956(f) ("[t]here is extraterritorial jurisdiction over the conduct prohibited by this section if…in the case of a non-United States citizen, the conduct occurs in part in the United States"). However, given the obvious jurisdictional implications of the MLCA's focus, Congress carefully crafted and limited, with precision, the individuals who are subject to the statute's prohibitions. *See Hoskins*, 902 F.3d at 83–84 (holding that the "carefully tailored text of the [Foreign Corrupt Practices Act ("FCPA")] statute, read against the backdrop of a well-established principle that U.S. law does not apply extraterritorially without express congressional authorization and a legislative history reflecting that Congress drew lines in the FCPA out of specific concern about the scope of extraterritorial application of the statute and that "Congress did not intend for persons outside of the statute's carefully delimited categories to be subject to conspiracy or complicity liability"). Gan's conduct falls outside these clearly delimited categories.

### B. The MLCA Does Not Apply to Gan's Wholly Extraterritorial Conduct.

The "presumption against extraterritoriality" reflects "the presumption that United States law governs domestically, but does not rule the world." *Kiobel*, 569 U.S. at 115 (internal quotation marks omitted). This presumption against extraterritoriality extends to criminal statutes. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016). Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255 ("legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.").

However, when a statute clearly indicates an extraterritorial intent with respect to a certain class of actors, then the presumption against extraterritoriality must operate to prevent extraterritorial application with respect to other classes of actors. *See Id.* at 265 ("[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."); *RJR Nabisco, Inc*., 136 S. Ct. at 2100 (the presumption also reflects that "Congress generally legislates with domestic concerns in mind."); *Firtash*, 392 F. Supp. 3d at 883 ("the government may only charge extraterritorial conduct that falls within the purview of a statute").

The MLCA unequivocally only criminalizes conduct by foreign citizens "[occuring] in part in the United States." Given Congress's clear intent with respect to the conduct of foreign citizens, the presumption against extraterritoriality bars Gan's conviction for conduct occurring wholly outside of the United States. *Hoskins*, 902 F.3d at 92–93 (finding that under the FCPA, Congress legislated that an offense committed "in part," be some act in furtherance of the scheme that takes place *within the territory of the United States*) (emphasis added).

As the Second Circuit held, once a court determines that the presumption against extraterritoriality applies "the only question we must answer in the individual case is whether the relevant conduct occurred in the territory of a foreign sovereign." *United States. v. Vilar*, 729 F.3d 62, 74 (2d Cir. 2013). The evidence at trial unequivocally omits any inference that Gan engaged in *any* conduct within the United States. Thus, because all of Gan's relevant conduct occurred extraterritorially, the substantive MLCA charges necessarily fail as a matter of law. *RJR Nabisco, Inc*., 136 S. Ct. at 2101 ("[t]he scope of an extraterritorial statute thus turns on the limits Congress has (or has not) imposed on the statute's foreign application, and not on the statute's "focus").

9

### C. Aiding and Abetting Cannot Be Used to Enlarge the MLCA's Clearly Delaminated Extraterritorial Reach.

The flaws in the substantive MLCA counts cannot be cured by the Government's use of aiding and abetting, codified under 18 U.S.C. § 2, to enlarge the MLCA's reach. By limiting the extraterritorial reach of the MLCA, Congress intended to exclude a particular class—foreign nationals acting wholly abroad—from the MLCA's jurisdictional reach. S. Rep. No. 99–433 at 14 (1986); *United States v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989) ("[t]here had to be 'an affirmative legislative policy' to create an exemption from the ordinary rules of accessorial liability").

Because Gan does not fall within the class of natural persons Congress defined for criminal liability under the MLCA, he cannot be liable for the offense in an inchoate form. *Hoskins*, 902 F.3d at 95 (finding that the text and history of the FCPA demonstrated "Congress's affirmative decision to exclude from liability the class of persons considered in this case" and holding "that the government may not override that policy using the conspiracy and complicity rules").

The above principles are well grounded in Supreme Court precedent. In *Gebardi*, the Supreme Court held that when Congress affirmatively chooses to exclude a certain class of individuals from liability under a criminal statute, the government cannot circumvent that intent by alleging conspiracy. *Gebardi*, 287 U.S. at 121–23. This rule has been extended and applied in the FCPA criminal context. *United States v. Castle*, 925 F.2d 831, 835 (5th Cir. 1991) (holding that foreign officials, not themselves subject to the FCPA's criminal penalties, could not be held criminally culpable for conspiracy to violate the FCPA); *Hoskins*, 902 F.3d 69.

The court in *Castle* reasoned that because Congress exempted foreign officials from prosecution under the FCPA, it would be "absurd" to take away that exemption by permitting prosecution for conspiracy under 18 U.S.C. § 371. *Castle*, 925 F.2d at 835.

10

Similarly, the Southern District of New York noted (and the Government conceded) that where the FCPA did not apply to the defendant, a charge for conspiracy to violate the FCPA must be dismissed. *United States v. Bodmer*, 342 F. Supp. 2d 176, 181 & n.6 (S.D.N.Y. 2004) ("where Congress passes a substantive criminal statute that excludes a certain class of individuals from liability, the Government cannot evade Congressional intent by charging those individuals with conspiring to violate the same statute").

The Second Circuit has recently recognized, yet again, that the principle underlying *Gebardi* is equally applicable to aiding and abetting charges under 18 U.S.C. § 2. *Hoskins*, 902 F.3d at 97 ("the territorial limitations of the FCPA preclude liability for" certain persons and the "government may not expand the extraterritorial reach of the FCPA by recourse to the conspiracy and complicity statutes"); *United States v. Amen*, 831 F.2d 373, 381 (2d Cir. 1987) (holding "that it would be contrary to Congress's intent to hold defendants liable for aiding and abetting the violation of a statute that necessarily excluded them from direct culpability").

Counts II-IV should be dismissed under *Gebardi* and *Hoskins*. *See also United States v. Doig*, 950 F.2d 411, 414–15 (7th Cir. 1991) (finding an affirmative legislative policy to exempt secondary liability because Congress had "carefully defined the terms within" 29 U.S.C. § 666 which "distinguished between liability for employers and for broader classes of individuals"). Congress intended to exempt foreign nationals outside of certain designated classes from the MLCA, and evidence at trial lacks any indication that Gan acted "in part" in the United States. Allowing aiding and abetting charges to proceed, where the substantive MLCA charges fail, would contravene Congress's intended legislative exemption. *See Gebardi*, 287 U.S. at 121–23; *Amen*, 831 F.2d at 381; *Doig*, 950 F.2d at 415; *United States v. Yakou*, 428 F.3d 241, 253-54 (D.C. Cir. 2005) (affirming dismissal of charge that foreign person aided and abetted violation of export laws:

11

"Congress and the State Department did not go to such lengths to exclude non-U.S. persons located outside the United States from direct extraterritorial liability…only to permit these same persons to be charged under an aiding-and-abetting statute for the identical conduct that they have determined should not result in their punishment as principals."); *Hoskins*, 902 F.3d at 97 ("the presumption against extraterritoriality bars the government from using the conspiracy and complicity statutes to charge…any offense that is not punishable under the FCPA itself because of the statute's territorial limitations…the government must demonstrate that [the defendant] falls within one of those categories or acted illegally on American soil").

Federal courts routinely find that ancillary offenses, including aiding and abetting, are only deemed to confer extraterritorial jurisdiction to the extent of the offenses underlying them. *See, e.g.*, *United States v. Garcia Sota*, 948 F.3d 356, 361 (D.C. Cir. 2020) (criminal statute with extraterritorial application); *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) ("Generally, the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute"); *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) ("[A]iding and abetting [ ] and conspiracy…have been deemed to confer extraterritorial jurisdiction to the same extent as the offenses that underlie them."); *Hoskins*, 902 F.3d at 97 (if "the territorial limitations of" a statute "preclude liability for such a person"…[t]he government may not expand the extraterritorial reach [of the statute] by recourse to the conspiracy and complicity statutes").

Accordingly, as aligned with Congress's intention, Counts II-IV must be dismissed.

## II.    The Convictions on Counts II-V Violate Gan's Due Process Rights.

Due process protects a defendant's right not to be coerced except by lawful judicial power. *Giaccio v. Pennsylvania*, 382 U.S. 399 (1966). A court may subject a defendant to jurisdiction only when the he has sufficient contacts with the sovereign "such that the maintenance of the suit

does not offend 'traditional notions of fair play and substantial justice.'" *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Federal courts routinely recognize that foreign nationals facing criminal prosecutions have due process rights under the Fifth Amendment. *See, e.g., United States v. Hayes*, No. 12 MJ 3229, 2015 WL 1740830, at *3-4 (S.D.N.Y. Mar. 20. 2015) (finding that a criminal complaint creates a cognizable relationship between a foreign defendant and the court such that the defendant may properly challenge due process violations in that forum); *In re Hijazi*, 589 F.3d 401 (Lebanese citizen living in Kuwait properly raised due process objections to Indictment); *United States v. Noriega*, 683 F. Supp. 1373, 1374-75 (S.D. Fl. 1988) (indicted *de facto* head of a foreign government permitted to file motion attacking indictment based on due process concerns).

While it is established law that foreign defendants have due process protections, circuits are split as to how to evaluate a violation of those rights stemming from an insufficient connection between the defendant and the United States. The Second and Ninth Circuits have held that it is permissible for a defendant to be charged in the United States provided that there is a "sufficient nexus" between the defendant and the United States. *United States v. Yousef*, 327 F.3d 56, 111-12 (2d Cir. 2003), *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990). The First and Third Circuits, on the other hand, look to principles of international law to determine the permissibility of a defendant being charged in the United States. *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993). The Supreme Court has not addressed the issue.

Whether analyzed under the sufficient nexus standard or principles of international law, Gan lacks the required connection to the United States, and as such the charges against Gan violate his due process rights. Because the Seventh Circuit has indicated that it would likely apply

13

international law principles to this question, this section will only analyze due process under international law principles and then briefly discuss the outcome under the substantial nexus test.

### A.      The Convictions Violate Gan's Due Process Rights under International Law.

While the Seventh Circuit has not directly addressed its standard to evaluate whether it is a violation of a foreign national's due process rights to prosecute him for acts occurring outside the United States, it has tangentially addressed the issue. *In re Hijazi*, 589 F.3d at 401. There, the Seventh Circuit directed the district court to take up the defendant's motion to dismiss for lack of jurisdiction and due process violations, where the district court had previously held that the defendant was a fugitive. *Id*. at 406-412. The Seventh Circuit further noted that while it was not ruling on the merits of the motion to dismiss, the outcome was uncertain. In considering whether a defendant's contacts with the United States are adequate to allow a United States prosecution, it asked, "how much is enough?" *Id*. at 411. The court described the standard as follows:

> The Restatement (Third) of Foreign Relations Law, to which the Supreme Court referred with approval in *Hoffman-La Roche*, *see* 542 U.S. at 164-65, 124 S.Ct. 2359, takes the position that "[s]ubject to § 403, a state has jurisdiction to prescribe law with respect to…conduct outside its territory that has or is intended to have a substantial effect within its territory." Restatement (Third) of Foreign Relations § 402 (A.L.I 1987). Section 403 qualifies all of § 402 by stipulating that a state may not exercise prescriptive jurisdiction "when the exercise of such jurisdiction is unreasonable," and it then goes on to specify eight circumstances that might indicate unreasonableness. *Id.* § 403(2). The first of these looks at how strong the link is between the activity and the territory of the regulating state and calls for consideration of "the extent to which the activity takes place within the territory or has substantial, direct, and foreseeable effects upon or in the territory. *Id.* § 403(2)(a). In *United States v. Nippon Paper Indus. Co*., 109 F.3d 1 (1st Cir. 1997), the First Circuit applied those principles to a criminal prosecution.

*Id.* at 412.

On remand, the district court observed that the Seventh Circuit "indicated that this Court should look to principles of international law to determine whether Hijazi's contacts with the United States were sufficient to support his prosecution" and not violate his due process. *United*

*States v. Hijazi*, 845 F. Supp. 2d 874 (C.D. Ill. 2011) (citing *In re Hijazi*, 589 F.3d at 411-412).

The court further noted the Seventh Circuit's citation to Section 402 of the Restatement (Third) of

Foreign Relations Law and found, based on the "language by the Seventh Circuit and the fact that

numerous other courts have applied principles of international law to the determination of whether

due process was satisfied, [that] the appropriate due process analysis [must be] performed under

the rubric of international law." *United States v. Hijazi*, 845 F. Supp. 2d at 883; *see also United*

*States v. Kashamu*, 15 F. Supp. 3d 854, 866-867 (N.D. Ill. 2014).

> Section 402 of the Restatement (Third) of Foreign Relations Law provides as follows:
>
> Subject to § 403, a state has jurisdiction to prescribe law with respect to…(1) (C) conduct outside its territory that has or is intended to have substantial effect within its territory;…and (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests.
>
> Restatement (Third) of Foreign Relations Law, § 402.

These principles have been described, respectively, as the *objective* and *protective*

territorial theories. In cases involving alleged criminal acts performed by a non-resident alien on

foreign soil, "courts in the United States have long held that if jurisdiction is to be extended over

that act, it must be supported by either the Protective or Objective territorial theory." *United States*

*v. Hijazi*, 845 F. Supp. 2d at 883 (citing *United States v. Columbo-Colella*, 604 F.2d 356, 358 (5th

Cir. 1979)).

The convictions here thus fail for lack of due process unless the conduct charged was either

intended to have a *substantial* effect within the United States or was directed against the security

of the United States or some other United States interest. Section 403(1) of the Restatement (Third)

of Foreign Relations Law also requires that the prosecution be "reasonable." While this inquiry is

context-specific, the Restatement provides a series of relevant factors for assessment:

15

(a) the link of the activity to the territory of the regulating state, i.e. the activity…has substantial, direct, and foreseeable effect upon or in the territory;…(c) the character of the activity to be regulated; (d) the existence of justified expectations that might be protected or hurt by the regulation;…(f) the extent to which the regulation is consistent with the traditions of the international system; [and]; (g) the extent to which another state may have an interest in regulating the activity.

Restatement (Third) of Foreign Relations Law, § 403(2).

Prosecuting Gan in the United States fails these tests and violates his due process rights. His alleged actions had no substantial effect on the United States and did not affect its security or some other interest. In addition, the prosecution is unreasonable.

> **i. Gan's Extraterritorial Conduct Had No Substantial Effect on the United States and Did Not Impact the Security of the United States or Any Other Interest.**

Counts II-V allege that Gan engaged in three separate transactions for the purpose of concealing or disguising the nature, location, source, ownership, or control of proceeds of a specified unlawful activity. (ECF #53, pp. 5-7). In each of those separate transactions, Government agents acted to receive the proceeds in the United States. Counts II-V only charge that Gan caused Government agents to receive funds in the United States hand delivered by third parties in what is deemed a "money pickup." Even the alleged purpose of the conspiracy charged (and for which Gan was acquitted) in Count I was that "Gan…and others received the laundered proceeds, and caused the laundered proceeds to be received, in Mexico and delivered, and caused to be delivered, the laundered proceeds" to subjects in Mexico. (ECF #53, pp. 5-7).

The charged conduct in Counts II-V does not have a substantial effect on the United States based upon funds transferred by third parties to a Government agent. A substantial effect on the United States is not created merely by passing money through United States accounts or using internet or cell phone services based in the United States. If such minor incidental "connections" to the United States could serve as a basis of jurisdiction, almost any business transaction could so

16

serve, rendering basic principles of international law and the presumption against United States jurisdiction meaningless. That is not the law, and should not be the law.

The evidence at trial likewise fails to set forth an impact on a security interest or any other interest of the United States. The Government failed to prove that Gan joined any conspiracy to launder alleged drug proceeds from the United States to Mexico; the remaining charged conduct does not implicate any legitimate or other United States interest. No identified United States citizen or company is alleged to have joined in the alleged conduct, and Gan was acquitted on conspiracy. Neither the United States government, nor any entity connected to the government, was damaged or affected by the mere transfer of cash to government agents. No United States banks, phone carriers, or internet services providers were affected by the "money pickup" in any way. There was no alleged conduct by Gan in the United States and there is no conspiratorial liability.

Allowing a United States prosecution on the facts set forth at trial would amount to the authorization of world-wide policing by the United States, even over matters unrelated to United States interests or investments. That is improper. *See, e.g.*, *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1132-33 (N.D. Cal. 2015) (noting that under the government's theory of extraterritoriality, there would be no limit to the United States' ability to police foreign individuals on matters completely unrelated to the United States' investments, which "is not sound foreign policy, it is not a wise use of scarce federal resources, and it is not, in the Court's view, the law").

The lack of "substantial effect" of the conduct charged in the Superseding Indictment, and of any connection to the security or other interests of the United States, is underscored by a review of other cases analyzing international law and principles of due process. Cases justifying prosecution of foreign citizens for foreign conduct always have a *direct* and *obvious* impact on

17

United States finances or the safety and security of its citizens. The same is not true here and the instant prosecution violates Gan's due process rights.

For example, the Central District of Illinois found prosecution permissible because the defendant devised a scheme to inflate the cost of fuel tankers used to supporting military operations in Kuwait by $3.5 million—a sum to be paid by the United States government. *United States v. Hijazi*, 845 F. Supp. 2d at 885. And even in light of those facts, the Seventh Circuit stated that the outcome of his due process challenge was "by no means a foregone conclusion." *In re Hijazi*, 589 F.3d at 412.

Other cases involve the same type of direct implication on United States interests, often involving terrorism or drug trafficking. In *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2014), the Second Circuit held that the prosecution of a defendant did not violate his due process rights under a sufficient nexus analysis where the defendant was alleged to have conspired to kill United States officers by supporting a known terrorist organization. *See also United States v. Yousef*, 327 F.3d 56 (2d Cir. 2011) (jurisdiction held proper under charge of conspiring to bomb a U.S. commercial airliner and with involvement in the 1993 World Trade Center bombing); *United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) (no due process violation when defendant had nexus including assisting Al Qaeda detaining U.S. nationals, taking U.S. citizens hostage and collecting money in New York to fund terrorist cases); *United States v. Brehm*, 691 F.3d 547, 552-553 (4th Cir. 2012) (no due process violation for charge of stabbing a British citizen at a United States airbase as the incident affected the American interest of law and order at the airbase); *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987) (a sufficient nexus where defendant possessed narcotics intended for U.S. distribution in U.S. customs waters); *Davis*, 905 F.2d at 245 (no due process violation when defendant was heading to U.S with controlled substances to smuggle in).

18

Cases outside the realm of drug trafficking and terrorism are typically only justified where the conduct involved has a direct effect on the security of the United States. For example, prosecution of a Costa Rican company was deemed acceptable under a sufficient nexus analysis when the company was structured as a business venture designed to assist criminal conduct in the United States and to harm United States citizens. *United States v. Budovsky*, No. 13cr368, 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015). The Court found connections to the United States, including 200,000 users of the defendant company's services in the United States (including criminal rings operating in the United States) and the laundering of $6 billion in criminal proceeds with the object of transferring funds *into and out of the United States*. *Id.* at *4-5.

But the allegations in this case come nowhere near those involved in the cases described above. And when the foreign conduct alleged does not have the required nexus with the United States, courts find due process violations.

The Seventh Circuit issued a Writ of Mandamus to review what it found was the district court's erroneous assertion of jurisdiction over two Hungarian banks. *Abelesz v. OTP Bank*, 692 F.3d 638 (7th Cir. 2012). In *Abelesz,* the plaintiff filed a complaint against the Hungarian banks for their role in expropriating property of Jewish Hungarian citizens to finance the genocide of holocaust in Hungary. *Id.* at 644. The Seventh Circuit held that the district court lacked constitutional power to assert jurisdiction over the banks despite: (1) thousands of U.S. citizens holding accounts at the Hungarian banks; (2) corresponding banking and contractual relationships between the charged banks and United States banks and companies; (3) Hungarian bank personnel travelling to the United States on business; and (4) the banks advertising in United States publications and targeting United States customers. *Id.* at 656-657.

19

The Ninth Circuit reversed the convictions of defendants and ordered the district court to dismiss their indictments on due process grounds because there was not a sufficient nexus between the conduct of the defendants and the United States where the defendants included the crew of a foreign flagged ship charged and convicted of conspiracy to distribute cocaine *to the United States*. *United States v. Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006).

Similarly, a California district court held that prosecution of the defendant violated his due process rights when the government failed to establish a sufficient nexus between the defendants and in the United States. *Sidorenko*, 102 F. Supp. 3d at 1124. One of the defendants worked for ICAO, an international organization that was 25% funded by the United States, and two others were charged with bribing the ICAO worker to abuse his position. *Id.* at 1126. The court held that the financial interest of the United States in ICAO did not constitute a sufficient nexus between the charged conduct and the United States, and further rejected the government's contention that because some of the ICAO offenses involved travel and identity documents, United States security interests were implicated. *Id.* at 1132-33. The Court stated that, "[the government's] argument that any financial or security interest supports a domestic nexus proves too much. If everything that had an impact on national security gave the United States the right to drag foreign individuals into court in this country, the minimum contacts requirement would be meaningless." *Id.*

The Fifth Circuit reversed a defendant's criminal theft conviction, holding that it was improper to assert jurisdiction over a defendant who agreed to sell a stolen car in Mexico even when the theft of the car occurred in the United States. *Columbo-Colella*, 604 F.2d at 356. The court acknowledged that the ruling could have negative effects in the United States: "[U]nfortunately, the legally correct result produces something like declaring an open season on motor vehicles in American border towns." *Id.* at 357. Nevertheless, when the actions of the

foreign defendant took place entirely outside U.S. borders, it was improper to prosecute him in the United States.

Gan's case has far less connection to the United States than any of the above. The nexus between the United States and Gan's alleged conduct is non-existent. Gan is not charged with further promotion of any illegal activities. The evidence at trial does not show that Gan "directed" his conduct towards the United States. To the contrary, evidence showed that no U.S. currency ever left the United States bound for Mexico. (Tr. 778). Gan controlled no bank accounts in the United States. (Tr. 1024-25). No harmful "effect" was felt in the United States as a result of the instantaneous hand to hand transfers of money initiated by third parties and received by Government agents.

Indeed, the concerns that spurred Congress to draft the Section 1956(a)(2) offenses in the first place are *entirely absent* here. The legislative history of the statute reveals that these provisions were enacted to prevent "foreign drug traffickers" from "keep[ing]" their earnings in the United States or "invest[ing] their earnings" in the United States. S. Rep. No. 99-433, at 11; *see also Firtash*, 392 F. Supp. 3d at 886 ("Congress enacted the [MLCA] 'to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency"). Neither scenario is at remotely at issue here. Thus, to the extent that the money laundering statute's limited extraterritorial reach could be read to encompass Gan's extraterritorial conduct, application of the statute in this case, on these facts, violates due process. *United States v. Lloyds TBS Bank PLC*, 639 F. Supp. 2d 314, 318 (S.D.N.Y. 2009) (even if Section 1956(f) could reach defendant's conduct, Government's claim would still require dismissal as "unreasonable and therefore impermissible" under due process law).

21

Unlike *Abelesz*, Gan lacks the deep, regular connections with the United States that the Hungarian banks maintained. Unlike *Perlaza*, the conduct at issue here does not relate to a criminal operation intended to have an effect in the United States. Unlike *Sidorenko*, the United States has zero interest in any of the foreign defendants in this case, and there are no allegations of forging travel or identity documents that remotely affected United States security. Unlike *Columbo-Colella*, the conduct here had no direct effect on the property interests of United States citizens. Because the conduct charged has neither a substantial effect on the United States nor implicates a United States security or other interest, the assertion of jurisdiction violates Gan's due process rights. For that reason, this Court should dismiss the remaining charges.

### ii. Gan's Convictions Are Unreasonable.

The Restatement (Third) of Foreign Relations Law requires—even where the government is able to meet the substantial effect or security interest tests—that the prosecution of a foreign citizen for conduct taking place outside the United States be reasonable. Here, it is not. There is no link between the United States and the conduct revealed at trial nor did the alleged conduct have any effect on the United States. The character of the activity at issue is that of a Government agent receiving funds in the United States from unconnected third parties allegedly involved in drug trafficking that had already taken place.

In assessing reasonableness, the Restatement considers "the extent to which another state may have an interest in regulating the activity." Restatement (Third) of Foreign Relations Law, § 403(2). Mexico, where Gan has at all relevant times resided, not the United States, has that interest. Indeed, Mexico has recently implemented money laundering laws.[3] But there is no allegation that

---

[3] The Mexican Anti-Money Laundering Law (Ley Federal para la Prevención e Identificación de Operaciones con Recursos de Procedencia Ilícita), *available* at https://www.lexology.com/library/detail.aspx?g=9beb6180-bbdc-4ed0-a74c-4da07a9f291e.

Mexican authorities have pursued, or are pursuing, any criminal charges related to this case. If Mexico had an interest in bringing a criminal case related to facts set forth in the Indictment it could have. *Lloyds TBS*, 639 F. Supp. 2d 314 (declining to assert jurisdiction over Swiss bank and observing that Switzerland and not the United States has a strong interest in maintaining Swiss banking integrity); *United States v. Javino*, 960 F.2d 1137, 1143 (2d Cir. 1992) (reversing criminal conviction under the National Firearms Act finding that it was unreasonable to prosecute foreign manufacturers of firearms even if the firearms were used in the United States); *Europe & Overseas Commodity Traders, SA v. Banque Paribas London*, 147 F.3d 118, 131 (2d Cir. 1988) (affirming dismissal of foreign investors against foreign defendants under federal securities law). In short, the convictions fail not only because evidence at trial failed to show a substantial effect on the United States or an implication of a United States security interest, but also because they are unreasonable.

### B.     No Substantial Nexus Exists Between Gan's Conduct and the United States.

The conduct charged in the Superseding Indictment has no connection to the United States, much less the "substantial nexus" required by the case law. As described in Section II.A above, courts affirming the assertion of jurisdiction by United States courts only do so in circumstances radically different from those presented here—circumstances where the connection to the United States territory or interests is obvious. Those circumstances are not present here and this Court should dismiss the convictions against Gan for violations of his due process rights.

### III.    The Aiding and Abetting Charges Fail as a Matter of Law Because No Underlying Crime Was Committed.

The essential elements of aiding and abetting money laundering are: (1) that the crime of money laundering was committed; (2) defendants knew that money laundering was being committed or were going to be committed; (3) defendants did some act for the purpose of aiding, assisting, facilitating and encouraging the money laundering and acted with the intent of causing

that crime to be committed; and (4) defendants' acts did, in some way, aid, assist, facilitate and encourage money laundering. *See United States v. Dixon*, 658 F.2d 181, 189 n. 17 (3d Cir.1981).

"A person is liable for aiding and abetting a crime if he takes an affirmative act in furtherance of that offense with the intent of facilitating commission of the offense." *United States v. Freed*, 921 F.3d 716, 721 (7th Cir. 2019). "[I]t is axiomatic that one cannot aid and abet a crime unless a crime was actually committed." *Id. see also United States v. Motley*, 940 F.2d 1079, 1081 (7th Cir. 1991) ("a defendant charged with aiding and abetting the commission of a crime by another cannot be convicted in the absence of proof that the crime was actually committed") (internal citations omitted). Aiding and abetting a "government agent who could not have committed the underlying crime" is not a criminal act. *Kash v. U.S.*, 112 Fed. Appx. 518, 520 (7th Cir. 2004) (unpublished). The Government must show that someone committed the offense in which the defendant had a part. *United States v. Doughty*, 460 F.2d 1360, 1363 (7th Cir. 1972).

Here, because Gan undertook no conduct in the United States, the Government has attempted to attach criminally liability to Gan through aiding and abetting a Government agent. (ECF # 53, pp. 5-7); (ECF # 81) ("[a]lthough, Gan was in Mexico at the time of [the] [sic] alleged transactions, the superseding indictment alleges he is criminally liable for the acts under 18 U.S.C. § 2."). However, a Government agent cannot commit a crime and the only conduct charged in Counts II-IV is the receipt of proceeds which was undertaken by a Government agent. *United States v. Murphy*, 768 F.2d 1518, 1528 (7th Cir. 1985) ("[t]he agents' acts merely appear criminal; they are not, because they are performed without the state of mind necessary to support a conviction"); (Tr. 276-278, 324, 1055-56, 1073, 1077-78, 1321); (ECF # 81, Gov.'s Response to Mtn. to Dismiss) ("Counts Two through Four are based, respectively, on the transfer of cash narcotics proceeds from a drug trafficker courier to the UC…").

24

Nor is there any complicit conduct to tie Gan to the Government agent's conduct. *Vega*, 2011 WL 3757883, at *2 (aiding and abetting a Government's agent transfer of money is insufficient as a matter of law in the absence of conspiratorial conduct). Because no underlying crime was committed, the convictions for aiding and abetting money laundering in Counts II-IV cannot stand as a matter of law and must be dismissed.

## IV. The Jury Instructions as to Aiding and Abetting Were Faulty and Require Dismissal or a New Trial.

The Seventh Circuit Pattern Jury Instruction § 5.06, which covers the criminal liability of principals codified at 18 U.S.C. §§ 2(a) and (b) mirror those given in this case:

> …any person who knowingly aids, counsels, commands, induces, or procures the commission of an offense may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed.
>
> If a defendant ***knowingly*** causes the acts of another, then that defendant is responsible for those acts as though he personally committed them.

(emphasis added).

However, 18 U.S.C. § 2(b) states that "[w]hoever ***willfully*** causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." (emphasis added). Thus, the instructions in this case allowed the jury to convict Gan on a lesser burden of proof than what is Constitutionally required under the statute.[4] *Freed*, 921 F.3d at 721 ("The difference between the use of ***willfully*** in the statute and ***knowingly*** in the jury instructions is obviously problematic") (emphasis added).

---

[4] In the context of 18 U.S.C. § 1035, making false statements in healthcare benefits matters, the Government has repeatedly acknowledged that there must be a distinction between a knowing standard and a willful standard, such that the willful standard requires the additional proof that defendant acted "with knowledge that his conduct was unlawful." Br. in Opp., pp. 8-10, *Ajoku v. United States*, 134 S. Ct. 1872 (2014) (No. 13- 7264); Br. In Opp., pp. 5-6, *Russell v. United States*, 134 S. Ct. 1872 (2014) (No. 13-7357).

In contrast to *Freed*, the jury in this case *did* entirely rely on the aiding and abetting theory to convict Gan of the substantive money laundering counts as Gan was not present in the United States when Government agents conducted "money pickups." The Government's theory at trial was that Gan caused Government agents to receive proceeds in the United States even though he was abroad. (Tr. 6-7, Hearing on Motion to Dismiss Indictment) ("The allegation of the government per the *Santiago* proffer is that he directly caused drug traffickers to take millions of dollars and launder them, with the collection occurring in large part through Chicago"). Accordingly, because the jury did entirely rely on the Government's theory of aiding and abetting liability to convict him on Counts II-V the error in the jury instruction has resulted in substantial prejudice to Gan. Therefore, the charges cannot stand as a matter of law and must be dismissed.

## V.    The Substantive Money Laundering Charges Fail as a Matter of Law.

Counts II-IV each charge Gan with conducting a "financial transaction," or "money pickup," through the acts of a Government agent that were designed to conceal the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (ECF # 53, pp. 5-7). However, Counts II-IV fail as a matter of law because there was no evidence to suggest that the purpose of *any* of the alleged "financial transactions" were designed to conceal or disguise. Rather, the charged conduct was nothing more than the mere transportation of funds, which does not meet the required elements. *Cuellar*, 553 U.S. 550.

### A.    None of the Superseding Indictment's Alleged "Financial Transactions" Were Designed to Conceal the Specified Attributes Under the MLCA.

To convict a defendant under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that the defendant: (1) conducted a financial transaction; (2) knowing that the property involved in the transaction was illegally derived; and (3) knowing that the transaction was designed in whole

26

or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds. *See United States v. Esterman*, 324 F.3d 565, 569 (7th Cir. 2003). The *particular* charged "financial transaction" must be "designed to conceal or disguise the specified attributes of the illegally obtained funds." *Cuellar*, 553 U.S. at 561–62.[5] Thus, "merely hiding funds during transportation *is not sufficient* to violate the statute, even if substantial efforts have been expended to conceal the money." *Id.* at 563 (emphasis added).

### i.   The Particular Charged Transactions Were a Mere Receipt of Currency.

The government must allege a specific financial transaction in a substantive money laundering charge. *See, e.g., United States v. Prescott*, 42 F.3d 1165 (8th Cir.1994); *United States v. Conley*, 826 F.Supp. 1536 (W.D.Pa.1993). The government must prove that the specific transaction(s) in question were designed to "conceal or disguise," not that ancillary transactions may have been. *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994). Moreover, "the statute does not make money laundering a continuing offense." *United States v. Cabrales*, 524 U.S. 1, 5 (1998); *United States v. Kramer*, 73 F.3d 1067, 1072 (11th Cir. 1996). The statutory language, case law, and legislative history indicate that *each* transaction or transfer of money constitutes a separate offense. *United States v. Li*, 856 F. Supp. 421, 423 (N.D. Ill. 1994), *aff'd*, 55 F.3d 325 (7th Cir. 1995); *see also* S. Rep. No. 99-433, at 12–13.

Counts II-IV charged Gan only with the *receipt* of cash, namely, three discrete "money pickups" from a third party to a Government agent. (ECF # 53, pp. 5-7); (Tr. 276-278, 324, 1055-56, 1073, 1077-78, 1321). Gan is *not* charged with conducting any complex "mirror transactions"

---

[5] *See United States v. Rezko*, No. 05CR691, 2008 WL 4890232, at *7 (N.D. Ill. Nov. 12, 2008) *citing United States v. Huezo*, 546 F.3d 174, 2008 WL 4553150 (2d Cir. Oct.14, 2008), at * 3 (holding that the *Cuellar* holding applies to the "transaction" prong of money laundering as well as the "transportation" prong).

or "currency swaps" which could perhaps be designed to "conceal or disguise" a specified attribute; such allegations are contained only in the acquitted conspiracy charge. Rather, the Government chose to charge Gan in Counts II through IV with mere receipt of a "money pickup." Accordingly, this Court must consider only the charged conduct, plainly a mere transfer, and insufficient as a matter of law. *See Rezko*, 2008 WL 4890232, at *8.

### ii. The "Money Pickups" Were Not Designed to Conceal the Specified Attributes Under the MLCA.

Government evidence focused almost solely on conspiratorial conduct for which Gan was acquitted. Witnesses testified that the "mirror transactions" and "currency swaps" were the specific transactions designed to conceal or disguise the specified attributes. There was little to no evidence to support the notion that the transfer of cash from an alleged drug dealer to a Government agent, so called "money pickups" were designed to "conceal or disguise." Agent Moton confirmed that the "money pickups" were *unconnected* to the subsequent (and uncharged) transactions which *may* have been designed to "conceal or disguise" or actually "launder" the money:

**Q**. What specifically was the undercover agent's role in these transactions?

**A**. Their role was to act as the money courier and broker in Chicago who was going to pick up the proceeds and launder it to China.

(Tr. 277-78).

Agent Moton's testimony concedes that the actual transactions designed to launder the money or "disguise or conceal" were subsequent uncharged transactions in which Gan did not participate. Agent Dennewitz corroborated Agent Moton's testimony, explaining that the "money pickup" process was merely the way in which "the drug trafficking organization gets money to the money laundering organization *to be laundered*" in subsequent and uncharged transactions. (Tr. 418, 419) (emphasis added). Agent Dennewitz continued that it was the subsequent, uncharged, "mirror transaction[s]" that were designed to "hide the source of the money," not the "money

28

pickups." (Tr. 419, 465). Indeed, Agent Dennewitz testified that the "manifestation" of the money laundering was the subsequent and uncharged "mirror transactions." (Tr. 507-508, 559).

Redirect examination testimony from Agent Moton also testified that the purpose of "money pickups," rather using banks, was to "elude law enforcement and detection," (Tr. 342), not to "conceal or disguise" the specified attributes. *Cuellar*, 553 U.S. 550 ("[t]he statutory text makes clear, however, that a conviction under this provision requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute").

Agent Dennewitz further testified that the purpose of the serial number passing process during the "money pickups" was merely to "authenticate" so that the engaging parties knew they were "meeting with the right individuals." (Tr. 389). Seok Pheng Lim ("Lim") testified that she did not know the source of the funds during the "money pickups," (Tr. 1097), begging the question: How could a transaction be designed to "conceal or disguise" a source that Lim was unaware of?

As the Seventh Circuit has affirmed repeatedly, "mere transfer…of funds is not enough to sweep conduct within the money laundering statute; instead, subsequent transactions must be specifically designed to hide the provenance of the funds involved." *United States v. Stewart*, 902 F.3d 664, 682 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 1390 (2019).

> There is a difference between concealing something to transport it, and transporting something to conceal it; that is, how one moves the money is distinct from why one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter.

*Cuellar*, 553 U.S. at 566 (internal quotations omitted). Concealing for purposes of transport or— as agents testified to—eluding law enforcement is insufficient.[6]

---

[6] The Seventh Circuit has identified "money laundering" as typically "a three-step process: (1) the criminally derived money is "placed" into a legitimate enterprise; (2) the funds are "layered" through various transactions to obscure the original source; and (3) the newly laundered funds are integrated into the legitimate financial world in the form of bank notes, loans, letters of credit, or other recognizable financial instruments." *Esterman*, 324 F.3d ats... 570. The charged conduct lacks all elements.

A conviction cannot stand on the basis of a Government agent conducting a "money pickup" in order to elude law enforcement. *United States v. Dimeck*, 24 F.3d 1239, 1246 (10th Cir. 1994) (holding that a money courier was not conducting a "financial transaction" designed to conceal by simply delivering illegal funds as illegal funds—"the secrecy surrounding the funds, were not to confuse or mislead anyone as to the characteristics of those proceeds, or to assist in allowing these proceeds to enter into legitimate commerce"); *accord Cuellar*, 553 U.S. at 567 (finding insufficient evidence that money was concealed in order to transport it back to Mexico to compensate leaders of a drug operation, rather, "[t]he evidence suggested that the secretive aspects of the transportation were employed to facilitate the transportation"). But that is precisely the conduct for which Gan has been convicted.

The "money pickups" did not include "efforts to transform ill-gotten funds into apparently innocent assets or funds…" *Esterman*, 324 F.3d at 572. And the use of serial numbers to effectuate the movement of funds does not provide evidence that the "money pickups" were designed to conceal or disguise. *United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) (defendant's "avoidance of a paper trail, hiding of the proceeds in packages of jewelry, and use of code words show only that he concealed the proceeds in order to transport them"); *United States v. Roberts*, 650 F. Supp. 2d 219, 223 (E.D.N.Y. 2009) (same); *cf. United States v. Thayer*, 204 F.3d 1352, 1354–55 (11th Cir.2000) (finding conviction sufficient since defendant funneled illegal funds through various *fictitious* business accounts) (emphasis added); *United States v. Majors*, 196 F.3d 1206, 1213 (11th Cir. 1999) (finding conviction sufficient since defendant funneled illegal funds through various corporate bank accounts in multiple signatory names); *United States v. Willey*, 57 F.3d 1374, 1387 (5th Cir.1995) (finding conviction sufficient since defendant utilized "highly unusual" transactions involving cashier's checks, third party deposits, and trust accounts used to disguise source of

funds); *Garcia–Emanuel*, 14 F.3d at 1476–79 (finding conviction sufficient since defendant purchased land in the name of a restaurant to make it appear that business was source of wealth and truck purchased in wife's name for stated purpose of deceiving IRS); *United States v. Lovett*, 964 F.2d 1029, 1033–37 (10th Cir.1992) (finding conviction sufficient since movement of funds involved convoluted financial transactions leading up to purchase of house, combined with misleading statements regarding nature and source of purchase money).

The evidence at trial is devoid of—and contrary to—the contention that the "money pickups" were designed to conceal or disguise. Rather, the evidence readily shows that any concealment was merely for purposes of transport. *Cuellar*, 553 U.S. at 568 (holding that the design-to-conceal element "can[not] ... be satisfied solely by evidence that a defendant concealed the funds during their transport"). Accordingly, the remaining money laundering charges must be dismissed.

**VI.    The Government Failed to Prove Lack of Entrapment Beyond a Reasonable Doubt.**

The defense of entrapment requires a defendant to prove that (1) he was induced by someone working for or on behalf of the government to commit a crime that (2) he was not predisposed to commit. *United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991). Once an entrapment instruction is issued "the government must prove predisposition or the lack of government inducement beyond a reasonable doubt in order to defeat it." *United States v. Blitch*, 773 F.3d 837, 844 (7th Cir. 2014), *as amended on denial of reh'g and reh'g en banc* (Jan. 27, 2015).

**A.    The Government Induced Gan into Carrying Out the Conduct at Issue and Used Pleas of Friendship in Order to Do So.**

"[I]nducement means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices

31

will do so in response to the government's efforts." *United States v. Mayfield*, 771 F.3d 417, 434–35 (7th Cir. 2014). The "other conduct" used to induce may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who would not commit the crime if left alone will do so in response to the government's efforts." *Id*. at 435. Indeed, even "subtle, persistent, or persuasive" conduct by government agents or informants qualifies as illegitimate inducement. *Id.* at 434 *quoting United States v. Pillado*, 656 F.3d 754, 765 (7th Cir. 2011).

The specific conduct at issue was initiated and carried out by the Government agents and through the use of an undercover informant, Lim, who had been a longtime friend of Gan's for over 20 years—calling each other "big brother" and "younger sister." (Tr. 623-624; 838; 857; 893; 1000; 1077-78; 1321; 276-77, Agent Moton Direct) (Agent Moton gave instructions to Lim to "contact defendant to setup [three] money pickups in Chicago"). The "money pickups," and the later (uncharged) transactions, could not have occurred without Lim's essential contacts in the United States. (Tr. 277-78; 874) (UC's role was to "act as the money courier and broker in Chicago who was going to pick up the proceeds and launder it to China"; Lim's role was to act as intermediary between UC and defendant). And, it was the Government who formulated, initiated, and "caused" the conduct to occur. (Tr. 306 – Agent Moton Cross) ("**Q:** Okay. And so it was you who caused this to be set in motion at that time. And that's a yes or a no. **A:** Yes.").

Lim testified that the Government instructed her to re-establish contact with the Defendant to setup "money pickups" *after* Gan had ceased his prior alleged (conduct. (Tr. 903-04; 1081-82); *United States v. McGill*, 754 F.3d 452, 458 (7th Cir. 2014) ("[t]he government is not free to induce

32

more-serious crimes simply because the target already committed a lesser crime"). Lim, after re-establishing contact with Gan, repeatedly steered Gan to transactions involving "money pickups" in illegal proceeds ("black money") rather than transacting in legal proceeds ("white money"), which Gan repeatedly insisted on. (Tr. 847; 850; 885; 892-893; 894; 1123-24; 1143-35). Gan explicitly told Lim "[white money] is quite desirable…I only take white orders. I don't want to take black orders." (Tr. 892). Gan continued to press "white money" transactions explaining "I am mostly talking about white orders…company to company…can it be done in Switzerland?" (Tr. 893). Lim replied that she could only do illegal money pickups in Chicago. (Tr. 893). Gan replied, "I'm telling you this white money is earned legally. It's all white money overseas." (Tr. 893). Gan continued to resist Lim's efforts to steer the transactions to "black money," "I am afraid to conduct the black business. Now in the US, I can't do your other projects because I am not familiar." (Tr. 896).

The Government's solicitation of the conduct and the exploitation of the twenty-year friendship between Gan and Lim, standing alone, establishes improper inducement. *McGill*, 754 F.3d at 459 ("Government exploitation of friendship can constitute improper inducement") *citing Sherman v. United States*, 356 U.S. 369, 371 (1958) (inducement consisted of repeated requests from an informant who was a friend). Thus, (1) the Government's initiation of contact with Gan; (2) the Government's design of and carrying out of the conduct; (3) the Government's repeated attempts at persuading Gan to transact in "black money,"; (4) Gan's reluctance to do so; and (5) the Government's exploitation of Gan and Lim's twenty-year long friendship irrefutably confirms improper inducement. *Mayfield*, 771 F.3d at 441 ("We do not need to decide whether any of these tactics standing alone would suffice to establish inducement; some of them almost certainly would not. But together, they are enough to permit a reasonable jury to conclude that the government

33

induced [defendant] to commit the crime") *cf*. *United States v. Lopeztegui*, 230 F.3d 1000, 1003 (7th Cir. 2000) ("This is not a case in which the government planted in [defendant's] mind the idea to commit the crime, nor even a case in which it supplied the means of carrying it out").

Gan had no contacts in the United States that could carry out either a "money pickup" or whom had contacts with Chinese businesses in the United States that needed United States dollars that were willing to exchange an equivalent sum in Chinese RMB in so-called "mirror transactions." The Government supplied both. *Cf. United States v. Belzer*, 743 F.2d 1213, 1218 (7th Cir. 1984) (finding no inducement because the defendant had first contacted the informant and the Government did not supply any help with "complex" tasks to carry out the conduct at issue). No reasonable juror could have found beyond a reasonable doubt that the Government did not induce Gan's conduct.

### B.    Gan Was Not Predisposed to Commit Any Criminal Acts.

The two elements of entrapment are related in the sense that inducement is "evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994). The Seventh Circuit has instructed that when analyzing a defendant's predisposition to commit a crime, courts are to consider: "(1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government." *United States v. Stallworth*, 656 F.3d 721, 725 (7th Cir. 2011) *quoting United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010)). "No individual factor controls the issue of predisposition, but the most important factor is whether the defendant was reluctant to commit the offense." *Id*. at 725-26. However,

acquitted conduct should *not* be considered in a predisposition analysis. *See Pillado*, 656 F.3d at 766 (emphasis added).

      **i.    Gan Was Neither Situationally Capable Nor Ready and Willing to Engage in Charged Conduct Absent Government Action and Solicitation.**

The evidence at trial did not entirely focus on the character or reputation of Gan, however, it is undisputed that Gan has no criminal history. Indeed, the jury acquitted Gan of the preceding conspiratorial conduct charged in Count I of the Superseding Indictment. That conduct must be set aside for a predisposition analysis. *Pillado*, 656 F.3d at 754.

Trial evidence showed that Gan operated several businesses outside of the United States, including a seafood business, and also exchanged currencies for legitimate businesses in need of Chinese RMB. Evidence clearly showed that Gan had stopped engaging in any alleged, and acquitted, conduct prior to the Government engaging him to conduct the transactions alleged in Counts II-IV. (Tr. 1064; 1079-1082). Moreover, predisposition must be measured prior to the Government's attempts to persuade Gan to commit the crimes alleged, *Mayfield*, 771 F.3d at 436, and plainly, there was no predisposition to engage in "money pickups" or any other illegal conduct.

Nonetheless, should this Court consider the alleged conduct prior to the 2018 "money pickups," the evidence showed that, if anything, Gan merely provided Chinese bank account numbers to Lim. (Tr. 1079-80; 1171-72). Even taking all evidence submitted by the government at face value, which the jury clearly did not, it was not until months after Gan ceased dealing with Pan and Lim that Gan was persuaded by Government agents to actually participate in "money pickups" which was "something he had never done before May of 2018." (Tr. 1080).

At the time the Government approached Gan, he was not situationally capable of (or "ready and willing" to) engage in "money pickups" as he did not possess the essential contacts in the United States to either (1) physically engage in the "money pickups"; or (2) carry out "mirror

35

transactions" through the use of Chinese businesses in the United States. *Mayfield*, 771 F.3d at 436 ("defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so"). Indeed, *Hollingsworth* requires that the defendant be *positionally* "ready and willing" to commit the crimes alleged, in addition being disposed to do so; Gan was neither. *Hollingsworth*, 27 F.3d at 1200; *Mayfield*, 771 F.3d at 436. Gan was not in a position to be involved in the charged conduct without substantial contacts in the United States, thus Gan asking Lim to conduct "white money" transactions without the need to use cash. *Id*. ("Anyone can wire money. But to get into the international money-laundering business you need underworld contacts, financial acumen or assets, access to foreign banks or bankers, or other assets"). Gan did not have any of these contacts or assets in the United States, and there was no evidence that he sought them out. Instead, the Government sought Gan out, designed and solicited the criminal conduct, steered him toward illegal transactions (away from legitimate ones), physically carried out the "money pickups," and provided Gan with every essential facility along the way. *Id*; *cf. Lopeztegui*, 230 F.3d at 1003 (defendant initiated contact and it was not a "case in which the government planted in [defendant's] mind the idea to commit the crime, nor even a case in which it supplied the means of carrying it out").

### ii. The Government Initially Suggested the Criminal Activity.

As examined *supra*, the Government designed, implemented, and carried out the conduct at issue. Thus, this factor must be considered in Gan's favor. *Hollingsworth*, 27 F.3d at 1200. ("The nature of the government inducement is "significant chiefly as evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question").

36

### iii.     While Gan Engaged in the Conduct for Profit, He Only Did So After He Was Overcome By Government Persuasion.

Admittedly, Gan did engage in the conduct for profit—much like his initially suggested "white money" transactions. Nonetheless, the most important factor in an entrapment analysis is "whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion."

### iv.     Gan Was Reluctant to Engage in the Alleged Criminal Conduct and the Government Repeatedly Steered Him to Transactions Involving "Black Money" While Gan Repeatedly Suggested "White Money."

No matter the Government attempts to spin Gan's words, the transcripts and testimony evince Gan's repeated reluctance to engage in "black money" transactions. *See generally*, Gov. Exs. 002-3T; 002-4T. Gan initially suggested that Lim assist in "white money" transactions in other countries. *See* Section IV(A). Yet Lim, under the direction of the Government, repeatedly steered the conversations towards "black money" in an obvious attempt to obtain jurisdiction over Gan in the United States. Only after repeated persuasion did Gan reluctantly oblige. *Mayfield*, 771 F.3d at 437 ("[a]ll this evidence must be considered with care, of course; by definition, the defendant's later actions may have been shaped by the government's conduct"). Gan's reluctance is unmistakable from trial testimony and transcript exhibits and fully demonstrates the most important factor in the entrapment analysis.

### v.     The Nature of the Government Inducement Significantly Lowers the Bar of Predisposition.

Lim's appeal to her friendship with Gan coupled with the "plus" factors already discussed *supra* considerably negates the inference that Gan was predisposed to commit the crimes for which he was convicted. *Mayfield*, 771 F.3d at 441 (finding appeals to friendship combined with a "campaign of persuasion" sufficient to lower the inference of predisposition, and remanding for entrapment instruction).

The facts presented at trial check off nearly every box required for entrapment, as a matter of law: (1) the Government initiated contact with Gan; (2) the Government designed and physically carried out the conduct at issue; (3) the Government appealed to friendship through a nearly twenty year relationship between Gan and Lim; (4) the Government repeatedly persuaded Gan to conduct "black money" transactions in the United States rather than Gan's initially suggested "white money" transactions; (5) Gan showed repeated and explicit reluctance to engage in "black money" transactions; (6) Gan had no predisposition to commit any crime since any prior conduct was acquitted at trial; and (7) Gan was not, at the time of Government intervention, *positionally* "ready and able" to engage in the illegal conduct for which he stands convicted.

Accordingly, no rational juror could have found that the Government proved predisposition or the lack of government inducement beyond a reasonable doubt beyond a reasonable doubt.

## VII. Gan Was Not Required to Be Licensed Under Illinois Law as a Money Transmitter, An Essential Element of 18 U.S.C. § 1960, as Charged in Count V.

Count V charged that Gan "did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, which was operated without a license from the State of Illinois, such operation constituting a felony under Illinois state law, 205 ILCS 657/90(h)" in violation of 18 U.S.C. § 1960(a) and 2. However, testimony at trial confirmed that neither Gan, nor Lim acting as a Government agent, were required to be licensed under Illinois law.

An "illegal money transmitting business" is defined, without exception, as a money transmitting business that is not licensed under state law in a state where a license is required. *United States v. Velastegui*, 199 F.3d 590, 595 (2d Cir. 1999). The reference to "State law" in §

1960(b) makes it plain that an appropriate license is whatever is required under state law.[7] *United States v. Dimitrov*, 546 F.3d 409, 415 (7th Cir. 2008).

Spenser Staton ("Staton"), Transmitter of Money Acts Specialist with the Illinois Department of Financial and Professional Regulation ("IDFPR") testified unequivocally that neither Gan nor Lim were required to possess a money transmitting license when Lim gave money from the "money pickups" to a third party to then transfer or engage in a "mirror transaction." (Tr. 1242; 1244-45). Rather, only the third party engaging in the transaction—here Government agents through the use of a bank—were required to have a license. (Tr. 1242; 1244-45). Further, Staton testified on cross examination as follows:

> **Q**. Okay. But if that person doesn't live in Illinois and is not -- is not present in Illinois, they're not subject to Illinois law. Is that correct?
>
> **A**. Correct.
>
> (Tr. 1244).

Because no evidence was shown at trial that Gan, or even Lim, were required to possess a money transmitting license—in fact the evidence was to the contrary—no rational juror could have convicted Gan of Count V of the Superseding Indictment. *See e.g.* (Tr. 1240-48).

Additionally, for the reasons discussed throughout, 18 U.S.C. § 1960(a) does not apply extraterritorially, nor does the underlying Illinois law, which is an essential element of the statute. Count V must be dismissed.

---

[7] Gan continues in his objection to the jury instructions given defining material terms regarding money transmitting businesses in terms of federal law rather than the Illinois state law which, by necessity, must have been violated. The jury was given no opportunity to know or understand the Illinois law allegedly violated by Gan, and Gan continues to submit that such state law statutes and definitions should have been given to the jury in order for them to make any determination as to whether or not Gan violated any state law at all, a necessary prerequisite to a conviction on Count V.

## CONCLUSION

For the reasons described above, Gan respectfully requests that this Court enter an

order dismissing Gan's convictions and the underlying Superseding Indictment as to Counts II-V.


Dated: June 8, 2020                             Respectfully submitted,

                                                //s// Aaron Schwartz
                                                Glenn Seiden, #2543761
                                                Brooke L. Stevens, #6245195
                                                Aaron Schwartz, #6331034
                                                SEIDEN LAW GROUP, P.C.
                                                333 S. Wabash Avenue-Suite 2700
                                                Chicago, Illinois 60604
                                                312-236-3060
                                                aschwartz@seidengroup.law
                                                gseiden@seidengroup.law
                                                bstevens@seidengroup.law


## CERTIFICATE OF SERVICE

I, Brooke L. Stevens, an attorney, do hereby certify under penalties of law that, in

accordance with FED. R. CRIM. P. 49 and the General Order on Electronic Case Filing (ECF), I

caused a copy of **DEFENDANT GAN'S COMBINED RULE 29 AND 33 MOTION** to be

served upon the all the named attorneys of record by CM/ECF filing methods on this the 8th day

of June, 2020.

                                                /s/ Brooke L. Stevens