UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 18 CR 781 |
| v. | ) | |
| | ) | Hon. Thomas M. Durkin |
| XIANBING GAN | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby respectfully submits the Government's Sentencing Memorandum, and asks this Court to sentence the defendant to 240 months' imprisonment, and a fine within the guideline range.

**I.   Background**

Between 2015 and 2018, defendant worked as a professional money launderer. During this time, Mexican drug traffickers regularly hired defendant and his associates to launder millions of dollars in drug proceeds using a system of secretive money "pickups" in the United States, followed by a sophisticated series of currency swaps between the United States and China, and China and Mexico. Defendant played a key role in the money laundering process, using his international financial expertise to facilitate the concealed flow of huge quantities of drug money through businesses and banks around the world. Defendant's crimes allowed his drug trafficking clients to secure the fruits of their pernicious trade faster, cheaper, and more securely than ever before.

## II. The Government's Position on Sentencing

The district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the guidelines range. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). The sentence imposed must be "sufficient, but not greater than necessary," to comply with the purposes of sentencing provided under 18 U.S.C. § 3553(a)(2).

### A. The PSR

As a threshold matter, and consistent with the PSR, the Court should consider the Count One conspiracy evidence at sentencing. Although the jury acquitted defendant of Count One, the evidence easily established defendant's guilt by a preponderance (as explained in detail in the Government's Version at pages 4 – 7). *See United States v. Gonzalez*, 765 F.3d 732, 738 (7th Cir. 2014) ("It has long been established that a sentencing court may consider conduct of which a defendant has been acquitted."); *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007); *United States v. Watts*, 519 U.S. 148, 154 (1997); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").

Further, the Probation Officer correctly determined that the Count One conduct constitutes relevant conduct to the counts of conviction pursuant to Guideline § 1B1.3(a)(2), which requires the court to consider "all acts and omissions . . . that

were part of the same course of conduct or common scheme or plan," whether or not the acts formed the basis for conviction. PSR ¶ 21; USSG § 1B1.3(a)(2); *Watts*, 519 U.S. at 153.

Specifically, Guideline § 1B1.3, Application Note 5(B)(i) provides:

For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.

Here, commonality of purpose (to launder drug proceeds for Mexican drugs cartels) and *modus operandi* (money pickups in Chicago, followed by mirror transactions between the U.S. and China, and then China and Mexico) brings the Count One conduct well within the bounds of relevant conduct to Counts Two through Five. The connection is further strengthened based on the short duration between the Count One conspiracy and the offenses of conviction, which was no more than 7 months.[1]

The government objects to the PSR's finding that the value of the laundered funds was only $18,000,000. PSR ¶ 22. The evidence shows that, even under a very conservative estimate, the amount was much higher and easily exceeded $25,000,000, such that the 22-level, § 2B1.1(b)(1)(L) provision should apply, leading to a base offense level of 30 pursuant to § 2S1.1(a)(2). Lim testified at trial that between early

---

[1] Evidence at trial showed that defendant was actively involved in laundering money with Haiping Pan through at least October 2017 (*see* Gov. Ex. 001-23, October 28, 2017 BBM intercept between Pan and Huanxin Long, Pan: "Old [defendant] has confirmed with you that the goods will surely arrive?" Long: "Yeah"). The defendant and Lim began planning the undercover money pickups in May 2018. *See, e.g.,* Gov. Exs. 002 – 1—8.

3

2016 and May 2017, defendant, Lim, and Pan carried out two money pickups per week with amounts ranging from $100,000 to $1,000,000 per pickup. R. 140, 660 – 675. The government did not ask Lim at trial the total amount of funds laundered, but in her plea agreement, she admitted it was approximately $48,000,000, which is consistent with her trial testimony. *United States v. Seok Pheng Lim*, 19 CR 279, R. 23, 5-6. Lim's grand jury testimony provides further detail and support. Consistent with her trial testimony, Lim testified in the grand jury that she conducted 1-2 pickups per week for defendant and Pan with amounts generally ranging between $150,000 and $1,000,000 per pickup. Lim further testified that the average amount per pickup was approximately $500,000.[2]

Lim's figures are corroborated by several months of wire intercepts that showed Lim and Pan planning multiple pickups per weeks in amounts that appear to average well over $500,000 per week. *See, e.g.,* Gov. Exs. 001-7, 9 (planning the receipt of $480,000 in Chicago for April 24, 2017, two days after $204,000 was received in New York); 001-14 (planning the pickup of $1.5 million in Atlanta so defendant could release the equivalent amount to the DTO client). Further, between January and May 2017, the government twice seized money from Lim or her lead courier, Sui Yuet Kong, and both seizures involved approximately $500,000 ($492,956 seized from Lim in Chicago on January 31, 2017, and $504,583 seized from Kong in New York on May 22, 2017).

Based on the above, a conservative estimate would be that defendant, Pan, and

---

[2] The government can provide the Court with a copy of Lim's grand jury testimony upon request. The defendant has a copy.

Lim laundered at least $500,000 per week. Between March 1, 2016 and May 22, 2017 (the date of the last seizure after which Lim no longer participated in the conspiracy), there were approximately 63 weeks.[3] However, to be extra conservative, the government will consider the duration to be only 52 weeks. $500,000 multiplied by 52 is $26,000,000, which is already over the $25,000,000 § 2B1.1(b)(1)(L) threshold.

Of course, while Lim's involvement in the Count One conspiracy ended after the May 22, 2017 seizure in New York, defendant's did not. Evidence presented at trial showed that defendant continued to launder money with Pan and Huanxin Long through at least October 2017, at roughly the same rate as when Lim was involved in the conspiracy. *See, e.g.,* Gov. Exs. 001-20 (August 8, 2017 BBM intercept between Pan and Long in which they discuss using defendant to complete a mirror transaction involving $300,000); 001-23 (October 31, 2017 BBM wire intercept between Pan and Long in which Long confirmed that defendant completed a mirror transaction involving $259,000). Moreover, defendant facilitated the laundering of funds derived from the money pick-ups in May and June 2018, totaling approximately $539,100. In sum, the government's calculations are firmly grounded in the evidence, use conservative numbers to best approximate the volume of funds laundered by the defendant, and fairly represent that defendant laundered a huge amount of drug process – an amount well in excess of $25,000,000.

The government has no other objections to the PSR (with the possible exception

---

[3] March 1, 2016 is a reasonable starting point, as Lim testified that she began conducting the money pickups for Pan and Gan in "early 2016," shortly after returning from her meeting with them in Guadalajara on January 21, 2016. R. 141, 660-676.

of the Probation Officer's findings as to whether a fine is appropriate, as discussed below). Based on the above, as well as the relevant portions of the Government's Version, defendant is a total offense level of 43 and a criminal history category of I, leading to an advisory range of life imprisonment.

### B. Response to Defendant's Objections to the PSR

Defendant's primary concern with the guidelines calculation is that it results in the same recommended penalties that he would be facing had he been convicted of Count One, which he argues is fundamentally unfair. R. 161, 17. Before the Court can address the fairness of the ultimate sentence, however, it must correctly calculate the guidelines. The law is crystal clear that the Court should include acquitted conduct proven by a preponderance and properly considered as relevant conduct under Guideline § 1B1.3 when making this calculation. *Watts*, 519 U.S. 148.

Defendant does not (and cannot) seriously attempt to argue that the government did not prove his involvement in the Count One conspiracy by a preponderance. Further, defendant's argument that the counts of conviction were not part of the same common scheme or plan as the Count One conduct are off the mark and unpersuasive. Rather than focus on the relevant commonality criteria, defendant rehashes old arguments about why he is not actually guilty of these counts (i.e. "black money" versus "white money," entrapment, etc.)—all of which the jury rejected. R. 161, 16.

Defendant objects to almost every guidelines enhancement and adjustment the probation officer applied. Across the board, defendant's arguments are conclusory and

6

contradicted by the evidence. R. 161, 17-19. Rather than respond to each of these undeveloped arguments individually, the government refers the Court to the Government's Version, which lays out in detail the evidentiary basis for each enhancement and adjustment the Probation Officer correctly applied.

**C. The 3553(a) Factors**

    *i.*    <u>Nature and Circumstances of the Offense</u>

For almost three years, defendant operated at the highest levels of international money laundering, facilitating and executing the movement of enormous quantities of drug proceeds through the international financial system on a nearly daily basis. Defendant's crimes allowed his Cartel clients—among the most violent, and politically and socially destabilizing, criminal organizations in the world—to prosper, while also enriching defendant (*see*, for example, Gov. Ex. 001-22, in which Pan explains to Lim that defendant had earned "at least one million" in commission fees from his involvement in the conspiracy).

The seriousness of defendant's crimes cannot be overstated. The flow of drug proceeds from the United States to Mexico constitutes the lifeblood of the drug cartels, and defendant and his associates acted as the heart pumping that money through the system. It does not matter that defendant never personally distributed narcotics—drug distribution and money laundering are two-sides of the same malignant coin.

To the extent that the Court thinks a 240-month sentence is high for a money laundering case, it should consider that the *at least* approximately $26,000,000 in

7

drug proceeds that the government has proven by a preponderance that defendant laundered equates to roughly 520 kilograms of heroin (at $50,000 per kilogram) or 866.67 kilograms of cocaine (at $30,000 per kilogram) sold in the United States. Notably, judges in this district routinely sentence drug traffickers who distribute similar quantities of narcotics to sentences *far* exceeding what the government is asking for here, largely based on drug quantity analyses determined under a preponderance standard. *See, e.g., United States v. Edgar Roque*, 15 CR 485, (N.D. Ill. Kendall, J) (420 month sentence for wholesale drug distributor found liable for distributing over 450 kilograms of cocaine and several dozen kilograms of heroin); *United States v. Jesus Raul Beltran Leon*, 09 CR 383 (N.D. Ill. Castillo, J.) (336 month sentence for Sinaloa Cartel member found liable for distributing in excess of 450 kilograms of cocaine). What is more, the above narcotics equivalency figures do not adequately capture the promotional aspect of money laundering—by returning at least $18,000,000 in profits to the drug cartels, defendant enabled his DTO clients to reinvest in *far* greater quantities of narcotics for future sales.[4] From the government's standpoint, there is little if any difference in terms of culpability between the drug traffickers who move the product, and the money launders who knowingly move the dirty proceeds.

At sentencing the Court will not hear directly from the likely thousands of individuals who struggle with addiction to the poison distributed by defendant's

---

[4] As the Court knows, Mexican DTOs purchase or produce narcotics at much lower prices per kilogram in Colombia and Mexico than what the narcotics are sold for in the United States.

clients', or their family members and friends who suffer quietly, or the many Chicagoans whose neighborhoods have been ravaged by violence linked to the drug trade, or the citizens of Mexico who endure regular atrocities and rampant corruption under the unwavering grip of the drug cartels. Nevertheless, the countless victims of international drug trafficking are out there, and the Court must consider them at sentencing.

Obviously, the defendant is not directly or solely responsible for all of the harm described above. However, after making it his business for years to ensure the drug cartels reaped the profits of their poisonous trade, it is appropriate that the Court hold him accountable to a meaningful extent for the widespread, foreseeable human costs inflicted by his clients.

When it comes to fairly factoring the Count One acquittal into the ultimate sentence, the government makes the following general points. First, contrary to defendant's argument, the jury's acquittal does not necessarily mean it determined defendant was not involved in the Count One conspiracy (as the defense well knows, there is good reason to believe the acquittal was based on reasons other than that the government did not meet its burden). *Watts*, 519 U.S. at 155 ("An acquittal is not a finding of fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt"). It does not offend basic notions of fairness for the government to revisit the matter at sentencing—indeed, the government would be derelict in not doing so.

Second, this case presents some unusual circumstances that give the Court

9

good grounds to rely on acquitted conduct in aggravation to a greater extent than it otherwise might. Specifically, the evidence underlying the four counts of conviction was also extremely probative of defendant's guilt as to Count One. Simply put, defendant and Lim could not have discussed complex money laundering transactions in such a second-nature fashion (*see* Gov. Exs. 002-1 – 7), and then carried out the three undercover pickups so quickly and seamlessly, unless they had laundered money together in the same manner before (that is particularly true given that defendant brought the DTO clients to the table). Defendant himself has stated as much. *See* Gov. Ex. 002-14 ("Listen. How did such a situation happen today? This is not the first time we do this!"). Further, the government's Count One evidence standing alone *far* exceeds a preponderance standard. As explained in further detail in the Government's Version (pp. 4-6), it included detailed cooperator testimony, corroborative wire intercepts between co-conspirators, consensual recordings with the defendant, evidence recovered from defendant's phone, toll records, travel records, and more. In the face of this evidence, the jury's verdict as to Count One was perplexing, but does not mean the conduct should be discounted or flat out ignored.

In the final analysis, the difficult balancing act for this Court is to meaningfully incorporate the verdict into the sentence without closing its eyes to the truth that for roughly three years, defendant laundered staggering quantities of drug money. The government believes its recommended sentence of 240 months—which is *substantially* below the low end of the guideline range—strikes the correct "sufficient but not greater than necessary" balance in light of the evidence and all of the factors

10

this Court must consider.

### ii. *History and Characteristics of the Defendant*

There is nothing in defendant's history or characteristics (*e.g.* abuse, addiction, poverty, lack of education/opportunity) that provides mitigating context to his crimes. To the contrary, as the defendant himself stresses in his sentencing papers, he was running a large, successful legitimate business at the time he engaged in the offense conduct. Although defendant apparently views this as mitigating, from the government's standpoint it is aggravating: it demonstrates that this was a crime motivated by greed, not necessity, and that defendant willingly jeopardized the livelihoods of "hundreds" of others so that he could make some extra drug money on the side. R. 161, 6.

Nevertheless, even setting the Count One acquittal aside, the Court could reasonably conclude that a below guideline sentence is sufficient but not greater than necessary given defendant's lack of criminal history, age, and immigration status. Specifically, as a Mandarin-language speaker who has never before resided in the United States, it is reasonable to assume that any time served in B.O.P. custody will be particularly difficult on the defendant.

### iii. *3553(a)(2) Factors*

The most salient 3553(a)(2) factor in this case is general deterrence. As the evidence at trial established, the defendant was part of a recent phenomenon in which a relatively small network of Chinese money brokers based in Mexico have come to dominate international money laundering markets. Like defendant, many of these

11

brokers are also engaged in legitimate business, and use that business as cover for and to further money laundering activity.

The government believes that defendant is the first such high-level broker to go to trial in the United States, and is among the highest-level brokers to be convicted in the United States. Based on the investigation, including wiretapped conversations and witness testimony, defendant appears to have held a prominent position among these expatriate brokers. Given what appears to be the small, tight-knit nature of this broker community, combined with the considerable press coverage this case has received and its first-of-its-kind status, it is reasonable to assume that other similarly situated brokers who remain at large are monitoring the outcome of this case closely. The Court thus has a rare opportunity to send these relatively newly-formed criminal syndicates a strong message: turn away from the cartels and stick to your legitimate trades or risk the severest of consequences.

Individual deterrence, incapacitation, and the need to punish are also important 3553(a)(2) factors in this case. Defendant possesses a sophisticated and rare skillset that is highly sought after by the cartels and is extremely lucrative. Defendant's sentencing papers demonstrate that his experience with the criminal justice system to date has left him utterly unreformed and unrepentant, and therefore likely to reoffend if not given a lengthy custodial sentence. Indeed, it is astonishing and deeply troubling that, after the jury's verdict and in the face of a mountain of plain-as-day evidence, defendant continues to try to gaslight this Court by presenting himself as nothing more than a big-hearted, unsuspecting seafood

salesman who was duped by his evil friend Lim and overzealous government agents. *See* R. 161, 7-11. Defendant's ongoing refusal to accept responsibility should be met with a harsh sanction from this Court.

    *iv.*    <u>*Need to Avoid Unwarranted Sentencing Disparities*</u>

The government's lead cooperator, Seok Pheng Lim, has not yet been sentenced. Under the terms of Lim's cooperation agreement, the government has agreed to recommend a sentence at 50% of the low end of the guideline range, which the government and Lim's attorney expect will result in a recommended sentence of 146 months. *See United States v. Seok Pheng Lim*, 19 CR 279, R. 23, 10-11.[5]

Of course, unlike the defendant, Lim pled guilty to the Count One conspiracy. Nevertheless, given that the evidence at trial established by a preponderance that defendant was not only a member of the Count One conspiracy, but also recruited and supervised Lim, and collected a larger percentage commission fee per money laundering transaction than Lim, coupled with the facts that defendant did not cooperate and did not accept responsibility for his crimes, it is the government's position that defendant should receive a sentence that is substantially higher than Lim's.

**D. Fine**

Guideline § 5E1.2 provides: "The district court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay a fine." The PSR states, "it appears that defendant is unable to

---

[5] Lim's guidelines calculations are based on a value of laundered funds of $48,000,000.

13

pay a fine within the guideline range at this time" because the defendant "reported that his net worth is unknown and denied having any monthly cash flow." PSR ¶ 64. However, the Probation Officer's Recommendation appears to reach the opposite conclusion: "The defendant has thus far not demonstrated his inability to pay a fine within the guideline range," but goes on to recommend a substantially below-guideline fine of $5,000.

It is the government's position that the defendant has not come close to demonstrating his inability to pay a fine within the guideline range, and thus a fine within the range should be imposed, particularly in light of the relevant factors under 18 U.S.C. § 3572(a) and Guideline § 5E1.2(d). *See United States v. Bauer*, 129 F.3d 962, 964 (7th Cir. 1997) (defendant bears the burden of proving he lacks the financial means to pay a fine). Indeed, the available evidence tends to show that he can *easily* pay a within-guidelines fine.

In addition to the information contained in the PSR (¶ 62), the Court should not ignore other obvious financial indicators (particularly since, as discussed below, defendant has been less than forthcoming about his finances). According to his own sentencing papers, defendant owns several large factories around the world that "have brought hundreds of jobs to multiple communities"—a fact that he did not reveal when reviewing his assets with the probation officer. R. 161, 6. Further, the evidence at trial showed that defendant earned huge profits through his money laundering work by charging percentage commission fees on at least weekly transactions that averaged $500,000. As discussed above, in an intercepted

14

communication between Pan and Lim, Pan complained that defendant had earned profits in excess of $1,000,000 during the course of their work together.

Further, defendant plainly tried to obstruct the Probation Officer's financial investigation. Specifically, defendant told the Probation Officer he was unable to provide any estimate of his funds overseas because he does not have "access" to the accounts. PSR ¶ 62. That is ridiculous. If defendant is personally unable to access or estimate the amount of money in his accounts (unlikely), he could presumably have his wife (whom he speaks to on a daily basis) or someone else pull that information for him.

Criminal defendants should not be able to slip out of meaningful fines so easily, especially where, as here, there is a strong need to deprive the defendant of illegally obtained gains from the offense, and there is no restitution ordered (so no risk of restitution impairment). 18 U.S.C. § 3572(4) & (5); *see United States v. Young*, 66 F.3d 830, 839 (7th Cir. 1995) (defendant who refused to provide financial data to probation failed to meet his burden of proof that he was unable to pay fine; district court did not err in imposing fine and requiring defendant to pay it through the Inmate Financial Responsibility Program).

The Court should impose a fine within the guideline range—the government recommends at least $350,000.

### E. Supervised Release

The government agrees it is unnecessary to impose a term of supervised release, as defendant will be deported upon his completion of any custodial term.

## III. Conclusion

For the reasons set out above, the government respectfully asks this Court to impose a sentence of 240 months' imprisonment, a fine of at least $350,000, and no term of supervised release.

                                      Respectfully Submitted,

                                      JOHN R. LAUSCH, JR.
                                      United States Attorney

By:   */s/ Sean J.B. Franzblau*
       Sean J.B. Franzblau
       Richard M. Rothblatt
       Assistant United States Attorneys