```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )   Docket No. 18 CR 781
                                       )
 4                    Plaintiff,       )   Chicago, Illinois
                                       )   February 26, 2020
 5             v.                      )   11:04 a.m.
                                       )
 6    XIANBING GAN,                    )
                                       )
 7                    Defendant.       )

 8                         TRIAL VOLUME 7 EXCERPT
                  TRANSCRIPT OF PROCEEDINGS - Closing Arguments
 9          BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury

10    APPEARANCES:

11    For the Government:    MR. SEAN J.B. FRANZBLAU
                             MR. RICHARD M. ROTHBLATT
12                           Assistant United States Attorneys
                             Honorable John R. Lausch, Jr.
13                           United States Attorney
                             219 S. Dearborn Street, 5th Floor
14                           Chicago, IL 60604

15    For the Defendant:     MR. GLENN SEIDEN
                             MS. BROOKE L. STEVENS
16                           MR. AARON SCHWARTZ
                             Seiden Netzky Law Group LLC
17                           333 S. Wabash Avenue, Suite 2700
                             Chicago, IL 60604
18
      Also Present:          MR. XIANBING GAN
19                           SPECIAL AGENT STEFANIE MOTON
                                (Homeland Security Investigations)
20
      Court Interpreters:    MS. ROBIN XU MURPHY (Mandarin)
21                           MS. TIAN HUANG (Mandarin)
                             MS. TINA DILLON (CART)
22
      Court Reporter:        LAURA R. RENKE, CSR, RDR, CRR
23                           Official Court Reporter
                             219 S. Dearborn Street, Room 1224
24                           Chicago, IL 60604
                             312.435.6053
25                           laura_renke@ilnd.uscourts.gov
```

1       (Proceedings had not herein transcribed.)

2       (In open court in the hearing of the jury; defendant

3       present.)

4               CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

5               MR. ROTHBLATT:  A serial number on a dollar bill, a

6   combination of letters and numbers that are meaningless to most

7   people.  But to the defendant and his network, it meant

8   everything.  It was the ticket, the ticket to millions of

9   dollars of drug proceeds generated from the sale of drugs in

10  the United States, which then led the defendant and his

11  operation to take that money on a tour through China, all the

12  way back to drug traffickers in Mexico.

13              That's because from 2016 through 2018, the defendant

14  was an international money launderer using covert tactics,

15  complex schemes, to collect drug proceeds in the United States,

16  move them internationally to get back to drug traffickers in

17  Mexico, to conceal the nature of those proceeds and who owned

18  them.

19              It is for that reason that we're here today, and it's

20  that reason the defendant's been charged in a five-count

21  indictment.

22              So today, for the next hour or so, I'm going to walk

23  you through the instructions that the judge just gave.  We'll

24  talk about the elements and what the government is required to

25  prove beyond a reasonable doubt and how the evidence satisfies

1    each element of each count.  And for that reason, we will ask

2    at the conclusion for you to return a verdict of guilty on all

3    counts.

4            As the judge instructed you, you will have a copy of

5    the indictment with you back when you deliberate.  But recall

6    that there are five separate charges, kind of in three

7    different categories and two different time periods.

8            Number one, there's money laundering conspiracy.

9    That's Count I.

10           Counts II through IV are substantive concealment money

11   laundering relating to the 2018 transactions that the defendant

12   set up and directed.

13           And Count V, again relating to that 2018 time period,

14   charges defendant with operating an unlicensed money

15   transmitting business in the state of Illinois.

16           Now, let's talk about Count I.  Count I requires you

17   to find two things beyond a reasonable doubt.  Number one, the

18   conspiracy charged in Count I existed.  Number two, that the

19   defendant knowingly became a member of the conspiracy with

20   intent to advance it.

21           The judge just read to you a lengthy instruction for

22   Count I.  It was a page and a half.  So let's talk about what

23   it means in English terms, in simple English.

24           The government is required to prove either an

25   international or domestic concealment, that there was an

1    agreement to do that.  And for that you need four

2    commonalities:

3            Number one, a financial transaction.  And that's, as

4    we'll talk about when we talk about the definitions, a money

5    handoff, a money pickup, the system you've heard so much about.

6    That is a financial transaction.  And, number two, the cash

7    swaps in China that the defendant was causing.  Those are

8    financial transactions under both domestic and international

9    concealment money laundering.

10           Number two, the government's required to prove beyond

11   a reasonable doubt that the money actually derived from the

12   sale of drugs.  And we'll talk about the evidence that

13   satisfies that element.

14           Number three, the government's required to prove the

15   defendant's knowledge that the money derived from illegal

16   activity.

17           Now, it's not required that the defendant actually

18   knew the money derived from drug sales but rather that it

19   derived from illegal activity generally, although that is what

20   the evidence establishes, and we'll talk about that later.  The

21   defendant very well knew he was moving drug money generated in

22   the United States through China back down to Mexico.

23           And, number four, the government's required to prove

24   beyond a reasonable doubt concealment, that the entire purpose

25   of these financial transactions was to conceal the owner, the

1    nature, the source of the money, the fact that it was drug

2    money.

3    And we'll talk about that being the only purpose for

4    going through these ridiculous transactions both in the United

5    States and in China to get money back down to Mexico.

6    Now, what is a conspiracy?  As Judge Durkin just

7    instructed you, it's simply an agreement to commit a crime.

8    You can consider all of the circumstances, including the words

9    or acts of the participants.  And as we'll talk about, we have

10   lots of those to consider.  The defendant doesn't need to be

11   involved in every step.

12   Now, you heard testimony about the defendant being

13   located in Guadalajara, Mexico.  He doesn't need to be in

14   Chicago, Illinois, for those money pickups or in China when the

15   transactions are actually taking place to be a member of the

16   conspiracy and guilty of the conspiracy, as long as he is a

17   member of the conspiracy, knowing its purpose and involved in

18   its purpose.

19   Some more definitions.  You heard about proceeds.

20   Proceeds are simply the money generated from the sale of drugs.

21   It's a felony to distribute narcotics, including heroin,

22   cocaine, marijuana, crystal methamphetamine, and the money

23   generated from that are drug proceeds.

24   Financial transactions we discussed.  That includes

25   the money pickups that you've heard so much about and the

Closing Argument - Government

mirror transactions the defendant was intimately involved in.

Three, that it affected interstate or foreign commerce, that simply it had an impact on commerce between the states or internationally. And clearly here when we're talking about drugs being moved from Mexico up to the United States, already crossing borders, the sale of those drugs and the movement of those proceeds from businesses through China back down to Mexico, we're talking about something affecting interstate or foreign commerce.

And the easiest definition we'll talk about now. To conceal is to hide. You don't need to overthink that one.

Let's talk now, before we dive into the evidence, just a quick primer on the money pickup process that you could probably describe in your sleep at this point.

As you well know, there are two main organizations involved in this process, the drug side and the money side.

The drug side first. Based in Mexico. The suppliers set up drug sales in the United States by distributing narcotics in the United States: Chicago, New York, Atlanta, and other places in the United States. And they generate cash proceeds.

Special Agent Jill Dennewitz walked you through the process. These drugs are secreted in semiautomatic trucks -- in semitrucks. And Anthony Valdivia told you the same thing. That's how he got his drugs, from semitrucks. And once those

Closing Argument - Government

1   drugs are brought into the United States and sold, the drug

2   trafficking organization needs to get the money back.

3          So how do they get that cash back?  They contract with

4   a money laundering organization just like defendant's.  So they

5   have a contract.  It's not a written contract.  It's not a

6   formal contract.  It could be a text message, a phone call, a

7   communication between the two parties agreeing to a money

8   pickup.

9          And that's where the money courier on the ground,

10  working for the money laundering organization, communicates a

11  few key pieces of information: the serial number from the

12  dollar bill, code to be able to communicate with the drug side

13  so they can identify one another and eventually hand off that

14  dollar bill as a receipt for the drug money transfer; a phone

15  number, typically from a burner phone because they don't want

16  to be associated with their real phone number; and, number

17  three, a code name, again, because they don't want to be

18  associated with the transaction because they know they're

19  dealing in illegal proceeds.

20         So the money courier passes this information up to the

21  money laundering broker in Mexico.  The money laundering broker

22  communicates that information over to the drug broker in

23  Mexico, who in turn communicates it to the drug courier in the

24  United States.  And that's when the meeting takes place.  They

25  confirm they're talking about the same code.  They confirm the

1   code name.  They meet up, and they have this handoff of the

2   drug proceeds from the drug side to the money side.  And that's

3   when defendant's role really comes in.

4           Now, you also heard about mirror transactions, and you

5   probably have nightmares about this demonstrative exhibit that

6   you've seen so many times.  And it looks complex and it looks

7   scary, but by this time you understand it.

8           What we're talking about here, the first portion of

9   the demonstrative, is the drug trafficking courier handing

10  money off to the money laundering courier, what we just

11  discussed, the money pickup process.  And then after that, as

12  Seok Pheng Lim told you, the money is transferred to retail

13  businesses who have money in China.

14          Now, why is this taking place?  Because there's going

15  to be a swap of equivalent currency in China, a way to get that

16  drug money from the money laundering organization through

17  accounts in China linked to the defendant and his associates

18  back down to Mexico to get to the drug trafficking

19  organization.

20          They don't -- the key to the system is threefold:

21  Number one, as Special Agent Dennewitz told you, it's fast.

22  Number two, it's efficient.  And, number three, there's no

23  paper trail.  When you have these transactions, it is

24  impossible to know what's going on unless you have someone on

25  the inside telling you that it's taking place.

Closing Argument - Government

1          And that's what Seok Pheng Lim, or Michelle, told you.

2   She told you about these transactions and how they worked in

3   the 2016 and 2017 time period.

4          Now, it's important to remember one instruction Judge

5   Durkin just gave you. You heard the testimony from Special

6   Agent Jill Dennewitz, who has been working on money laundering

7   cases for 16 years for the Department of Homeland Security.

8   She walked you through that structure on this board. And she

9   was able to identify -- she was able to identify members of the

10  organization.

11         You'll recall her testimony. She -- after all of her

12  experience, wires, recordings, debriefing undercover agents,

13  working with confidential sources, she was able to go through,

14  read 25 transcripts and tell you who was who.

15         She said that Louis Vuitton, Esparza, AMG, Horseshoe,

16  that's on the drug side; they're the ones setting up the

17  contracts. And Haiping Pan, he's the money laundering broker

18  with the contacts with the drug supplier. And she told you

19  that's very common in money laundering organizations.

20         You have your client-facing money laundering brokers,

21  then you have your money guys. And that was Garry, or Old Gan,

22  the defendant. And she told you about intermediaries, Seok

23  Pheng Lim and Huanxin Long. Those people were corresponding

24  with Pan, getting information about the contracts, and then

25  working with the couriers to pass the information up.

Closing Argument - Government

1    Those couriers she identified based on the transcripts

2 are Mrs. Yue, Karen, Amy, and Andy.  Later you learned that a

3 lot of those names are associated with Kong, the individual in

4 New York who Lim had working for her.

5    So you heard this testimony from Special Agent

6 Dennewitz that this organization depicted in the transcripts

7 was emblematic of a money laundering organization and that the

8 mirror transactions they engaged in, this is the telltale sign

9 of a money laundering organization, moving drug proceeds.

10    She told you that in the course of her experience, she

11 has never encountered an investigation in which the serial

12 number system and money pickups like this were taking place

13 where they weren't moving drug proceeds.  This was Textbook 101

14 money laundering participated in by these individuals and this

15 kind of organization.

16    But I highlight this instruction for a reason.  You

17 don't need 16 years of experience with the Department of

18 Homeland Security to listen to the evidence that you heard over

19 the last week and realize something is wrong here.  Use your

20 common sense.  You know that confirming identity through serial

21 numbers on dollar bills, orchestrating meetings in parking lots

22 and hotel lobbies where hundreds of thousands of dollars,

23 millions of dollars are being passed, indicates we're talking

24 about drug trafficking and money laundering and that the

25 purpose of this was to conceal the nature of the money, who

Closing Argument - Government

1    actually owned it and how it was generated.

2           So when you go back to deliberate, please consider all

3    of the evidence that you heard, including that of Special Agent

4    Dennewitz, but don't forget your common sense.  You know these

5    transactions are illegitimate, and you know that anyone

6    participating in this system, including the defendant, knows

7    the same.

8           Now, talking about the Count I evidence, let's turn to

9    the beginning, January 2016.  Lim told you that in January of

10   2016, the defendant summoned her down to Mexico.  And at that

11   time she flew down to Guadalajara.  She met with the defendant

12   and Haiping Pan, who was described as the defendant's business

13   partner.  And this trip is corroborated by travel records for

14   Lim, which reflect travel in January of 2016 down to

15   Guadalajara, Mexico.

16          And this meeting was important.  This is the beginning

17   of the conspiracy, the beginning of an agreement to launder

18   money, because defendant and Pan tell Lim there's money

19   available in the United States associated with Mexican

20   companies and businesses.  There's cold, hard cash in the

21   United States that needs to be picked up.  And we need

22   something from you.  Because you are in the United States, go

23   find businesses that can accept this cold, hard cash but also

24   have RMB in China available to swap to accounts that we're

25   going to give you.  And the goal is to get that money back to

Closing Argument - Government

1    the Mexican businesses.

2            So Lim at the time hears about this system, and she

3    knows her charge:  Go find these businesses.  But Pan also

4    tells her about this interesting system involving serial

5    numbers and code names and burner phones.  So already they're

6    planting the seeds for the money pickup process that's going to

7    take place over the next two years as a member of this

8    conspiracy.

9            So you also heard Lim testify about Haiping Pan,

10   Francisco, someone she knew as.  And you'll hear -- we'll

11   discuss the testimony that reflects that Pan throughout the

12   next two years was in constant communication with the

13   defendant.

14           Interestingly enough, again, corroborating Lim's

15   testimony, you heard testimony from Special Agent Daoud about

16   phone extractions from the defendant and particularly about the

17   addition of Pan as a contact in the defendant's phones.  One

18   such contact was added in January of 2016, corresponding

19   directly with Lim's trip down to Mexico in January of 2016.

20           So you just received an instruction from Judge Durkin

21   about considering Lim's testimony and that of Wei Li's with

22   great caution and care, and you should.  However, when you

23   consider her plea agreement and her cooperation with the

24   government, you can also consider all of the evidence in the

25   case, including that independent corroborative evidence which

Closing Argument - Government

1    establishes that Lim was telling you the truth.  So be

2    mindful -- and I'll point it out throughout the course of my

3    presentation -- of all the evidence that establishes that Lim's

4    story is fully and independently corroborated.

5        Now, you know from testimony from Special Agent

6    Matthew Daoud and his phone extractions that Gan -- that the

7    defendant and Pan were communicating.  But they were

8    communicating over WhatsApp.  That was the source of his

9    contacts.  And Lim also told you she communicated with the

10   defendant over WeChat and by phone.

11       We'll talk about additional records introduced during

12   the course of the trial that establish this manner of

13   communication.  Now, why is that relevant?  Because as you saw

14   in the BBM interceptions, the defendant wasn't captured.

15       Now, the government acknowledges defendant was not

16   intercepted in those BBM conversations, but that's because he

17   didn't use BBM.  Special Agent Daoud told you he went through

18   the two phones associated with the defendant, and he did not

19   find the BBM applications on the phone.  So, simply put, the

20   defendant used other means of communication as a part of the

21   conspiracy, including with Pan and the WhatsApp communications.

22       Now, you heard from Lim that when she gets back to the

23   United States after this meeting in Guadalajara, she goes out

24   to find businesses in New York that can accept the cash and

25   swap RMB equivalent amounts in China.  And she walked you

1  through the very first time she did it.  She told you that it
2  started with a contact from the defendant, a WeChat
3  communication about a contract in New York and a solicitation
4  for a serial number, code name, and phone number, which Lim
5  provided by WeChat to the defendant.

6      Soon after Lim provided that information to the
7  defendant, she received a phone call from an individual whom
8  she did not know.  Now, you know who that individual was.  He
9  was a drug courier.  And he was contacting Lim because his boss
10 had received information from defendant or Pan.

11     And for that first meeting, she walked you through it.
12 She said she went to Lower Manhattan after making contact with
13 that individual.  She waited outside a café.  She didn't know
14 who she was meeting with, so they had to text about their
15 clothing.  He was wearing a blue shirt, a white hat.  They
16 ended up meeting outside on a street in Manhattan.  She opened
17 up the bag, and she saw stacks of cash.

18     She jumped in a taxi, and she went down to the broker
19 she had found, which was an export and import of Chinese
20 supplements.  She went in there; they counted the cash
21 together.  And upon counting the cash, she contacted the
22 defendant yet again by WeChat and told him the amount of money.
23 Then the defendant, along with Lim and the Chinese broker,
24 discussed the exchange rate, which they confirmed over an
25 application.

Closing Argument - Government

1    So the defendant is intimately involved in this whole

2  process, but his involvement isn't done.  He then provides an

3  account number in China for the Chinese broker based in New

4  York who is receiving that cold, hard cash to wire an

5  equivalent amount of RMB.

6    That is defendant's involvement in the money

7  laundering process.  He is the money man with the accounts

8  based in China to accept RMB in exchange for the drug money

9  being exchanged in the United States.

10    And I plugged in here that first money pickup just so

11  it's perfectly clear as to who is who in that first

12  transaction.

13    Blue shirt and white hat's boss is the one

14  communicating with defendant or Pan, and defendant is directing

15  Lim about that first money pickup in order to get the money to

16  China, back down to Mexico.

17    Now, how did it move after it gets picked up by the

18  broker?  You know they're using mirror transactions.  And how

19  do you know?  Well, first, you heard the testimony from Lim

20  about it, but they also acknowledge it directly over the course

21  of the wire.  When asked by AMG, a drug trafficker, to lower

22  the commission rate, Pan says, "It's a mirror, buddy.  We're

23  not lowering their commission rate."  And then further he says,

24  "If I mention that to Garry," defendant, "he's going to be

25  mad."

Closing Argument - Government

1    An important question I want you to ask yourself when
2  you're deliberating is why in the world is defendant, Garry,
3  being referenced on these wires, these communications between
4  the defendant and drug traffickers?  If defendant is not
5  involved, they would respond, "Who the heck is Garry?  I have
6  no idea why you're even talking about a guy named Garry when
7  we're talking about getting our drug money."

8    But they very well know who Garry is.  They know the
9  defendant is involved in the money laundering conspiracy.  So
10  they derive comfort where they understand that the defendant is
11  involved, and he is going to assist in getting that money back
12  to them.

13    So here when Pan references Garry to AMG, he's telling
14  you, "Look.  My partner in this money laundering operation,"
15  the defendant, "will not let us lower the commission rate."
16  And that's another way you know the defendant was involved in
17  this money laundering conspiracy.

18    So they're using these mirror transactions.  And,
19  again, just quickly here.  You know the mirror transactions at
20  this point.  But the first one works as follows:  Blue shirt
21  and white hat drops off the money to Lim.  Lim goes to the
22  supplement store.  A supplement store in China has RMB that it
23  would wire to defendant's accounts in China.  Then, probably
24  through another swap or simply a wiring in Mexico, the
25  defendant gets that money back to blue shirt and white hat's

Closing Argument - Government

boss, the drug supplier in Mexico who set up the contract in the first place.

Again, how do we know the references to "Garry" and "Old Gan" are actually referring to the defendant?  Well, look at the owner name that he put in his phone: Garry Gan.  In his visa application, he puts Garry Gan.  We're talking about the same person here.  So the references to "Garry," the references to "Old Gan," those are references to the defendant.

We talked about this briefly before, but the means in which the defendant was communicating is evidenced in the record.  He's talking through WeChat; he's talking through WhatsApp; he's talking through FaceTime.  That's exactly what Lim's testimony was.  He didn't use BBM.  He used these other sources of communication, and that's borne out by the evidence.

And further, pay attention to a moment of Special Agent Daoud's testimony yesterday.  He told you that he searched defendant's phones for WeChat communications in May and June of 2018, and he didn't find any.

Well, that's interesting because you know there were WeChat communications between the defendant and Lim in May and June of 2018.  They're in evidence.  The 002 series has WeChat text communications between the defendant and Lim in May and June of 2018.  So if they weren't there in November of 2018 when the defendant's phones are searched, you know he deleted them.

Closing Argument - Government

1    And you also heard testimony he was regularly marking

2    for deletion his communications with Pan.  So the defendant is

3    deleting during communications because he doesn't want them to

4    be found later because he knows he's laundering money for the

5    drug trafficking organization.

6    You heard testimony about how after a few pickups

7    together, the system changed.  And it changed in two ways.

8    Number one, you heard from Lim that Pan became the person with

9    whom she directly corresponded about the serial numbers, the

10   code names, and the phone numbers.  Why was that?  Pan was a

11   fluent Spanish speaker.  He could liaise with the drug

12   trafficking organizations faster, and they could get those

13   communications set up.  The defendant spoke poor Spanish.

14   Number two, you heard about Sui Yuet Kong, a courier

15   who was going to be below Lim actually doing the physical money

16   pickups.  Lim told you that she was often present for those

17   money pickups.  It was going to be Kong on the bottom level.

18   Now, that testimony is also corroborated because you

19   heard about two seizures from Kong in April and May of 2017

20   where she was directly the one observed picking up the money in

21   April of 2017, and then in May 2017, the money is seized from

22   her apartment and from her person.

23   So we take -- we come away with it with these roles

24   now.  This is the main part of the conspiracy.  You have the

25   drug side, the same people identified by Special Agent

1    Dennewitz confirmed by the wires:  It's AMG; it's Antonio
2    Cuellar Esparza; it's Horseshoe.  You have defendant on the
3    money side moving the currency around, and you have Pan, the
4    one facing with the drug trafficking clients, getting these
5    contracts.  You have Lim beneath Pan and the defendant.  She is
6    helping communicate the contracts.  And you have Kong on the
7    bottom level picking up the cash.
8            But, again, let's talk about defendant's role.  What
9    was defendant's role specifically?  And you heard it from Lim.
10   She talks about providing the account information, effectuating
11   these swaps in China, working with Pan to get the money to the
12   drug trafficking clients in Mexico.
13           But you also see it through the BBM wires.  What was
14   defendant's role?  Take a look at the transcripts.  Lim says,
15   talking about a New York City order, a money pickup, says,
16   "Garry have not answer my text to clear the account."  Why
17   would she be referencing the defendant in connection with a New
18   York City money pickup unless he's involved in the process?
19           You also heard from Special Agent Dennewitz that the
20   term "clear the account" has a very particular meaning.  "Clear
21   the account" refers to mirror transactions and the fact that
22   the account is cleared when the equivalent amount of RMB in
23   China has been swapped for the drug proceeds in the United
24   States.
25           And Lim tells you in this communication, "Okay.  Then

Closing Argument - Government

1  I just receive his account," again corroborating what Lim told

2  you about the defendant's involvement in the conspiracy and his

3  role of providing those accounts in China to receive the drug

4  proceeds.

5          A really interesting communication took place in May

6  of 2017.  You'll recall they're talking about a Chinese bank

7  holiday.  And it starts off with Pan saying, "Garry," the

8  defendant, "have $1.5 million to pay.  Now Carmen only have

9  Atlanta $1.5 million."

10         Special Agent Dennewitz interpreted this transcript,

11  and she told you something interesting.  This is a perfect

12  storm.  The defendant has $1.5 million ready to give out to the

13  drug traffickers, and we have a pickup in the United States in

14  Atlanta of $1.5 million.  So why is defendant's having

15  $1.5 million available to him relevant?  It's relevant to these

16  pickups because he's involved in the process of moving the

17  money back to the drug trafficking organization in Mexico.

18         And, again, why is it relevant that there's a Chinese

19  bank holiday in connection with an Atlanta money pickup and

20  Garry having money available to distribute?  Why does that

21  matter at all?  Because you know the Chinese banks are integral

22  to the process.  He provides the bank accounts in China, the

23  money moves through China, and then he is able to disburse it

24  to Pan or the drug traffickers in Mexico.

25         So a Chinese bank holiday shuts down operations, and

1    that's what you saw in the second part of this exhibit.

2    Because of the Chinese bank holiday, Pan says, "Forget Atlanta.

3    I'm not sending you to Chicago or New York.  We're not doing

4    pickups."

5             Lim says, "Okay."

6             And then Pan says, "I just told defendant."

7             Why in the world is he telling defendant about these

8    Chinese bank holidays and the fact that they're not doing

9    pickups in Chicago, New York, Atlanta?  Why does defendant need

10   to know that unless he's involved?  Because his role is

11   critical to the money laundering process and he is a member of

12   this conspiracy.

13            Again, talking about defendant's role, you saw

14   transcripts in which Horseshoe, the drug trafficker, is asking

15   Pan, "Hey, when are we getting our money today?"

16            Pan responds, "They already arrive to Garry's wife's.

17   That's what Garry told me."

18            The drug traffickers want their money, and Pan is

19   saying, "The defendant's got some money.  We're going to get it

20   to you."

21            Again, ask yourself.  Why is he referencing the

22   defendant in communications with drug traffickers unless the

23   drug traffickers know who he is, unless they know he's a part

24   of the money laundering organization?  He is involved.

25            And, finally, another evidence of defendant's role is

Closing Argument - Government

1   another transcript.  They're talking about delivering today's,

2   the money picked up during a money pickup.  And Pan says,

3   "Defendant wants to give me everything all together at once,"

4   because the defendant is the money man.  He is the one in

5   Mexico have -- getting access to the money after the equivalent

6   swap in China in order to provide it to Pan and the drug

7   trafficking clients.

8           The transcripts, even though they don't capture

9   defendant because he wasn't a BBM user, evidence his

10  involvement in the money laundering organization.  And ask

11  yourself why he would be referenced time and time again in

12  communications between drug traffickers and money launderers

13  unless he's involved.

14          One more communication to go through.  Lim talks about

15  a $169,000 pickup.

16          Pan says, "Okay.  I told Garry 169,000 minus our

17  commission rate, 4,920.  So it's going to be this total of

18  $164,080.  Wire the equivalent amount in China."  Pan says,

19  "Okay.  Only that amount.  Don't forget."  They're telling

20  Garry this, defendant this, because defendant needs to know how

21  much money his accounts in China are going to receive.

22          Now, one element we talked about before is that the

23  government's required to prove beyond a reasonable doubt that

24  the proceeds involved were drug proceeds.  How do you know that

25  they were drug proceeds?  Well, there are two key ways.  Number

1    one, during the course of the wire, Huanxin Long and Pan

2    discuss it openly.  Long says, "It's marijuana money."  So kind

3    of takes the fun out of it right there.

4           But, number two, you heard testimony from cooperating

5    source Wei Li.  Wei Li told you about two pickups he did in the

6    Atlanta area November 10th of 2017.  He did these money pickups

7    as part of the Pan and defendant organization.  And it's

8    evidenced through the wire and corroborated through the wire.

9           You also heard a stipulation that ten days after the

10   pickup, the same person who defendant -- who Wei Li had picked

11   the money up from, Oligario Pineda, had a drug seizure.  And

12   that drug seizure involved a substantial quantity of heroin,

13   crystal methamphetamine, and cocaine.

14          So you know the money they're moving is drug money.

15   It's evidenced through a drug seizure related to the wire and

16   an individual who had passed money to the network.  So we know

17   the money is drug money.  But how does defendant know it's drug

18   money?  Well, he knows from the start.

19          But let's talk about a particular meeting you heard

20   about.  You heard that after a series of money transfers, Lim

21   started to get suspicious.  She told you the money smelled like

22   marijuana.  It was bundled.  It was in small bills.  Kong told

23   her that people who were delivering the money were really

24   suspicious, looking over their shoulder.  So they began to

25   worry about the nature of the money they were picking up.

Closing Argument - Government

1    Lim went down to Mexico, and that's corroborated by

2    the May 2016 travel records evidencing her trip down to Mexico.

3    And this is a critical moment.  She meets with defendant and

4    she meets with Pan at a hotel bar, and they talk about her

5    concerns.  She says, "I'm concerned about this money."  She

6    says, "It smells like drugs.  Small bills wrapped in Saran

7    Wrap.  People are suspicious.  You told me this was legitimate

8    money.  What's going on?"

9    And Pan basically acknowledges directly to her face

10   right in front of defendant, "It's drug money.  Of course it's

11   drug money.  I didn't know you didn't know it was drug money."

12   Now, Lim is shocked.  The defendant, not so much.

13   If the defendant didn't know it was drug money, don't

14   you think at that moment he would stand up and say, "Whoa.

15   We're moving drug money here?  I had no idea.  I don't want to

16   be any part of this," or call law enforcement officials and

17   say, "This is crazy.  They're moving drug money here."

18   No.  He doesn't do any of those things because he

19   knows it's drug money, and he's comfortable moving drug money,

20   and he keeps doing it after this meeting.

21   Another important thing that happens during this

22   meeting is instead of shutting down operations in light of this

23   revelation, they talk about expanding business.  They talk

24   about going to Chicago, setting up money pickups in Chicago

25   directly in defendant's presence.  They're talking about Lim

Closing Argument - Government

1   getting new clients in Chicago that can accept dollars, the

2   drug money, and do equivalent swaps of RMB in China.  So they

3   talk about expanding it.

4        Now, I mentioned before corroboration of Lim's

5   testimony.  And I want to take a brief detour just to show you

6   how her testimony is fully and independently corroborated.  She

7   told you about Huanxin Long and a particular meeting she had in

8   2016 with Huanxin Long.  Now, critically for that meeting,

9   Long, who was going to be a new intermediary in the money

10  laundering organization, doesn't know the defendant.  She said

11  that -- Lim told you this person was introduced to them through

12  business contacts in Mexico.  So they don't know Long.

13       Well, in May of 2016, during the same time period of

14  Lim's travel for that meeting with defendant and Pan, Long is

15  added as a contact to the defendant's phone.  So her meeting in

16  2016 also involved a meeting with Long and corroborates the

17  fact that she is telling you the truth when she tells you Long

18  was at this meeting, and the defendant met him.  Defendant

19  didn't know him beforehand.  He's added as a contact in his

20  phone.

21       Throughout the rest of 2016, the defendant, Pan, and

22  Lim are in constant phone communication.  And it's not just

23  that they're talking a lot.  They're talking a lot in quick

24  succession.  You saw this with Special Agent Daoud.  It might

25  have been mind-numbingly boring, but it's important evidence

1    because they're not just talking.  They're talking in

2    succession, a conversation with Lim, then a conversation with

3    Pan.  And that's the defendant having these communications, and

4    it's evidenced by the records on his phone.

5            So this happens in November of 2016, happens in

6    December of 2016.  The defendant's talking to Pan, and he's

7    talking to Lim, and they're talking about money pickups.

8            Now, things change in January of 2017 because law

9    enforcement starts intercepting communications, and that led to

10   the first seizure January 31st of 2017 in Chicago.  You heard

11   all about this.  Lim and Kong flew from New York to Chicago at

12   the direction of Pan.  It's captured by the wire communications

13   with AMG.  And just like in every other deal that Lim told

14   you -- and it's evidenced by the wire, corroborated by the

15   wire -- she provided code name, a serial number from a dollar

16   bill, a phone number, and said it was for Chicago, for the

17   Chicago money pickup, and references Karen, who is going to be

18   Kong in this deal.

19           But things are a little off when they get to Chicago.

20   There are two dollar bills.  Do you remember that?  There are

21   two serial numbers.  And Lim was a bit confused as to which

22   dollar bill was applicable to this money contract, so she

23   actually physically shows up for the money transfer rather than

24   Kong.  And she goes down, and she's intercepted by law

25   enforcement.  And so are the individuals providing the money.

1          Now, critically, she also told you during the course

2     of this day she couldn't get in phone contact with Pan.  She

3     told you she was talking to the defendant over the phone and

4     through WeChat.  Once again, she's corroborated by the phone

5     records.

6          On January 31st, 2017, she has a two-minute FaceTime

7     telephone conversation with the defendant.  So she's in contact

8     with the defendant while she's in Chicago in connection with

9     the money transfer.  Perhaps they were discussing seafood

10    availability in Chicago, but in reality, they're talking about

11    the money transfer.

12         So you heard testimony from Special Agent Stefanie

13    Moton about how the actual seizure took place.  They detained

14    two individuals associated with the drug trafficking

15    organization who hadn't yet passed that pink bag that you saw

16    admitted into evidence.  And you heard from the -- from Lim

17    that she was also detained briefly and questioned by Special

18    Agent Moton, corroborated again by the wire.  And here's a

19    picture of that bag and all of the cash seized, approximately

20    $190,000 seized by law enforcement on that day.  I'm sorry.

21    $500,000 seized by law enforcement.

22         Now, she also told you that soon after that seizure,

23    she had a phone call with the defendant.  And the defendant

24    told her, "Come back down to Mexico.  Let's talk about this,"

25    again, corroborated by the travel records because the next day,

Closing Argument - Government

1    Lim travels down to Guadalajara.  And during that -- during

2    that trip, she talks to the defendant about the seizure.

3         So now defendant knows that money is being seized in

4    connection with their money movement operation.  Rather than

5    defendant saying, "Hey, that money all comes from seafood.

6    Let's put in a claim with the government.  Let's get that money

7    back," they accept it as the course of doing business because

8    they know it's drug money.

9         But they keep going forward.  They keep working

10   together as part of the conspiracy.  In March 2017, you still

11   have additional phone contacts between the defendant and Pan

12   and the defendant and Lim, again, talking about these money

13   pickups which kept taking place.

14        But, again, in April of 2017, there's another seizure,

15   this time taking place when Kong transfers money to an

16   individual named Jian Tong Li, who eventually gets it to his

17   brother Jian Tan Li.  You heard that testimony yesterday.  Law

18   enforcement seized that money as well.

19        So again a seizure, and this time after the transfer

20   has taken place.  And this is critical information.  Remember,

21   liability goes to the money laundering organization if the

22   money has been transferred.

23        And that's something Lim told you.  Defendant was

24   concerned about that.  He asked her after the January 31st,

25   2017, seizure, "Had the money been passed yet?"

Closing Argument - Government

1      She said, "No, it hadn't."

2      And he said, "That's good."  He knows that's good

3 because they are liable once they accept that money.

4      So in April of 2017, the money laundering

5 organization's starting to have some problems.  Money is being

6 seized directly on their end, not before it gets to them from

7 the drug traffickers.

8      Then in May 2017, they get hit again.  You heard

9 testimony from Task Force Officer Angelo Pisani.  He told you

10 about surveillance on Kong in connection with wire evidence in

11 New York and how they stopped her, found $100,000 in her bag,

12 another $390,000 in her apartment.

13      And this was the money laundering organization's

14 money.  They had accepted this money from the drug traffickers,

15 and this caused a major problem.  And you heard a lot about

16 this debt that the money laundering organization owed to the

17 drug trafficking organization.

18      In fact, Lim testified that around the time of the

19 seizure, she is already heading back down to Guadalajara,

20 again, corroborated by her travel records.

21      On May 23rd, 2017, she flies down to Guadalajara.  And

22 you'll remember she has two important meetings during this

23 trip.  Meeting number one, directly with the defendant in her

24 hotel room where he tells -- where she tells the defendant

25 about the seizure.  She tells him the money is seized, and

Closing Argument - Government

1  he -- they acknowledge that the money that was seized belonged

2  to the big boss, the big boss being a drug trafficker.

3      So the defendant again -- it's being brought to his

4  attention that the money involved is drug money, and now it's

5  being seized. Defendant doesn't tell Lim, "Hey, go back to New

6  York. Claim that money. It's legitimate money," because he

7  knows it's not legitimate money. He knows it's drug money that

8  they're moving.

9      But at that point Lim's testimony was that the

10  defendant went off to do other business, and she went along to

11  meet with Pan, the big boss, and his family for that Japanese

12  lunch.

13      And after the lunch, the big boss's family clears out,

14  and they talk about what happened on May 22nd. They talk about

15  the seizure from Kong, and they talk about liability. Who is

16  going to pay these $500,000 that were seized?

17      And the big boss and Antonio Cuellar Esparza, depicted

18  in the next slide, they make an agreement. They say, "Okay.

19  The drug trafficking organization will take responsibility for

20  half of the money seized. 250, that's on us. But the other

21  250 is yours, money laundering organization. It's going to

22  belong to Pan. It's going to belong to defendant and Antonio

23  Cuellar Esparza."

24      They are dividing up the rest of it. They are liable

25  for that money to the big boss and his drug trafficking

1    organization.  And as you know from the evidence and as we'll

2    talk about, that leads to major problems.

3          After this seizure, another change happens.  Lim drops

4    out.  She says, "I am done doing these money transfers."  She's

5    scared by the seizures.  She's already been arrested.  She's

6    never done anything like this before in her life.

7          The defendant, he keeps on going.  And you know that

8    because of the wire intercepts.  August 2017 when Long now gets

9    integrated to replace Lim, he's talking to Pan about a money

10   pickup.  And they reference their commission rate, and Pan

11   says, "Such is the current price of Old Gan," the defendant.

12   Why is he referencing the price of the defendant?  Because he's

13   talking about the defendant's commission rates in connection

14   with his money laundering for drug cartels, just like Long and

15   Pan are talking about the same thing.

16         Now, you'll recall in August 2017 intercepted phone

17   call between Pan and Lim.  And it's a critical conversation for

18   a number of reasons.  It starts off with Pan talking about the

19   fact that he could get killed by the drug traffickers he's

20   working for.  And he talks about the defendant's debt, that

21   portion of the $500,000 seizure that defendant's liable for,

22   and says he has to pay it.  Effectively they're dealing with

23   drug dealers.  Doesn't matter if he wants to pay it.  He's got

24   to pay it.  These are violent individuals.

25         Pan then says, "I don't want to do business with him

Closing Argument - Government

1    anymore.  I don't think you should either.  You should clear

2    the account with him.  Make sure all their tabs are settled

3    from their money laundering business and then be done with it."

4    When she talks -- when he talks about "if you're still doing

5    the business with Old Gan," he's talking about the money

6    laundering business.

7             And then critically, Pan makes an interesting

8    statement.  He says, "We supposed to make money together, and

9    we all agreed at the beginning, but he later told me to make

10   less and then he could make more."

11            "We all agreed at the beginning."  Two things to note

12   about this.  Number one:  What is a conspiracy?  A conspiracy

13   is an agreement.

14            And, number two, Pan and Lim don't know they're being

15   recorded at this time.  So why is Pan saying this about the

16   defendant, and why is he talking about an agreement to move

17   money together?  Because the agreement existed.  It was real.

18   And it shows that the defendant was involved from the beginning

19   of this money laundering organization.

20            Now, whatever hostilities built up from that debt,

21   they keep working together.  And you know that from an

22   intercept in October of 2017 where Pan and Long are talking

23   about a New York delivery and pickup, and they talk about Old

24   Gan, the defendant, confirming that the goods arrived.  What

25   are the goods?  It's the drug money.  And he's still working

1    with these individuals in October of 2017.

2            You'll note in the indictment that Count I charged the

3    conspiracy from January 2016 to October of 2018.  And that's in

4    large part because of the intercepted communication between Lim

5    and the defendant in October of 2018 where they're talking

6    about a debt to the Shanghainese.  And Lim told you the

7    Shanghainese, that's Pan.  We're talking about the fact that

8    Lim -- that the defendant still owes this money to Pan.  He's

9    still working to pay off that debt, and they have to settle

10   their tabs.  So there's still an interest by the defendant in

11   resolving this debt to the conspiracy and to this organization.

12           But be mindful of something.  Even if you find that

13   the conspiracy didn't last all the way through October of 2018,

14   the evidence still establishes that a conspiracy existed.  You

15   should still find defendant guilty of Count I.

16           So talking about the Count I evidence, the government

17   has established, has proved beyond a reasonable doubt, that

18   there was an agreement between the defendant, Pan, and Lim to

19   conduct financial transactions, money pickups in Chicago.  And

20   they were going to effectuate currency swaps, financial

21   transactions in China and resulting dispositions in Mexico, of

22   drug proceeds.  So financial transactions.

23           The money derived from the sale of drugs.  You know

24   that because of the seizure.  You know that because of the

25   admission on the wire.  You know that the money -- that the

Closing Argument - Government

1    defendant knew the money derived from illegal activity based on

2    the nature of the entire organization, based on the statements

3    made in his presence about the fact that it was drug money.

4            And you know the whole purpose was to conceal.  You

5    know the whole purpose of this was to keep law enforcement from

6    seizing the money and under -- and finding out the individuals

7    involved in the operation.

8            So when you review Count I of the indictment and you

9    review the verdict form, you should find the defendant guilty

10   of Count I under both international and domestic concealment

11   theories.  Although you don't need to find both -- you can find

12   one or the other -- the evidence supports both theories of

13   money laundering conspiracy.

14           So that's the Count I evidence.

15           Let's talk about Counts II through IV.  Counts II

16   through IV, similar to Count I, except there's no agreement

17   required.  Here the defendant simply needs to cause or attempt

18   to cause a financial transaction -- a money pickup or a

19   currency swap -- again, using drug proceeds, knowing the money

20   derives from illegal activity, in order to conceal the nature

21   or source, ownership of the money.

22           So this is defendant getting actually involved.

23           Now, you heard testimony again defendant's based in

24   Guadalajara.  So how is he involved in this?  Well, it's

25   important to remember instructions Judge Durkin just gave you:

Closing Argument - Government

1    "Any person who knowingly aids, counsels ... the commission of

2    an offense may be found guilty of that offense if he knowingly

3    participated in the criminal activity" -- excuse me -- "and

4    tried to make it succeed."

5         You also know that if a defendant knowingly causes the

6    acts of another -- so if he's directing these money pickups to

7    take place, if he is the one setting these transactions up --

8    he is responsible for those acts as though he personally

9    committed them.  So keep that in mind when you're considering

10   the evidence for Counts II through IV.

11        So let's go straight to the evidence for Counts II

12   through IV.  You heard testimony from both Special Agent Moton

13   and Lim that Lim was arrested on May 3rd, 2018, and around that

14   time, she began to start cooperating.  She's going to first

15   reach out to the defendant, see if he's still moving money in

16   Chicago area, and, if so, she is then going to try to set up

17   money pickups.

18        And ten days later, you saw an intercepted

19   communication where defendant is saying, "I asked you to send a

20   serial number to me."  So who is the one setting up these

21   deals?  The defendant.  He is asking for the serial numbers to

22   set these deals up.

23        Also, keep an important point in mind when considering

24   this.  She starts cooperating on May 3rd, 2018.  May 13th,

25   2018, defendant says, "I'm asking you for serial numbers."  So

Closing Argument - Government

1    in those ten days, the defendant was able to get this process

2    rolling again really quickly.  He has access to drug

3    trafficking clients.  He knows the business.  This isn't hard

4    for him because he's still doing it.  He's predisposed to

5    commit these crimes.  He's been doing it since 2016.

6         So when he asks for the serial number, when the

7    cooperation begins, he is right back in the game.  It takes him

8    no time at all to get rolling.

9         You heard about three separate UC pickups: May 22nd,

10   2018; June 26th, 2018; and June 29th, 2018.  I'm going to take

11   these a little bit out of order, but let's start with the

12   May 22nd, 2018, deal.

13        In the intercepted communication, you saw that Lim

14   provided Gan with serial number and he provides with contact

15   information, and Gan is full aware of this.  One thing to keep

16   in mind for these early transcripts too where they're talking

17   about serial numbers, if the defendant wasn't involved in 2016

18   and 2017, wouldn't he be asking, "Why are you giving me serial

19   numbers?  What's the deal with serial numbers here?"

20        No.  He knows all about the system.  He knows how it

21   works because he was there when it was introduced to Lim.  So

22   he's not surprised at all.  He's directing her to give serial

23   numbers.  He knows the serial number system is unlawful and

24   it's in connection with these money pickups, but that's how he

25   does his business.

Closing Argument - Government

1      So you also heard and you saw surveillance video of

2  the unidentified male who dropped that drug money into the

3  undercover vehicle. He found it was unlocked, put the money

4  in. And this was approximately $190,000. And you heard

5  testimony from Homeland Security Investigations Agent Matthew

6  Daoud that they took this money back. K-9 -- and I'm sorry.

7  You heard a stipulation about this -- certified K-9 sniffed the

8  money and alerted positive to the presence of narcotics.

9      So this first money pickup, involving drug money

10  supplied by the defendant in a contract that he arranged for.

11  Keep that in mind for all of these undercover transactions. It

12  is not Lim setting up these transactions in Mexico; it's the

13  defendant. Who was the one necessarily passing off those

14  serial numbers that Lim provides? Who was the one getting the

15  contracts? Who was the one contacting the drug clients? It's

16  not Pan anymore; it's the defendant directly. The evidence

17  bears that out.

18      You then heard about a June 29, 2018, undercover deal.

19  During that deal -- you saw the communication -- Lim provides

20  the defendant with a serial number from a dollar bill. Soon

21  after, she gets contacted by Carlos Cuevas Garcia with that

22  same exact serial number from a dollar bill.

23      So ask yourself. How does that serial number which

24  Lim provides to defendant get to Carlos Cuevas Garcia to

25  contact Lim? Defendant is the missing link.

Closing Argument - Government

1     The defense counsel mentioned during his opening

2     statement the idea that this is an illusion; this is magic.

3     This isn't magic.  It's a really clear system set up by the

4     defendant to effectuate money pickups of drug money in the

5     United States and then swaps in China and Mexico to get the

6     money back to the drug trafficking clients, to conceal the

7     nature of that money.

8     So the way in which Cuevas Garcia gets the serial

9     number is not magic.  It's from the defendant.

10    And you also heard about during the June 29th, 2018,

11    UC deal, Cuevas Garcia tells the undercover agent something

12    really interesting, which again goes to your common sense in

13    considering the evidence here.  He tells her, "The less you ask

14    questions about how much is it ... you think ... I don't know

15    you.  You think I bring -- you think I bring 250,000 to you?"

16    Cuevas Garcia is absolutely right.  This system is

17    insane.  He's bringing hundreds of thousands of dollars in a

18    mall parking lot to an individual he's never met before.  And

19    they're only identifying each other through serial numbers on a

20    dollar bill.  The system is set up to conceal the nature of the

21    money and move drug proceeds.

22    After the June 29th, 2018, UC deal, law enforcement

23    officials seized additional drug money.  And you heard a

24    stipulation that after the money was transferred from Cuevas

25    Garcia to the undercover agent, law enforcement officials later

1    made a drug seizure from Carlos Cuevas Garcia involving heroin

2    and marijuana.  So you know that this money was also drug

3    money.

4           Let's talk now about the June 26th, 2018, deal.

5    June 26th deal.  Lim, same process, provides defendant with a

6    serial number from a dollar bill, the name Alicia -- a code

7    name -- and a phone number for the undercover agent.

8           Soon after, Richard Skylas and Anthony Valdivia

9    contact the undercover agent.  Again, how does that information

10   get to Anthony Valdivia?  Because the defendant contacts

11   Valdivia's boss.  Valdivia told you, "I work for a guy named

12   Carlos based out of Jalisco in Mexico.  He's a drug trafficker.

13   He supplies me with my narcotics.  And Carlos gave me

14   information -- the phone number, serial number, and name -- to

15   contact the money launderer."

16          How does he get it?  He gets it from Carlos.  How does

17   Carlos get it?  He gets it from the defendant.  And the

18   defendant gets it from Lim, who is then cooperating.  The

19   defendant is an integral part of causing these transactions to

20   take place, and he knows all about the system.

21          But remember during this transaction, there's a

22   problem.  The undercover agent shows up, and she doesn't have

23   the dollar bill.  Skylas says, "I need the dollar bill."  So

24   right then, he takes a pause and he calls his father, Anthony

25   Valdivia.  He says, "Hey, she doesn't have the dollar bill.

Closing Argument - Government

1    Should we still go forward?"

2              And Valdivia testified he's on both hands.  He's got a

3    phone on each hand right now.  He's talking to Skylas, and he's

4    talking to Carlos in Mexico.  And he's saying, "Should we do

5    this deal?  She doesn't have the proof on her.  She doesn't

6    have the dollar bill."

7              Well, interestingly enough, you also saw calls between

8    the defendant and Lim.  The defendant says to Lim, "Urgent

9    matter.  Urgent matter.  Halfway there.  My friend is pissed.

10   This little girl you referred is several hours away.  We

11   finally located her.  She has nothing in hand to show for it."

12             How does the defendant know that unless he's talking

13   to Carlos in Mexico?  That's the way he knows that the UC

14   doesn't have the dollar bill.  Lim didn't tell him that.  And

15   then defendant confirms that this is how they prove up their

16   money transfers.  This is how they prove up the deals.

17             Gan -- the defendant tells her, "You better recommend

18   and never forget we settle accounts based on this proof.  If we

19   don't have the proof and we could not acknowledge it, there is

20   nothing she could do."

21             What's the defendant saying there?  He's saying, "This

22   is drug money.  We can't go to court and fight for that money

23   back.  We need the proof in order to pass that dollar bill and

24   get the drug proceeds into our hands so we can then effectuate

25   the swaps and move that money back down to Mexico."

Closing Argument - Government

1    And critically, during this exchange, the defendant

2    also makes another important admission about his prior

3    involvement and his predisposition.  He says, "This is not the

4    first time we do this."

5    Of course it isn't.  They've been doing this together

6    for years.  Why would Lim send a courier who didn't have the

7    physical dollar in hand?  She knows better.  And defendant

8    knows she knows better because they were working together in

9    2016, they were working together in 2017, and they're working

10   together again in 2018 to move drug money for drug suppliers.

11   When the defendant says, "They were upset to death,"

12   what is he talking about?  He's talking about the drug side.

13   They're upset that the system they've set up wasn't followed in

14   this particular instance.  And you heard about -- the testimony

15   about the money ultimately being recovered by law enforcement

16   after it's passed to the undercover agent.

17   Now, you also heard that that money derived from the

18   sale of drugs.  Anthony Valdivia testified that he was a

19   cocaine, marijuana, and occasional heroin dealer.  And the

20   money that he generated, the $100,000 passed to the undercover

21   agents, around $99,000 was derived from the sale of cocaine.

22   And how was he corroborated?  By a drug ledger and a

23   money ledger that he maintained.  And it says "June 26," the

24   name they used for the money laundering organization, "Japs,

25   100."  And that 100 was the approximately $100,000 in drug

Closing Argument - Government

1     money that they had just passed to the undercover agent.

2           Now, you also heard testimony about May 2018

3     transcripts and references to other transactions. And I'm just

4     going to flag this briefly because I think Lim walked you

5     through it pretty clearly. They're talking about two different

6     things in May 2018 conversations. They're talking about the UC

7     money pickups, what you've heard all about, and they're also

8     talking about other transactions.

9           So the key to understand this is when they're talking

10    about company to company, when they're talking about millions

11    of dollars, when they're talking about black money and white

12    money, that has nothing to do with anything. That's related to

13    other business the defendant was trying to set up with Lim.

14          When they talk about Chicago, when they talk about

15    units, the code words, product, when they're talking about

16    cold, hard cash, serial numbers and that they can't file

17    lawsuits, they're talking about the UC money pickups. They're

18    talking about the money pickups that the defendant was engaging

19    in with -- with Lim.

20          And interestingly, when they're discussing those other

21    deals, the defendant evidences knowledge of the kind of money

22    that they've been moving together. He talks about black money.

23    He said, "It wasn't that kind of black money." What's "that

24    kind of black money"? Drug money, the drug money he moves with

25    Lim and had moved with Pan in the past.

Closing Argument - Government

1          In terms of the Chicago money pickups, how do you know

2    they're talking about something different?  Well, before they

3    even get started in the Chicago money pickups, defendant

4    suggests, "Let's expand our business.  Let's go to Detroit."

5    He doesn't say, "Let's go to Detroit because there's great

6    companies there and there are millions of dollars to move."  He

7    talks about, "Law and order are not good.  Over here there will

8    be products," using the code word that he had established with

9    Lim to talk about drug money.

10          So you know when they're talking about Chicago, when

11   they're talking about lawlessness, when they're talking about

12   products, when they're talking about units, they're talking

13   about drug money and the money pickups that he is setting up

14   with Lim.

15          Interestingly, you also heard testimony from Special

16   Agent Moton and Lim that the defendant sent Lim certain bank

17   account information.  This is par for the course, right?  This

18   is what defendant did.  And during the conspiracy time period

19   and in 2018, he passed bank accounts for those clients, the

20   brokers that Lim gave the drug money to, to wire money to in

21   China.

22          Now, Lim told you a couple of important things about

23   this.  Number one, it's not the defendant's named accounts.

24   It's not Xianbing Gan's account in China.  That makes sense

25   because they're moving drug money.  It's individuals' accounts,

Closing Argument - Government

1    other individuals.  And you saw here it's an individual named

2    Gan Dekuan.  Well, who is Gan Dekuan?  It's his father.  You

3    saw that from his visa application.

4         So ask yourself.  Why in the world in connection with

5    these UC money pickups is defendant passing a bank account

6    associated with his father in China for money to be wired to in

7    connection with these money pickups in Chicago?  Why would his

8    father be relevant to these money pickups at all?

9         And the answer is because that's the way in which the

10   defendant laundered the money.  The money is going to be picked

11   up in Chicago, delivered to a client, and then an equivalent

12   wiring is going to go in China to people like his father so he

13   can have access to those accounts and get the money back down

14   to Mexico to his drug trafficking clients.

15        So based on all this evidence we just went over, the

16   defendant is guilty of Counts II through IV.  He conducted

17   financial transactions.  He caused these money pickups and

18   wirings in China to take place.  The money derived from the

19   sale of drugs.  Defendant knew the money derived from illegal

20   activity.  And the entire purpose of this system -- the money

21   pickups, the serial numbers, the mirror transactions -- is to

22   conceal the nature, origin, and source of the money.

23        So when you consider the evidence and the verdict form

24   for Counts II through IV, you should find the defendant guilty

25   of all those counts as well.

Closing Argument - Government

1    Now, Count V charges defendant with the operation of

2    an unlicensed money transmitting business.  And the elements

3    are listed over here, and Judge Durkin just went through them.

4    The point is you cannot operate, control, manage a

5    money transmitting business in the state of Illinois without an

6    appropriate license.  And operating such a business without a

7    license is a felony.  So the business has to be -- is required

8    to be licensed in Illinois.

9    Now, you heard instructions from Judge Durkin that

10   money transmitting includes transfers within the United States

11   or to locations abroad by wire or courier and that Illinois

12   state law requires a license to do money [*sic*] as a money

13   transmitter.  It's a felony not to do so.

14   And you also heard under Illinois law you -- and a

15   money transmitter engages in the business of exchanging, for

16   compensation -- for compensation -- money of the United States

17   government or a foreign government to or from money of another

18   government.

19   So, ladies and gentlemen, keep in mind a few things

20   here.  The defendant didn't register a business in the state of

21   Illinois in connection with the UC money pickups.  Why would

22   he?  They're moving drug money.  So of course this isn't going

23   to be a brick-and-mortar store located on the street

24   legitimately accepting cash.  This isn't Western Union because

25   they're moving drug money.

Closing Argument - Government

1    Now, Spenser Staton from the IDFPR told you it's

2    important that people who are moving money like this, causing

3    swaps in another country, register because they have to comply

4    with, among other things, anti-money laundering requirements.

5    The State of Illinois and the IDFPR need to know where this

6    money is coming from that's going to be given to retail

7    businesses and swapped in another country.

8    So keep in mind the defendant doesn't have to be

9    physically present in the state of Illinois to operate this

10   business.  He can be located in Mexico, causing these

11   transactions to take place and being compensated for them.  He

12   is profiting from the handoff of these drug proceeds and these

13   equivalent currency swaps in China and the movement of the

14   money back down to Mexico.

15   And the business is taking place in the state of

16   Illinois.  The pickups are in the Chicago area.  The money is

17   delivered to retail brokers in the Chicago area.  And if the

18   defendant causes this conduct to take place, he is responsible

19   as well.

20   So for all of these reasons and the evidence we

21   discussed with regards to Counts II through V, the defendant is

22   also guilty of Count V.

23   Ladies and gentlemen, you heard ample evidence over

24   the course of the last week about defendant's involvement in an

25   international money laundering conspiracy and his sole

1   proprietorship as an international money launderer in 2018.

2          For all of these reasons, for all of the evidence that

3   you've heard, we ask that you consider the evidence and return

4   the only verdict consistent with the evidence, verdict of

5   guilty on all counts.

6          Thank you.

7          THE COURT:  All right.  Thank you.

8          Ladies and gentlemen, we're going to take a lunch

9   break right now.  You are free to stay in the jury room and eat

10  your lunch.  Otherwise, the court security officer is going to

11  take you to the second floor, to the cafeteria.  You can order

12  lunch.  It will be paid for by the government.

13         We want to keep you together, though, for lunch.  So

14  either stay in the jury room if you brought your lunch or go

15  down to two and come back up.

16         It's 12:06.  I'm going to assume between the time it's

17  going to take for you to get the lunch and eat it, we're not

18  going to be ready before 1:00.  If you need longer than 1:00,

19  you tell the court security officer when you're done eating.

20  But we'll assume it will take you to 1:00 to get down there,

21  get your food, and eat it.

22         Please don't discuss the case among yourselves or with

23  anyone else.  And it's very important now to keep an open mind.

24  You've heard the government argument.  You've not heard from

25  defense counsel.  And it would be unfair to the defendant for

1      you to start making up your mind about this case.  You swore at

2      the beginning of the case that you would keep an open mind.

3      That applies now especially because the evidence is over, but

4      the case is not over until you've heard all the arguments of

5      the lawyers.

6              And the defendant is presumed innocent.  The burden of

7      proof remains with the government throughout the case.  And

8      it's proof beyond a reasonable doubt.  It's especially

9      important you keep an open mind at this point.

10             And there may be a tendency now that you've heard some

11     arguments to want to talk about the case.  Resist that urge.

12     This is not the time to talk about the case.  That will be

13     later today.  But please resist that urge over the next 50 or

14     55 minutes.

15             If you need more than 1:00, just let the court

16     security officer know when you're ready.  Otherwise, we'll come

17     back here at 1:00.  Thank you very much.

18             COURT SECURITY OFFICER:  All rise.

19             THE COURT:  You're free to leave materials on your

20     chairs if you want.

21         (Jury out at 12:07 p.m.)

22             THE COURT:  All right.  Anything we need to put on the

23     record?  First, government.

24             MR. FRANZBLAU:  No, your Honor.

25             THE COURT:  Defense.

1          MR. SEIDEN:  No, your Honor.

2          THE COURT:  Okay.  Any objections to the instructions

3   as read?  I must have -- I'm glad you pointed out that I had

4   missed a sentence or two, so -- but otherwise, as read, any

5   objection by the government?

6          MR. FRANZBLAU:  No, your Honor.

7          THE COURT:  By defense?

8          MR. SEIDEN:  No, your Honor.

9          THE COURT:  Okay.  Back here at 1:00.  And then we'll

10  see you then.

11         MR. FRANZBLAU:  Thank you, Judge.

12         THE COURT:  Oh.  I think your client wanted to talk to

13  you.  All right.

14     (Recess at 12:08 p.m., until 1:00 p.m.)

15         MR. SCHWARTZ:  So I was waiting in line in the

16  lunchroom.  A juror said hello.  I smiled, looked away.  I just

17  want to make it clear that I wasn't being rude.  We're not

18  being rude if we don't respond to them.

19         THE COURT:  Oh.  I'll -- you know, in fact, I'll tell

20  them that.

21         MR. SCHWARTZ:  Okay.

22         THE COURT:  Given they were all going to the

23  lunchroom, it's entirely possible they ran into attorneys.  Do

24  you want me to make that instruction or just leave it alone?

25         MR. SCHWARTZ:  Yeah.  But don't single any juror out,

1    just --

2              THE COURT:  No, no.

3              MR. SCHWARTZ:  Okay.

4              THE COURT:  I'll -- any problem with that by the

5    government?

6              MR. FRANZBLAU:  No.

7              MR. ROTHBLATT:  No.

8              THE COURT:  All right.  Then I will make that comment

9    before you do closing.

10             MR. SCHWARTZ:  Thank you, Judge.

11             THE COURT:  Sure.

12         (Off-the-record discussion.)

13             COURT SECURITY OFFICER:  All rise.

14         (Jury in at 1:10 p.m.)

15             THE COURT:  Please be seated, ladies and gentlemen.

16             All right.  I just -- I should have mentioned this

17   earlier.  I wanted to remind you again that just given the fact

18   everyone uses the same cafeteria, the same elevators, the same

19   hallways, attorneys may come by you occasionally, involved in

20   the case, or witnesses.  And I have instructed them simply to

21   not be cordial, not have -- make eye contact, not engage in the

22   normal pleasantries people do in everyday life.  They're doing

23   it at my direction, not because they're being unfriendly.  But

24   so please keep that in mind if you happen to see people or run

25   into people in the common areas we all have to share.

Closing Argument - Defense

1      So with that, Mr. Seiden, are you ready to proceed?

2      MR. SEIDEN:  Your Honor -- and I'm usually cordial,

3   ladies and gentlemen.  I can't be during the trial.

4           CLOSING ARGUMENT ON BEHALF OF THE DEFENSE

5      MR. SEIDEN:  You sat here for a number of days, and

6   you've listened to a number of witnesses, and you've heard some

7   arguments.

8      To my way of thinking, this is the hardest part of the

9   jury service that you have to do.  You have to listen to the

10  lawyers speak for hours and tell you things that you've already

11  heard and try to put them together so they make sense.  So here

12  we stand speaking at you for a number of hours.  I apologize

13  for that, but it is part of the process, and I do need to do my

14  part.

15     As far as my part is concerned, I represent Mr. Gan.

16  Mr. Gan, stand up.

17     That's Mr. Gan.

18     Thank you very much.  Have a seat.

19     The government goes first because they have the

20  burden.  And they go last because they have the burden, and the

21  burden never shifts.

22     I go in the middle.  I tell you how I believe the

23  evidence unfolds and tell you what I see.  The government will

24  sandwich me both ways.

25     When I sit down, when I'm finished, I will charge you

Closing Argument - Defense

1    with the responsibility of asking yourselves when Mr. Franzblau

2    talks, what would Glenn Seiden say if he got a chance to get

3    back up here and speak again?

4            We'll get to that in a few moments, though.

5            Mr. Gan is -- is a Chinese citizen who's lived in

6    Mexico, as you've heard from the testimony, for about six years

7    where he conducts his business.  He does not have business

8    here.  He does not live here.  He does not have family here.

9    He has no contacts here.  He has no business associates here.

10           The last time that he was in the United States was

11   about five years ago, to Houston -- that was the testimony --

12   to visit on vacation.

13           I will say one other thing before I continue on.

14   Everything I say is going to be from my notes and from my

15   memory as to what we heard, what we all heard from the witness

16   stand.  If I misstate something, I'm also charging you with the

17   responsibility of setting aside what I say and relying on your

18   memory of what the testimony was.

19           My arguments here are not -- they're not to

20   razzle-dazzle you.  They're not to talk fast.  They're just to

21   remind you of the things that were said and where they're

22   important.

23           So now Mr. Gan gets off a plane where he's arrested in

24   November of 2018, and here he sits.  He has no family here.  He

25   has no friends.  Doesn't speak the language.

Closing Argument - Defense

1    And I can tell you, he didn't know me before he got

2  off that plane.

3    This is a man who is in business in Mexico.  He had

4  been in business in China.  We heard that.  And he was in the

5  seafood business.  Ms. Lim couldn't tell you the size of the

6  business, but you can assume that he wouldn't have moved to

7  Mexico and engaged in the seafood business unless it was

8  substantial.

9    Ms. Lim did tell you she thought he dealt with

10  deep-sea conch and jellyfish, not necessarily in my diet, but

11  something that is a delicacy in China, I suppose.

12    That is his business.  We also came to learn

13  because -- that he did money changing.  I told you that in the

14  opening statement, and that is what the evidence has been.  He

15  did money changing.

16    What that means is that when somebody like him or

17  anybody else in the Chinese community needed Mexican money --

18  that's pesos -- and if they made a deposit of RMB, which is the

19  national currency in China, in a Chinese bank -- and

20  Ms. Dennewitz explained that they would do a mirror image.

21    That means that once the dollar is in -- or the yuan

22  is in the bank in China, I will give you or I will withdraw

23  pesos from my bank in Mexico.  It's really simple.  Doesn't

24  require -- doesn't require three-color charts.  Doesn't

25  require -- they've got it tucked in there -- doesn't require

Closing Argument - Defense

1    three-color charts.  Doesn't require arrows and everything

2    else.  It's a pretty simple deal.

3          And I had Mr. Li explain it to you, you will recall.

4          So if you put -- if I make a sale and I get paid in

5    RMB and I put it in my account in China and I can get my hands

6    on that money, then I will disburse pesos in Mexico.

7          Now, I have an order, but apparently I go the way my

8    conversation is.  So you'll have to stick with me if you can.

9          Ms. Dennewitz, Agent Dennewitz, testified she had

10   16 years of experience.  She did not want to cooperate with me.

11   She did not want to answer a question.  She felt very

12   uncomfortable that she might be used somehow to destroy the

13   government's case.

14         I was interested in one thing.  Very difficult to get

15   from her.  And that is the mirror transaction, the one I just

16   explained to you.

17         And the reason it's important, the reason it was

18   important, is because Wei Li -- Wei?  Is that how to pronounce

19   his name?

20         Okay.  Wei Li testified later in the case he was a man

21   that Mr. Pan engaged for Mr. Pan's business transactions in the

22   United States.  And you will recall that he was involved I

23   think with Long -- or Long involved him, one of the two -- to

24   make transactions.

25         And one of the instructions you're going to get is to

Closing Argument - Defense

1    say -- it says that when somebody receives a benefit like

2    Mr. Li did, you may consider his testimony with great care and

3    caution.  You're going to get the same instruction regarding

4    Ms. Lim, and we'll talk about her in just a moment.

5            Mr. Li I found to be a very interesting individual.

6    He was the one who had the classical education from Notre Dame.

7    CPA, licensed by the state.  And he was probably doing pretty

8    good.  It's not a bad job.  And then the next thing you know,

9    he becomes in the money transferring business.

10           He understood it.  He understood it clearly.  I mean,

11   this is the mind of a CPA.  And we talked about it, he and I

12   did, in front of you.  And we talked about it, Mr. Lim --

13   Mr. Li.

14           "Let me understand.  Somebody, or you, received or got

15   money, or Long, one of your minions, got money in New York."

16           "Yes."

17           "And they took that to a -- a broker, which is nothing

18   more than a retail store."

19           "Yes."

20           And I gave the example of cell phones.  And as a

21   matter of fact, later on in this conversation, he says exactly

22   what happens.

23           So that store owner takes the cell phone, buys it for

24   a -- whatever he buys it for, ships it off to China.  His

25   friends or confederates or just him sells it in China for a

Closing Argument - Defense

1    profit.

2          That profit is then put into his account.  This is as

3    simple as it can be.  Buys a cell phone for a dollar, sells it

4    for 2, puts $2 -- now it's in RMB -- into his Chinese account.

5          "Mr. Li, when that occurred, where is the money

6    laundering?"

7          The money laundering is from actually taking the money

8    that he received in New York and giving it to the broker, who

9    then changed it from money to cell phones.  It now has changed

10   its character.  It is now concealed.  It is no longer cash.  It

11   is cell phones.

12         Those cell phones are then taken to China and sold.

13   When it's sold -- when the cell phones are sold in China, he

14   says that money was legal.  It came from legal sales of phones

15   in China.

16         "What happens then?"

17         "I put it in my account," or an account he controlled.

18         Now, I said, "Does it go to another account?"

19         He says, "It can."

20         "What is it then?"

21         He says, "It's legitimate funds which transferred from

22   A -- my account" -- remember, he used the letters -- "A to B,

23   legitimate money going over."

24         That is how money laundering works.  It is the

25   changing of the character of money.

Closing Argument - Defense

1          Again, I'm out of order.

2          The matter that we are here on today is really -- I

3  consider it to be a three-part matter.  There's five counts,

4  but I consider it to be three parts.  The first part is

5  conspiracy.  The second part is the movement of money,

6  transfers.  And the third part is this Illinois thing, which we

7  don't believe is a part at all.  But it is charged, so we'll

8  have to discuss it.

9          So let's talk about the conspiracy that's been

10 alleged.  Ms. Lim says -- and it was in her plea agreement.

11 Let's see.  Yes -- that she went down in 2016 and joined an

12 international money laundering operation by Haiping Pan -- and

13 you'll recall, folks, I read about two and a half pages of

14 this.  Mr. Gan's name never showed up -- which contracted with

15 Mexican-based drug traffickers to receive bulk quantities of

16 cash narcotics proceeds.

17         That's what she said.  She testified that she went

18 down there, had a meeting with Mr. Pan, had a meeting with

19 Mr. Gan, and the three of them decided to do this deal.

20         Now, do we know that's true or not true?  Well, we

21 weren't there, so we have to figure out what happened from what

22 we've heard on the stand.

23         Five or six months later, her confederate, Kong,

24 smelled -- the money smelled like marijuana, and she, Kong,

25 presumably talked to Gan -- talked to Lim.  And I have a

Closing Argument - Defense

1    problem with names.  I told you that when we started, so I'll
2    go slow.

3              Kong complained to Lim that the money stunk.

4              So Lim got on the phone and then went down to Mexico.
5    And her testimony from the stand was very clear.  "When I met
6    with Mr. Pan, I yelled at him."  And you saw her demeanor here.
7    She was quite capable of losing it and opening up her mouth.

8              Her testimony was clear.  "When I met Pan, I yelled at
9    him."  She said nothing about Gan.

10             Later in the trial she did, when she realized she had
11   left him out.  But that's when she testified and felt
12   comfortable testifying.  She said, "I yelled at Pan."

13             So what does that mean?  That means that she did not
14   enter into an agreement to go into a money laundering business
15   or a drug business with Mr. Pan and/or Mr. Gan in January since
16   she didn't know or she claims she didn't know what she was
17   doing until five or six months later.

18             These are very small things, but on the large scale,
19   these are things that together are trying to be used or
20   accumulated to be used to send this man to the penitentiary.
21   So we have to examine these little details because these
22   details are where the case lies.

23             When we did our opening statement, I told you then
24   Mr. Gan knows and knew Pan because Pan was a fellow businessman
25   down there in the toy business.  We know that because Lim said

1    he was in the toy business.  I don't know that anyone here

2    knows better than Lim since that was her boyfriend.

3            So Mr. Gan, changing money for his own account, had

4    offered and did change money for other accounts.  We know that

5    because in the -- in the conversations that you did overhear

6    Mr. Gan finally speak, he talked about money changing for other

7    businesses, companies to companies.

8            As a matter of fact, in one of the conversations, he

9    repeats it three times in the same conversation.  Companies to

10   companies.  Some companies to individuals.  This is what the

11   discussions were.  And this is who and what he was.

12           Mr. Pan was in his business.  Mr. Gan was in his

13   business.

14           Now, I can hear you now thinking, well, it's all the

15   same business.  Let's talk about that too.  Again, I'm going to

16   jump ahead.  I'm going to go to -- I think it's May -- let's go

17   August of 2017, and we're going to talk a lot about August of

18   2017.

19           Apparently Ms. Kong -- that is, Ms. Lim's

20   confederate -- has $500,000 -- or $496,000 taken from her in

21   New York.  And, once again, it results in Ms. Lim flying down

22   to Mexico.

23           And we also saw a conversation where Ms. Lim had a

24   conversation with Mr. Pan about the loss.  Apparently Ms. Lim

25   and Mr. Pan were invited by their -- Mr. Pan's customer to

Closing Argument - Defense

1    lunch.  I said dinner one time; she corrected me.  Lunch.  He

2    came with his family -- I mean, it's a family business.  You

3    might as well talk about your drug business with family -- and

4    had lunch with Mr. Pan and Ms. Lim, after which he sent his

5    family on their way and told Mr. Pan, "I'll split the loss with

6    you."

7            Not "I'll split the loss with you, Ms. Lim."  Not

8    "I'll split the loss with you, Mr. Gan."  "I will split the

9    loss with you, Mr. Pan," because it was Mr. Pan who was in the

10   business.  It was Mr. Pan who was the one who was responsible.

11           What does Mr. Gan have to do with all this?  Nothing.

12   It's not his money.  He has no interest in it at all.  The only

13   thing he is interested in, if money shows up in his bank

14   account in China -- and not a hidden bank account, a family

15   bank account -- then he will make a mirror-image disbursement

16   to Mr. Pan's business.  That's it.  That is not part of a drug

17   conspiracy.

18           So Mr. Pan gets Mr. Gan, I suppose, on the phone, or

19   he gets Ms. Lim on the phone, and it becomes clear that Mr. Gan

20   will have nothing to do with making any payment, contributing

21   to any part of -- any portion of the deal that he has no

22   interest in.

23           To the extent that his life is threatened, he is told

24   he cannot do business in Guadalajara, that is -- that's

25   something.  And notwithstanding that, he still pays no money.

Closing Argument - Defense

1    He is not responsible for this money.  It is not his money; it

2    is not his deal.  That's it in a nutshell.

3         The testimony that you -- or the things that the

4    government is asking you to rely on are conversations heard by

5    an individual who is not here and we just were told that he's

6    under indictment, who was somewhere else.  And we heard from

7    Ms. Lim, who, as the judge, as I said, is going to tell you,

8    you have to consider her testimony with great care and caution.

9         That is the conspiracy.  There have to be -- there has

10   to -- the government is going to have to show out of Mr. Gan's

11   own mouth acts and deeds that made him part of a conspiracy, a

12   drug conspiracy.  They didn't do it.  They can't do it.  It

13   does not exist.

14        But as I told you when we started, there is an

15   illusion here because the guy is very close.  I mean, that's --

16   he moves money.  That's what he does.  He does it for his own

17   business.

18        There you go.  Another illusion.  That's all it is.

19        If I'm in the drug -- if I'm in the drug business and

20   I'm -- I have a friend that is not -- if I'm in the drug

21   business and I have a friend that -- who moves money, it's

22   certainly going to look like the friend is in the drug

23   business.  He is not.  That's the illusion.

24        If you're going to convict Mr. Gan, it has to be from

25   his own words and his own deeds, and you're going to hear

1    that -- and you heard that in the instructions.  Those

2    instructions are in your hands.

3         A second part of this case is going to be money

4    transfers.  Those money transfers, I take it, are the Counts II

5    through IV.  And the reason that those are not part of the

6    conspiracy -- and the judge has already indicated to you --

7    Ms. Lim cannot be a co-conspirator at this point.  She is a

8    government informant; she's a government agent.  Government

9    agents cannot conspire.  And that's what occurs in this case.

10        From August 2017 till May 2018, Ms. Lim -- and I don't

11   know exactly what time it's best to comment on her character,

12   but I'll do it right now.  On direct examination, she had been

13   prepared, as is appropriate to do, and she went right through

14   her direct examination.

15        On cross-examination, when she had not been prepared,

16   she fought me tooth and nail.  She didn't understand a word.

17   She didn't understand a question.  She wouldn't answer a

18   question.  She was very difficult.  You get to judge that when

19   you consider her testimony.

20        But more telling than that was her redirect

21   examination.  Mr. Franzblau jumped up and he started.  He

22   asked -- first question, he says, "And the equivalent" -- and

23   remember the word "equivalent" was in there?  And this was a

24   lady that didn't know what the simplest terms meant.

25        I got up there and asked her:  "What's equivalent?"

Closing Argument - Defense

1       She said, "That's something that equals something

2   else."

3       This is not a dumb person.  This is not an idiot.

4   This is a person who was arrested and within one hour concocted

5   a way to get out of it.  "What if I work for you?  What if I

6   cooperate before you charge me?  Before you charge me, before I

7   see a lawyer."  This lady was very quick, very sharp, figured

8   it out very fast.

9       Now, when she testifies here, she's looking for a

10  reduction in her sentence, a recommendation for reduction in

11  her sentence.  I started to make a comment about it, and the

12  judge reminded me of this.  I had to ask straight questions

13  because in the news recently, we've heard about reductions of

14  sentences.  The government makes a -- a recommendation for

15  reduction, they're saying that she cooperated, and the -- Judge

16  Coleman can consider the recommendation and go below it still.

17      Otherwise, the lady's looking at 20 years, and that's

18  just on the conspiracy count.  If she had been charged with

19  money transfers and the other things she did, she would be

20  looking at the 30 years that --

21      MR. ROTHBLATT:  Objection, Judge.

22      THE COURT:  Objection overruled.  This was gone into

23  in testimony.  And as the jury's been instructed, it's your

24  memory of what the evidence was that controls.

25      Proceed.

1          MR. SEIDEN:  Thank you.

2          If she were charged with the other matters that she

3     was not charged with that she could have been charged with,

4     she'd have been looking at the full guideline, the 30.4 years.

5          Her testimony was colored and difficult at best.  It

6     was slanted, and it was slanted for her and for her benefit.

7     Her testimony and her -- her responses to my questions show

8     that.  Her body language alone.  She would look away, look

9     down.  She couldn't look at anybody to answer a direct

10    question.  Tells you a lot.

11         Anyway, it's August.  And Ms. Lim indicated that she

12    had -- "I don't remember how many times I talked to him between

13    August and May."  When the government asked her a question, she

14    said, "Many."  When I asked her a question, she didn't remember

15    any.

16         She talked to Mr. Gan a number of times between August

17    and May.  Why is this important?  Because in May, she went to

18    work for the government.  And the first conversation you heard

19    about from the government was May 13th.

20         But she testified she had talked to Mr. Gan a number

21    of times before then, even one of them that I brought out,

22    which was a conversation about business that had nothing to do

23    with drugs or -- nothing to do with drugs at all, and it was a

24    fairly long conversation.  And I -- I even had to bring that

25    out.

1    And she said she talked to him other times.  She even

2    talked to him a few times when the recording device, which she

3    was responsible for hitting the button, did not work.

4    Why is that important?  It's important because the

5    government failed to have sufficient evidence at that point to

6    have -- was it -- is that -- okay.  The government had

7    insufficient evidence at that point to charge Mr. Gan with

8    anything.

9    So as I asked Agent Moton, I said, "At that point is

10   when you had to have him set up."

11   She said, "Well, I don't like that word."

12   "Okay.  You don't like the word.  But isn't that

13   right?"

14   "Yes."

15   So they enlist the aid of Ms. Lim to set up Mr. Gan.

16   Since Mr. Gan had no contacts with any drug contacts in the

17   previous matter -- none -- all the drug contacts were

18   Mr. Pan's.  His only contact with that case was the exchange of

19   money from his accounts in China to his accounts in Mexico.

20   They needed more.  They needed to bring him in.

21   So Agent Moton went ahead and charged Ms. Lim, now

22   Agent Lim, to do the job.  She doesn't hit the button.  You

23   know why she doesn't hit the button?  Because there's

24   conversations there that she didn't want anybody to hear.

25   There's conversations there that suggest that she's relying

1    upon 20 years of friendship -- brother, sister -- in all these

2    conversations and a cultural obligation and her own need for

3    work, her desire to see her pay for her kids.  We will never

4    know what she said in those conversations to talk to Mr. Gan,

5    to get Mr. Gan to do anything other than what he had done

6    before.

7              And then we'll talk about predisposition too.  There's

8    no predisposition because from August to May, Mr. Gan was not

9    in the -- he wasn't working with Mr. Pan.  There's no evidence

10   that he knew or was involved in any drug business at all.

11   There's no evidence that he had reached out to anybody to do

12   any further business.  He didn't call Ms. Lim and say, "Well,

13   Pan's out of the picture.  Let's find somebody else."  He has

14   no predisposition whatsoever at all, nor does he have the

15   wherewithal or the know-how to do it.  And as far as any

16   potential, well, if he could have obtained the know-how to do

17   it or the ability to do it, Mr. Pan closed that door.

18             So there is no predisposition whatsoever.  I refrained

19   from using the word in -- in the opening statement, but the

20   word is "entrapment."  But for the government's -- but for the

21   government's efforts and energies, Mr. Gan would not have been

22   charged in those cases.  That's II through IV -- II through V,

23   actually.

24             Then there's the third series of matters, this third

25   matter.  And that is this Illinois license, which -- I want to

Closing Argument - Defense

1    be polite about it -- I find to be -- well, I find it to be

2    beneath the government to even bring the charge.  We heard from

3    the -- from Mr. Staton from the State of Illinois.

4          "Mr. Staton" -- I asked him a series of questions.

5    "When does the transfer take place?  What has to be licensed?"

6          He says, "When the money goes to the broker."

7          "Who is the broker?"

8          "The retail outfit.  That took place in Illinois."

9          "Did that take place outside of Illinois?"

10         "No."

11         Counsel got up and argued, "Well, he was directed to

12   do this -- he was directed to do that by somebody outside the

13   state."

14         Doesn't work like that.  The money transfer is in the

15   state of Illinois.

16         And I asked about money transfers because I think it's

17   important that we know what they're talking about.  If any of

18   us go to a Currency Exchange and buy a money order for -- to

19   send the money somewhere to pay a bill, they have to be

20   registered.  If we decide to go to a travel agent to send our

21   money back to the family in another country, they have to be

22   registered.  Anybody who receives money from one person to pay

23   a third person has to be registered.

24         And he talked about the national banking and

25   everything else.  The receipt of the money occurs within the

Closing Argument - Defense

1    state.  That was the testimony.  Doesn't occur outside the

2    state.  Nobody outside the state is subject to the laws of the

3    State of Illinois.  You don't pay liquor taxes in Illinois

4    [*sic*] if you buy the liquor in Illinois and you decide to drink

5    the bottle at home in Illinois.  If you buy it in Indiana and

6    you drink it in Illinois, you don't have to pay the Illinois

7    taxes.  It's just that simple.  Lots of things occur out of

8    state.

9              In this particular case, we have lots of things occur

10   out of the country.  Mr. Gan does not live here.  We talked

11   about that.  He doesn't have family here.  He has no business

12   here.  He has no connections.  Yet the government would like to

13   have the -- would like to overreach and charge somebody in a

14   different country with a violation of law here in the state of

15   Illinois, here in the United States.

16             That, ladies and gentlemen, is significant -- makes

17   the government the world's policeman.  So if you -- I think the

18   example I may have used was in China, if you are a news person

19   and you report on the coronavirus, you get arrested.  So I

20   suppose if I tell you that the coronavirus is bad in China

21   here, does that mean that the Chinese can arrest me when I land

22   in China?  It's the same difference.

23             Agent Moton said that they have laws in Mexico.  Agent

24   Moton said that they cooperate with the -- with Mexico.  Agent

25   Moton indicated there's laws in China, but they don't cooperate

Closing Argument - Defense

1    quite as much.  If Mr. Gan did something wrong, have him

2    arrested in Mexico.  Get his records from -- by the way, that's

3    another thing.  Where are his records?  Where are the banking

4    records?  If there's cooperation, international cooperation,

5    where are the banking records?  Where are the business records?

6    Where are any records?  There are none.

7         I would think that that would be significant.  If

8    you're going to try to convict a man without having any direct

9    conversations from him, without having his own actions, it

10   would be at least nice if you brought in his business records

11   to show that he was doing all of this.  None.  And it was

12   clear, there was cooperation amongst -- at least between Mexico

13   and the United States.

14        That's the outline, ladies and gentlemen.  Let's see

15   how it -- I'm going to see how it plays out.

16        These are the instructions that you've already heard.

17   And you'll take them back with you when you go back to the

18   room.  But I'm going to point a few out.

19        Now, ladies and gentlemen, I have a bad habit.  I

20   write on everything.  So you'll forgive me if there's some

21   writing on there.

22        One of the instructions that you're going to see we've

23   talked about.  It's part of your job as jurors to decide how

24   believable each witness was and how -- how much weight to give

25   to each witness.  And you can accept any -- any or none of it,

Closing Argument - Defense

1    any part of it or none of it.

2            Now, ladies and gentlemen, we have to talk about the

3    quality of the testimony, the quality of the witnesses.

4            I told you that I personally liked Mr. Li, even though

5    he is an individual who received a benefit.  But he had no

6    reason to make up how money is transferred, how money is given

7    from a person in New York to a -- to a retailer in New York.

8    That -- there's no upside for him to tell a fib about that.

9            But the one you did have to be concerned about is

10   Ms. Lim.  And you got to look at her.  You may consider her

11   intelligence; her ability to opportunity -- I'm sorry -- her

12   ability and opportunity to see, hear, and know things that she

13   testified about; her memory.

14           Her memory was horrible.  She remembered nothing,

15   especially when I asked the questions.  She didn't -- do you

16   realize that when I asked her, "Remember, Ms. Lim, when you

17   testified here Friday?" she says, "No, I don't remember.  I

18   don't remember testifying three days ago"?

19           This is the quality of the witness the government has

20   put on to attempt to convict Mr. Gan.  When we started, the

21   judge asked you if you were in the frame of mind to make a

22   decision about somebody that you cared about.  Is that a

23   witness that would put you in the frame of mind to convict

24   another human being?  I think not.

25           Her memory, her demeanor.  We talked about her

Closing Argument - Defense

1    demeanor.

2         Whether she had any bias or prejudice or reason to lie

3    or slant her testimony.  Undoubtedly she did and does.

4         The truthfulness and accuracy of her testimony in

5    light of other evidence presented.  Absolutely.

6         Inconsistent and consistent statements toward the

7    conduct by the witness.  You will recall I read to her her

8    statement when she got arrested.  She had two pages in there

9    about Mr. Gan.  She had nothing in there about Mr. Pan.

10   Nothing.  Nothing.  Nothing until she was shown a picture by

11   Agent Moton:  "Oh, yeah.  Mr. Gan."

12        And why did she conveniently forget Mr. Pan?  Well, he

13   was a significant other in her life.  I'm going to resist the

14   temptation to be cute about that, but that's what it was.  So

15   she was reaching out to protect her significant other.

16        Once she entered her plea agreement, which I also went

17   through with her, it was exactly opposite.  It was all about

18   Pan, Pan's organization.  She met with Pan.  She talked to Pan.

19   She agreed with Pan.  It was Pan, Pan, Pan until the third page

20   when she said "and/or Gan."  And she didn't write that; the

21   government did.

22        Once again, my bad habit.  Sorry about that.

23        You've heard testimony from witnesses, Mr. Li,

24   Ms. Lim, who expect a benefit in return for their testimony and

25   cooperation with the government.

Closing Argument - Defense

1    You know, I feel bad again for Mr. Li because if he

2    got -- if he got a pass in this case, he loses his license.

3    He's destroyed for the rest of his life. All that education,

4    all that money, all that licensure, and he is -- that's all

5    gone. People work real hard to get where he was, the advantage

6    that he had in life. And it's totally gone now.

7    You've heard testimony from Seok Pheng Lim -- that's

8    Ms. Lim -- who has pled guilty to one of the crimes the

9    defendant is charged with committing. You may not consider her

10   guilty plea as evidence against the defendant.

11   You -- I'll skip Li. You may give their testimony

12   whatever weight you believe is appropriate, keeping in mind --

13   now, this is a Court's instruction. This isn't my instruction.

14   This is the Court's instruction -- keeping in mind you must

15   consider that testimony with care -- with caution and great

16   care. What does that tell you about what your -- what they

17   have to -- about what she has to tell you? It tells you that

18   legally, it's a problem before we start.

19   All right. This one is for me. During the course of

20   the case -- Mr. Gan's from another country. We can't even

21   speak to each other without going through an interpreter. It's

22   not possible. I don't have the resources of the United States

23   government. Certainly Mr. Gan here in the United States

24   doesn't either.

25   Because I can make a cute chart with a bunch of colors

Closing Argument - Defense

1    and have people who are prepared to write their names in

2    different places does not make it so.  That's all this is.

3    This is not evidence.  It's just a cute chart with a government

4    exhibit number on it, and you stand up people for the theater

5    to have them write on it.  That's what this is.  This is just

6    theater.

7              I need you to stick with the evidence in this case,

8    not necessarily this theater of the charts, the clickies

9    (demonstrating).  It's just I need your intelligence.  I need

10   your view.  I don't need the showmanship.  We need reality.

11             And so I put this up here, that certain charts and

12   graphs were shown to you to help explain evidence that was

13   admitted.  But they don't explain it because Mr. Li indicated

14   very clearly that the money that was laundered, laundered from

15   the dropoff to the retailer -- I'm doing it again -- from the

16   dropoff to the retailer -- that's where it's laundered -- goes

17   to China and become legal, and it's moved in China and back

18   down.  That's not on those charts.  Mr. Li said it in as clear,

19   succinct terms as could be.

20             So you will not -- you'll not have these particular

21   charts back there.  They're not evidence.  Do not consider them

22   during your deliberations.

23             Okay.  Here's where we start.  Shall I make this

24   larger?  I think I shall.

25             "A person acts knowingly if he realizes what he is

Closing Argument - Defense

1   doing and is aware of the nature of his conduct and does not

2   act through ignorance, mistake, or accident."

3           You're going to see a number of instructions that are

4   going to sound relatively similar to this.

5           "In deciding whether a defendant acted knowingly, you

6   may consider all the evidence, including what the defendant did

7   or said."

8           We have a paucity of that information in this case.

9           And here's my habit again.

10          Do you have page 21?  I marked this one.  Thank you

11  very much.

12          This is not fair that I mark it up.

13          "A defendant's presence at the scene of a crime and

14  knowledge that a crime is being committed is not sufficient by

15  itself to establish defendant's guilt.

16          "If a defendant performed acts that advanced the crime

17  but had no knowledge that the crime was being committed or was

18  about to be committed, those acts are not sufficient by

19  themselves to establish guilt.

20          "A defendant's association with persons involved in a

21  crime is not sufficient to prove participation in a crime."

22          We have -- we have that.  We have Mr. Gan knows

23  Mr. Pan.  Mr. Gan knows Ms. Lim.  But we don't have any acts of

24  Mr. Gan making him or putting him into a drug deal or making a

25  drug dealer out of him.

Closing Argument - Defense

1     The only thing that we have is "I need your bank

2   account number so the money that goes into my account, I can

3   disburse an equal amount from my other account."

4     I need 22.  Boy, I write on all these, don't I?  Not

5   yet.

6     All right.  Told you we'd be back to the conspiracy.

7     "Count I charges the defendant with a conspiracy.  In

8   order for you to find the defendant guilty of the charge, the

9   government must prove the following elements beyond a

10   reasonable doubt:  That the defendant and others conspired to

11   knowingly conduct a financial transaction affecting interstate

12   and foreign commerce."

13     Now, there is a transaction that occurs for Mr. Gan.

14   His transaction is for him to receive money in China and

15   transact his own money, that money, to Mexico.

16     "The transaction involves proceeds of an illegal

17   activity, namely, buying, selling, importation, or otherwise

18   dealing in a controlled substance."  That's drugs.

19     "Knowing the transaction was designed, in whole or in

20   part, to conceal or disguise the nature, location, source,

21   ownership, control of the proceeds of that illegal activity."

22   That's a lot of stuff.

23     Mr. Gan has hidden nothing.  His transaction between

24   his banks are as public as public can be.

25     The government, I suppose, could have had that just by

Closing Argument - Defense

1   getting the records from the banking -- the banking or the

2   business records in Mexico.  They're not hidden.  The only

3   hiding here was that when the broker in the -- the real -- the

4   retailer -- the retail dealer changed it from money to cell

5   phones, from money to clothes, from money to some other

6   commodity.  That was the only concealment, the only changing of

7   the nature of the -- of the transaction.

8        "iii:  While conducting such financial transaction

9   knew the property involved in the transaction represented

10  proceeds of some form of unlawful activity."  Well, the

11  unlawful activity is talked about in ii above, and that is

12  controlled substance.

13       "Defendant and others conspired to transport, transmit

14  a monetary instrument and funds involving proceeds of unlawful

15  activity, namely, buying, selling, importation, otherwise

16  dealing in a controlled substance, from a place in the United

17  States to or through a place outside the United States."

18       I read that one.  You've got 23?  Thank you.

19       MS. STEVENS:  That's yours.

20       MR. SEIDEN:  Right.

21       That was the first page.  The second page is

22  knowing -- "ii:  Knowing that the monetary instrument and the

23  funds involved in the transportation, transmission, and

24  transfer represented the proceeds of some form of unlawful

25  activity."  We go back to drugs again.

Closing Argument - Defense

1    "iii: Knowing that the transportation, transmission,

2 and transfer was designed, in whole or in part, to conceal and

3 disguise the nature, location, source, ownership, and control

4 of the proceeds and that the defendant knowingly became a

5 member of the conspiracy with an intent to advance the

6 conspiracy."

7    I told you that there was a bit of an illusion here.

8 Mr. Gan is not part of a conspiracy.  It's that clear.  Did he

9 have money -- did he transfer money from China to his account

10 in Mexico?  You betcha he did.  I told you that in the opening

11 statement.  I'm not going to look at you and tell you that

12 didn't occur.  That would be lying.  I won't do that.

13    But he was not involved in a conspiracy to move drugs

14 and to hide drug money.  What he did as far as the transfer of

15 the money was as obvious as the nose on one's face.  He did not

16 transfer the money, the cash.  You saw those cash proceeds.  He

17 had nothing to do with that.  That was not him.  That was not

18 his.

19    I'm going to call your attention to this portion

20 (indicating) of the -- to be a member of a conspiracy.

21    "In deciding whether a person joined a conspiracy, you

22 must decide" -- "you must base your decision on what the

23 defendant did or said."  You haven't heard anything or seen

24 anything that he did or said that would make him a member of a

25 conspiracy.

Closing Argument - Defense

1    He did not control or -- disguise means to hide the

2    nature, location or source, ownership and control of the

3    proceeds.  Didn't happen.  And there's no proof of that.

4    Ladies and gentlemen, I'm looking at some of you, and

5    I'm getting the feeling that I'm talking to myself in a closet.

6    This is what we have.  Mr. Gan lives outside the United States.

7    Mr. Gan is not, we believe, subject necessarily to the laws of

8    the United States, nor would he necessarily --

9    MR. ROTHBLATT:  Objection.

10    MR. SEIDEN:  I said what I believe.  I didn't -- I'm

11    not arguing from evidence.

12    Mr. Gan has no --

13    THE COURT:  If there's an objection, you have to stand

14    up and say so.  If there's not --

15    MR. ROTHBLATT:  Objection, Judge.

16    THE COURT:  All right.  That objection is sustained.

17    MR. SEIDEN:  Okay.

18    Mr. Gan is somewhere else in the world.  One of the

19    people that knows him decides to go ahead and utilize his

20    services to transfer money for his business, his toy business

21    at first, and perhaps later less than that.  That is what

22    brings Mr. Gan here.  That's why I did the illusion thing.

23    That's what that was all about.

24    Mr. Gan does this for a time until he gets asked for

25    money because Mr. Pan lost money.  He lost a half a million

Closing Argument - Defense

1    dollars to his group of people.  Mr. Gan says, "Not a chance.

2    It's not my money.  I'm not part of your deal.  I'm not part of

3    what you do."

4              "We will kill you, Mr. Gan."

5              "Then kill away.  Do your worst.  You're getting

6    nothing from me.  It's not what I do for a living.  Drugs are

7    not what I do for a living."

8              The government, knowing this, enlists a weak

9    individual -- well, smart but weak -- Ms. Lim, in hooking

10   Mr. Gan back in to something he has not done before.

11             Something does not change.  Mr. Gan still doesn't have

12   any connections here.  He still doesn't know anybody in the

13   United States.  And you haven't seen any evidence that he did.

14   He has no group.  He has no contacts.  He has no money

15   launderers.  He has no money deliverers.  He doesn't have any

16   of these people.

17             But with the use of the government's resources and

18   Ms. Lim, they go ahead and dig some folks up.  They make the

19   transfer.  We see the pretty pictures.  We see -- we hear -- we

20   see the money drops.  We see pictures of lots of money.

21             Mr. Gan has nothing to do with that whatsoever.  That

22   was all the government's creation because they knew they did

23   not have enough to convict Mr. Gan for conspiracy.  It's just

24   that simple.

25             And I'm going to circle back to Count V.  Mr. Staton

Closing Argument - Defense

1    and I had a very nice question-and-answer circumstance.  It was

2    slow.  It was one of the few times I asked questions that even

3    I understood.  And he was very clear that the transfers that he

4    was talking about is when the guy comes in with the cash and

5    gives it to the retailer.  That's the transaction that has to

6    be licensed.  Mr. Gan is in Mexico.  He has nothing to do with

7    the price of cheese on that.

8           I don't know how else to communicate this to you.

9    I've got lots of notes here.  I've got my opening statement.

10   I've got my closing.  I've got little charts that I'm not

11   using.  So I'm just going to have to digress a little bit.

12          There's no evidence that this man, Mr. Gan, has ever

13   done anything wrong in his life.  He's just a businessman in

14   Mexico minding his own business until a friend of his asks him

15   to do him a favor.  The favor finally blows up at some point in

16   time, and the friend comes back and says, "Now you're

17   responsible for my business too."

18          And he says, "No."

19          The evidence after that is a number of months pass.

20   You never hear from Mr. Gan again.  There's no evidence.

21   Nobody has even suggested that he has done anything wrong after

22   that period of time.

23          The next knock he gets at the door -- figuratively --

24   is from Ms. Lim.  And it's interesting.  Ms. Lim has many

25   conversations with him, doesn't record a bunch.  And you may

Closing Argument - Defense

1    consider those to the detriment of the government and to the

2    benefit of Mr. Gan because the only conversation that occurred

3    before that conversation was a -- indicated Mr. Gan was only

4    interested in doing lawful business.  Ms. Lim pressed, pressed,

5    pressed until she gets Mr. Gan involved in her drug transfers

6    that you saw about.

7            I'm having personal -- and I -- this is not the first

8    case that I've done a closing argument, but I -- I -- I'm

9    getting that feeling that I'm not getting through.  And it's

10   very difficult for me.

11           I've got an honest guy here who lives in a foreign

12   community, comes from a foreign land, and he's a total

13   foreigner here.  He has no idea what I'm saying.  He has no

14   idea why I'm saying it.  He's not used to this system.  He

15   didn't come here to violate any laws; he didn't come here to

16   hurt anybody.  All he did was know somebody who did.

17           That's it.  He associated with somebody who did and at

18   some point in time maybe even had the knowledge of what he --

19   the other guy was doing.  But you, again, have not heard

20   anything -- anything -- directly from this man to suggest that

21   he did anything wrong.

22           Now, the illusion is they can stand up here and they

23   can say he was close to the flame.  He has no reason that he

24   didn't get burned.  I -- the proof is in the pudding.  From

25   August to May, nothing.  Before January of 2016, nothing.

Closing Argument - Defense

1          Come here.

2          (Counsel conferring.)

3          MR. SEIDEN:  You didn't hear from Mrs. Stevens in this

4   case.  She's a very competent trial lawyer.  But scheduling

5   didn't allow her to have enough time to prepare.  So I didn't

6   mean to pick up all the witnesses myself.  So if you have any

7   questions -- you might -- why she hasn't gotten up here and had

8   a witness, it's because -- totally because of scheduling.

9          Again, there's no evidence that Mr. Gan had any

10  knowledge of what was going on before and/or until Ms. Lim

11  dragged him in.  That's it in a nutshell.

12         I don't have the fancy charts.  I don't have all that

13  stuff.  All I have is your recollection of the evidence that

14  was -- was adduced, what you saw in this case, your view of the

15  witnesses, Ms. Lim's testimony.  And, again, to send somebody

16  to jail based upon her testimony?  I think not.

17         Ladies and gentlemen, I've taken a lot less time than

18  I expected, a lot less time than I prepared.  I'm going to rely

19  on your review of the evidence and the facts in this case.  And

20  when I do that, there's only one -- one verdict you can come

21  out with, and that's not guilty.

22         And I'm not a fool.  You're going to have to -- you

23  would have to think about it, you're going to have to argue

24  about it, and you're going to have to extrapolate.  There's no

25  doubt about it.  But this man is not guilty.  He's not guilty.

Rebuttal Argument - Government

1    He was not guilty then, and he's not guilty now.

2              Ladies and gentlemen, thank you very much.

3              THE COURT:  All right.  Thank you, Mr. Seiden.

4              Government may give its rebuttal argument.

5              MR. FRANZBLAU:  Thank you, Judge.

6              THE COURT:  Do you need to switch to a different mode?

7    It's on --

8              MR. FRANZBLAU:  No, that mode is fine.

9              THE COURT:  All right.

10             REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

11             MR. FRANZBLAU:  Well, I hope you enjoyed your trip to

12   fantasyland where the defendant is a poor, misunderstood fish

13   salesman who accidentally laundered tens of millions of dollars

14   for Mexican drug cartels.

15             That is absolutely ridiculous.  It is contrary to all

16   of the evidence in this case, and it is designed to distract

17   you.  It is garbage.  You should treat it like garbage, and you

18   should throw it out.

19             Let's get back to reality.  Three things that matter

20   back here in the real world: evidence, law, and your common

21   sense.

22             Let's start first with this idea of entrapment, which

23   is the ultimate illusion.  So let's knock it out quickly.

24   You're going to hear that the -- you've already heard that the

25   government overcomes any entrapment burden by proving beyond a

Rebuttal Argument - Government

1    reasonable doubt one of two things: either that the defendant

2    was predisposed to commit the crimes or that there was no

3    undue -- no inducement by government agents.  And it's defined

4    for you in the jury instructions.

5              Let's start with inducement because, ladies and

6    gentlemen, this argument does not even get off of the ground.

7              Here's a formula for you, an equation that's a lot

8    simpler than the equations that Pan and Gan were exchanging

9    when they were laundering RMB into dollars in Mexico.

10             Participation in the Count I conspiracy equals

11   predisposition.  How can we have entrapped him if he was doing

12   this for two years before it picked up again with Ms. Lim?  How

13   could it have gotten going again so quickly?  We're not talking

14   about a matter of weeks or months or years.  Days.

15             Lim gets off the plane and says, "I've been laundering

16   money with this guy."

17             And we said, "All right.  Prove it.  Here's a

18   recorder.  Go out and do something."

19             And, boom, they're back in business.  No questions, no

20   confusion, no hesitation.  It's business as usual.  They're

21   back up and running.

22             Things could not have played out in May and June of

23   2018 unless this man is exactly who Ms. Lim says he is and he

24   did the things with Ms. Lim, exactly the things that she said

25   they did, together in 2016 and 2017.

Rebuttal Argument - Government

1    It is simply implausible.  It defies common sense.

2 It's garbage.  You should treat it like garbage and throw it

3 out.

4    Let's put the distractions aside and get back to the

5 evidence.  The evidence is what matters in this case.

6    Let's talk about predisposition.  Government

7 Exhibit 002-1T.  Right off the bat, the first conversation

8 about organizing these money pickups, the defendant says, "I

9 was waiting for you.  What took you so long?  I want to get the

10 money pickups going again.  I was waiting for you."

11    I would call that predisposition.  He's ready to go.

12 It's Lim who is dragging.

13    He says, "You have to give me a reply for the matter.

14 It's been a week.  What do you mean I don't have it?  I asked

15 you to send the serial number to me, and I didn't hear from

16 you."

17    That's predisposition.  There's no questions, there's

18 no confusion, and there's no hesitation.  It's business as

19 usual, just like they did in 2016 and 2017.

20    Defense counsel just got up here and told you, "My

21 client doesn't do transactions in the United States."  He said

22 that to you in opening statement, and he just said it again two

23 or three times in closing argument.

24    Lawyers mumble; evidence speaks.  Look at the

25 evidence.

Rebuttal Argument - Government

1    002-1T, page 3.  Lim says, "What about Chicago?

2  Chicago?"

3    Gan:  "In a few days, there will be some in Chicago."

4    What's this fisherman doing up in Chicago?  If he's

5  just doing these mirror transactions between China and Mexico,

6  why is he talking about product in Chicago?

7    Because the story they've told you is a lie.  It's

8  contradicted by the evidence.  It's garbage.  Treat it like

9  garbage and throw it out.  Focus on the evidence.

10    "There will be product.  There will be product every

11  day.  There will be products every week.  Products every week.

12  It will probably be next day or two."

13    How does he know about this?  Suddenly Ms. Lim places

14  a phone call to him, and they're back in business.  He knows

15  there's going to be product available every week because

16  they're picking up where they left off.  No questions, no

17  confusion, no hesitation.  They're back in business.  It

18  couldn't have played out the way it did in 2018 unless the

19  things that Lim said that happened in 2016 and 2017 is true.

20    Now, you have to consider the evidence for each count

21  separately.  But what you can do with that evidence is give

22  Lim's testimony the weight it deserves because it's

23  corroborated.  It's corroborated across the board by wire

24  intercepts when they don't know government agents are listening

25  to them.  She and Pan are talking in detail about the

Rebuttal Argument - Government

1    defendant's role, and it matches exactly what she said on the
2    witness stand.

3           Flight records, toll records, the defendant's own
4    phone records, and then, boom, Lim's detained.  Government
5    agents say, "Prove it, Ms. Lim."  And the first thing she does
6    is place a phone call to the defendant, and they're back in
7    business.  No questions, no confusion, no hesitation, no
8    entrapment.  It's ridiculous.  Put it aside.

9           Now, let's talk a little more about the transcripts,
10   the evidence, what actually matters in this case.

11          002-5T.  Okay?  Recorded phone call on May 17th of
12   2018.  If you want to distill this case down -- it's been a
13   long week and a half -- go back and read this transcript, and
14   you can call it a day.  Okay?  Everything you need to know is
15   in this transcript.

16          Page 8.  Remember, we're talking about predisposition
17   or inducement.  Do these con -- let's talk about inducement.
18   Does it look like Lim is coercing him or pulling him into
19   something he doesn't want to do?

20          Examine the power dynamic.  Who's calling the shots?
21   Who is giving the commands?  It's this guy, not Lim.  Read the
22   evidence.  Lawyers mumble; evidence speaks.  Read the evidence.
23   Forget about that.  It's garbage.  Read this transcript.

24          He says, "There's another city, Detroit.  In
25   English" -- we saw this.  "This city seems to be very chaotic

1  nowadays.  It was a motor town.  Wasn't this city bankrupt two

2  years ago?  A lot of" -- racial expletive.  "Law and order are

3  not good.  Over here.  Over here ... over here ... over here,

4  there will be products.  That's what it is."

5          That is what it is.  Not because Lim said it, because

6  he said it.  And you know -- when you read that transcript, you

7  know exactly what he's talking about.

8          Now, he uses offensive language there, and I'm not

9  saying that to incite you.  You have to set that aside.  The

10 reason it's relevant is because it's probative to the meaning

11 of the word "product."  Unfortunately, we all know what he

12 meant by that.

13         Use your common sense.  He's not talking about fish

14 flopping around on the streets of Detroit.  He's talking about

15 drug money, and he wants to expand there, because he wasn't

16 coerced; he wasn't tricked.  He wanted to do it.  He is

17 expanding into Detroit because he's predisposed to commit these

18 crimes.

19         Lim was simply the person he was waiting for to get

20 back in business, and that's exactly what they did.  They

21 couldn't have done it unless the things that Lim tells you

22 about in 2016 and 2017 were true.  It's corroborated by the

23 evidence.

24         I'm going to talk -- there's just -- there's a lot of

25 confusion coming out of this from the defense, and I just want

Rebuttal Argument - Government

1    to clear up a few things.

2           Let's -- let me just go back to one more transcript.

3           Talking about inducement, again, examine the power

4    dynamics of these conversations.  Okay?  Did you ever get in

5    trouble at work and have your boss yell at you?  That happens

6    to me a lot.

7           Read these conversations.  It sounds a lot like he's

8    the boss and he's yelling at her because she's screwing up.

9    That's not a situation in which Lim coerced him or tricked him.

10   He's in charge.  They're his clients.  He's arranging the

11   contracts.  He's getting the serial number.

12          If the roles were reversed, if Lim was down in Mexico

13   and she was setting up the deals, they might have an argument

14   about entrapment, that somehow we tricked him into it.

15          But he's the one -- he's the moving force behind these

16   things.  He's the one in Mexico that gets the process moving.

17   He's the one that gets the serial number.  He's the one that

18   makes that ridiculous circle that we've been looking at for a

19   week and a half happen.

20          No one tricked him.  No one forced him to do it.  He

21   wanted to do it because he wanted to get back into business.

22          Look at the transcript 002-12T.  June 26th, 2018.  The

23   defense just stood up here and told you he had nothing to do

24   with these ridiculous money handoffs that we saw videos of.  I

25   beg to differ.  Look at the evidence.

Rebuttal Argument - Government

1    On June 26, 2018 -- forget -- this is the one that is

2 most telling.  While -- literally while the parking lot

3 transaction is going on, he's on the phone yelling at Lim,

4 complaining about how it's going down because the courier

5 didn't go to the normal pickup location in Chinatown, because

6 the courier didn't have the actual physical dollar bill, and

7 because the courier could only take $100,000.

8    How could he have these complaints if he hadn't done

9 it before?  This shows his knowledge and his familiarity with

10 the process.  He is deeply enmeshed in this process because

11 he's been doing it for years.  That conversation could not have

12 happened unless the things Lim tells you about that did happen

13 in 2016 and 2017 were true.

14    It's true.  It's trustworthy not because you have to

15 blindly rely on her; because it is corroborated by the

16 evidence, the things he said when he didn't know he was being

17 recorded.  Unlike what they did, you can take that to the bank.

18    Government Exhibit 002-14T.  This is the -- this is

19 the boss yelling at the employee phone call I love.

20    "Listen.  How did such a situation happen today?  This

21 is not the first time we do this."

22    I mean, there it is in writing.  Again, corroboration

23 of the conspiracy.  He wouldn't be saying those things in 2018

24 unless they've been doing it before.  How could he have these

25 expectations of Lim?  "You know better.  That's not how we do

1  business.  That's not meeting our normal standards."

2      These things don't make any sense unless the things

3  that Lim said happened in 2016 and 2017 actually happened.  Not

4  because you're blindly relying on a witness; because the words

5  came out of his mouth when he didn't know he was being

6  recorded.

7      There's no inducement.  There's all predisposition.

8  Entrapment is garbage.  Treat it like garbage.  Throw it out.

9      Now, let's talk about Lim.  I've already talked about

10  how she is thoroughly corroborated, but now let's consider her

11  incentives under the plea agreement.

12      What motivation does she have based on the evidence to

13  lie to you at this point?  You've heard she's got her deal.

14  She did her work, and she's earned this benefit from the

15  government.  And you heard her benefit gets no better if he's

16  convicted and no worse if he's acquitted.

17      So why in the world would she risk getting up there

18  and telling you a fake story?  And why would she do that to

19  this man who she's known for 20 years?  And she said she was --

20  he was her friend.  And you can see she was uncomfortable up

21  there because she felt bad and guilty about having to come out

22  about the truth of what they did.

23      And try as they might to embarrass her about her

24  personal life and the illnesses within her family, she stood

25  firm and she told you the truth.  It was raw.  It was messy at

Rebuttal Argument - Government

1    times, but it was real.  It was authentic because she has no

2    motivation to lie to you.  This isn't a big frame-up job,

3    ladies and gentlemen.

4              Defense counsel likes to talk about illusions and

5    magic, but none of that was involved.  It's real.  She was only

6    able to make these things happen in 2018 because they'd been

7    doing it for years.

8              Final point about Lim.  If she was going to lie about

9    the defendant and this was a big frame-up job, wouldn't her

10   testimony have been a little bit stronger?  Think about that.

11   If she was a government patsy who just wanted to say whatever

12   the government wanted to convict him, wouldn't her story have

13   been stronger?

14             Let's think about a couple examples.  The January 2016

15   meeting.  She said that it was mostly Pan who was explaining

16   the serial number system to her, right?  The defendant was

17   sitting there, and the defendant later used it, but it was

18   really Pan who was driving the ship with that.

19             May 2016 meeting.  This is critical.  It's Pan who

20   explains to her that it's drug trafficking money.  And the

21   defendant, she said, just sat there and listened silently.

22   He's obviously there.  He heard it.  His lack of response is --

23   tells you all you need to know.

24             But if she was going to lie for the government,

25   wouldn't she have tossed in some extra details to help us out?

Rebuttal Argument - Government

1  "Yeah, and Gan explained too that it's drug money.  Yeah, we

2  all had a great conversation about it.  Then we, you know, did

3  a couple lines of cocaine and celebrated."

4        No.  That would have been much stronger testimony, but

5  that's not what she said.  Wouldn't she have put him at the

6  meeting with the big boss, this big dramatic moment at trial,

7  if she was going to lie and it was a big frame-up job?  No.

8  She didn't put him there because she -- he wasn't there,

9  because she's not here to lie to the government.

10       She's here to tell the truth, keep the deal, and get

11  off.  She's self-interested.  Why would she risk losing that

12  50 percent recommendation to spend up to 20 years in prison

13  just to frame up an innocent man?  It doesn't make sense.  It's

14  garbage.  Treat it like garbage and throw it out.

15       Distill this case down to three things.

16       That Detroit conversation.  Again, the relevance of

17  this is the probativeness of what he meant by the word

18  "product."  Set aside any feelings about offensive language.

19  It tells you everything you need to know.  He knows it's drug

20  money at that stage.  Okay?  By 2018, he knows it's drug money.

21  So he's guilty of those counts, II, III, IV, and V.  He knows

22  it's drug money.  Not because she said it; because he said it.

23  "Product."  Law -- "It's lawlessness.  It's chaos.  There's

24  going to be drug money there."  That's the only way that

25  conversation makes sense.

Rebuttal Argument - Government

1    Point number two:  Again, the only way that things

2    could have picked up and happened the way they did in May and

3    June of 2018 is if Lim was telling the truth about what had

4    happened in 2016 and 2017.  There's no way that this innocent

5    fisherman in ten days could have suddenly gotten -- you know,

6    built up that he was suddenly moving hundreds of thousands of

7    dollars in drug proceeds, within days, without any questions,

8    any confusion, any hesitation.  He had done this before.  He

9    knew the system because he'd been doing it for years.

10    Last point.  It's been a long week and a half.  I'm

11    going to close up here.

12    This is a commonsense case.  Okay?  Ms. Dennewitz

13    spent a long time telling you about how it's a telltale sign of

14    drug trafficking when people were engaged in this outrageous

15    process of passing serial numbers up through Mexico, back down

16    to the United States, strangers meeting in parking lots handing

17    off cash, you know, and all the rest.

18    Then engaging in this ridiculous process of taking

19    money in the United States, trying to get it to a company

20    that's right next door, but first let's send it halfway around

21    the world, then let's immediately send it right back.  Does

22    that make any sense?  Of course not.  And you don't have to

23    have spent 17 years of your life working international money

24    laundering cases to know that.

25    It is ridiculous.  The only reason you would engage in

Rebuttal Argument - Government

1   those kinds of transactions and take the risks associated with

2   that stuff, dealing in these huge amounts of cash and allowing

3   strangers to handle this stuff -- you heard him talking about

4   the risk:  "You have to guarantee the security of the units

5   because if we get robbed, we're finished."

6           Well, why is he risking it?  He's a sophisticated guy.

7   He's supposedly this legitimate business guy.  He knows there's

8   banks.  He knows banks can send money to one another.  Why is

9   he taking the risk?  Why is he going through the trouble?

10  Because he knows it's dirty money.  That's the only reason that

11  makes sense.

12          And you don't have to be a money laundering agent to

13  know that.  You have to be over ten years of age and not lived

14  your life in a cave.  Anyone with real-world experience knows

15  that is absolutely ridiculous.  The system stinks, ladies and

16  gentlemen.  And it doesn't stink like seafood; it stinks like

17  drugs.  And the defendant and Pan could smell it all the way

18  from Mexico where they were orchestrating it and pumping out

19  tens of millions of dollars to the big boss and their other

20  drug trafficking clients.

21          You have the evidence; it's overwhelming.  You have

22  the law; it is clear.  You have your common sense; let it guide

23  you.  Go back there and convict him on all counts.

24      (Excerpt proceedings concluded at 2:25 p.m.)

25      (Proceedings had not herein transcribed.)

1                        C E R T I F I C A T E

2          I certify that the foregoing is a correct transcript of the

3     excerpt of proceedings in the above-entitled matter.

4

5     /s/ LAURA R. RENKE                        May 27, 2021
      LAURA R. RENKE, CSR, RDR, CRR
6     Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25