```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )      Docket No. 18 CR 781
 4                    Plaintiff,        )
                                        )      Chicago, Illinois
 5        vs.                           )      October 5, 2020
                                        )      9:32 a.m.
 6   XIANBING GAN,                      )
                                        )
 7                    Defendant.        )


 8          TRANSCRIPT OF TELEPHONIC PROCEEDINGS - Oral Arguments
 9             BEFORE THE HONORABLE THOMAS M. DURKIN

10

11   APPEARANCES:

12   For the Government:     MR. SEAN J.B. FRANZBLAU
                             MR. RICHARD M. ROTHBLATT
13                           U.S. Attorney's Office in the
                             Northern District of Illinois
14                           219 South Dearborn Street, 5th Floor,
                             Chicago, Illinois  60604
15

16   For the Defendant:      MR. GLENN SEIDEN
                             MR. AARON SCHWARTZ
17                           MS. BROOKE L. STEVENS
                             Seiden Law Group, P.C.
18                           333 South Wabash Avenue, Suite 2700,
                             Chicago, Illinois  60604
19

20

21

22                          ELIA E. CARRIÓN
                         Official Court Reporter
23                     United States District Court
                   219 South Dearborn Street, Room 1432,
24                        Chicago, Illinois 60604
                              (312) 408-7782
25                    Elia_Carrion@ilnd.uscourts.gov
```

1    (Proceedings had telephonically:)

2          THE COURT:  Please call the case, Emily.

3          THE CLERK:  This is 18 CR 781, USA versus Gan.

4          Could I please have anyone speaking on behalf of the

5    government state their name for the record.

6          MR. FRANZBLAU:  Good morning, Your Honor.

7    Sean Franzblau and Rich Rothblatt for the United States.

8          THE CLERK:  And anyone on behalf of the defendant.

9          MR. SEIDEN:  Good morning, Your Honor.  This is

10   Glenn Seiden, S-E-I-D-E-N, for Mr. Gan, along with...

11         MR. SCHWARTZ:  Good morning.  Aaron Schwartz on

12   behalf of defendant.

13         THE COURT:  All right.

14         MS. STEVENS:  And Brooke Stevens as well.  Sorry,

15   Your Honor.  I was on mute.

16         THE COURT:  Okay.  Good morning.

17         All right.  I would ask everyone to identify

18   themselves by name, other than Ms. Stevens, 'cause her voice

19   is different than the rest of yours.  But I think you all need

20   to identify yourself by name when you speak so my

21   court reporter can get an accurate transcript.

22         We're here for oral argument on the posttrial motions

23   in this case.  I raised some issues when we had a brief phone

24   status last week indicating that I did not want to proceed

25   with the sentencing today and instead wanted to hear some

1  argument on some of the posttrial motions that have been filed
2  in this case.

3      My understanding is, from the defendants, that
4  Mr. Gan did not wish to be present for this phone
5  conference -- or at least didn't view it as necessary.  Nor do
6  I, frankly.

7      MR. SEIDEN:  Right.

8      THE COURT:  But it's his call.

9      So what is the position on that to the extent --

10      MR. SEIDEN:  Yeah.

11      THE COURT:  Be sure you state your name.

12      MR. SEIDEN:  This is Glenn Seiden.

13      I did have a relatively significant discussion with
14  him, because he is quite interested in the outcome.  And we
15  talked about it for a while, and then he indicated that he'd
16  be fine not attending.

17      But we did have a relatively extended discussion on
18  the issue and the underlying issues as well.  He understands a
19  great deal, and he is interested -- he is significantly
20  interested, so it required some explanation and discussion.
21  Nonetheless, he has chosen not to attend.

22      THE COURT:  Okay.  All right.

23      Well, I can start with a few questions.  I'll ask,
24  first, the government.  One of the issues raised in the reply
25  brief of the defendants is that the indictment was

1   impermissibly enlarged at trial, that your indictment charges
2   the receipt of -- well, let me back up a minute.  This is more
3   a factual issue.  The government can help me on this.

4          On the undercover transactions, Counts II, III, and
5   IV, did you let the money walk?  In other words, was there
6   actually a transmission of the money, after it was given to
7   the undercover agent, or did it simply get seized by the
8   government?

9          MR. FRANZBLAU:  Judge, this is Sean Franzblau for the
10  United States.

11          We did conduct further transactions, but we didn't
12  present evidence of those transactions at trial.  The
13  transactions that matter and that were charged in the
14  indictment and that were proven at trial is the DTO courier's
15  delivery of the funds to the undercover agent.

16          THE COURT:  Okay.  And that I understand.  I just
17  didn't know -- I didn't think there was evidence presented on
18  what happened after that.  I was curious because it would seem
19  odd for Mr. Gan to have continued allowing this to happen if
20  there weren't transmission of the funds to accounts in China,
21  because he would have smelled a rat.

22          I don't know what the evidence was of that.  But if
23  you say there was no evidence presented of it, then the
24  inquiry stops once the money was delivered from a DTO courier
25  to the undercover agent.

1  MR. ROTHBLATT:  Judge, this is Richard Rothblatt on
2  behalf of the government.
3  We did introduce very limited evidence of it.  We
4  discussed the provision of bank account information to
5  Ms. Lim.  And we did introduce evidence of electronics seized
6  from Mr. Gan after his arrest and how that bank account
7  information was later found on his phones as well.  So we
8  didn't introduce the government's movement of the money that
9  was provided to the undercovers, but we didn't introduce the
10  evidence about the providing of the bank accounts for the
11  wiring purposes.
12  THE COURT:  Yeah.  My question was a little
13  different.
14  Once the 190,000, for instance, on May 2nd was in the
15  hands of the undercover agent, it was then not -- Ms. Lim
16  didn't try and trade that with cash-rich Chinese clients who
17  had bank accounts in China?
18  MR. FRANZBLAU:  Judge, this is Sean Franzblau.
19  She did on -- well, Ms. Lim, if you recall, didn't
20  have hands on the money.  It was the UC.  But the UC took it
21  to a broker on one occasion, because we're also investigating
22  the brokers and we used this component of the investigation to
23  do that.
24  And on two occasions we used shelf accounts --
25  THE COURT:  Okay.

1    MR. FRANZBLAU:  -- or our own accounts for the very

2    reasons that Your Honor is talking about.  But the whole thing

3    would have blown up immediately if we hadn't sent the money

4    through.

5    THE COURT:  Well, that's why I thought maybe there

6    was some action that took place after.

7    But Mr. Rothblatt has stated the extent of the

8    evidence relating to that that was heard by a jury.  Correct?

9    MR. FRANZBLAU:  That's exactly right, Judge.

10    And if I can go ahead and -- did you want me to just

11    focus on the argument that the delivery of the funds and the

12    receipt of the funds -- the defense argument that those were

13    two separate transactions?  I think that's really the core

14    issue here.

15    THE COURT:  Well, and it relates to the legal issue

16    of whether or not the conduct was actually charged in the

17    indictment where you expanded the scope of the indictment

18    impermissibly by making that the crime.  And I think it really

19    depends on how you read the indictment, but go ahead and argue

20    that, please.

21    MR. FRANZBLAU:  Thank you, Your Honor.  So this is

22    Sean Franzblau.

23    Counts II through IV charged the three discrete

24    financial transactions, which is the physical transfer of drug

25    proceeds from the DTO courier to the undercover agent on

1  May 22, June 26, and June 29th of 2018.  The DTO courier's

2  delivery of the funds and the UC's receipt of the funds is all

3  part of the same single financial transaction.  A hands money

4  to B.  Same time, same place, same financial instrument; it is

5  the same criminal transaction.

6        The defendant's argument that A's delivery of the

7  drug proceeds and B's receipt of the same are two distinct

8  financial transactions is absurd.  It is illogical on its

9  face, and there's absolutely no case law to support that.

10        The defendant relies primarily on *United States v.*

11  *Lee*, but that case does not stand for what he says it does.

12  In *Lee* the defendant had his wife deposit an illegal kickback

13  payment into the wife's business's bank account on

14  December 15, 1988; but the bank did not process the deposit

15  until the following day, December 16 of 1988.  Exactly five

16  years later, on December 16, 1993, the government charged the

17  husband with a substantive money laundering count based on the

18  wife's deposit of the kickback payment into her company's bank

19  account five years prior.

20        And so the question in that case, Judge, was whether

21  the transaction occurred when it was initiated, meaning when

22  the wife delivered the check to the bank, or when it was

23  completed, when the bank processed the check.  And in the

24  former scenario, the account was barred by the statute of

25  limitations; but in the latter, it was not.

1       And so the Court in *Lee* held that, for purposes of

2   calculating the statute of limitations, they would use the

3   initiation of the financial transaction as the starting point.

4   In other words, the clock started ticking when the wife

5   deposited the check at the bank, when she delivered it, not

6   when the bank actually processed it in their system.

7       Now, this is what's key here, Judge:  The Court did

8   not -- did not hold that the delivery of the check to the bank

9   and the processing of the check were two separate

10  transactions.  They simply said that the charged financial

11  transaction -- the deposit, the delivery of the check --

12  occurred on the day it was initiated, when the check was

13  dropped off, not when it concluded, when the bank actually

14  processed it.

15      Here, in this case, there is no delay between the

16  initiation and the conclusion of the charged transaction.

17  It's simultaneous.  It's the cash hand-off.  It's the

18  equivalent of the wife delivering the check to the bank and

19  the bank receiving that check.

20      The indictment didn't --

21      THE COURT:  Let me interrupt.

22      MR. FRANZBLAU:  Yeah.

23      THE COURT:  We have to go to the language of the

24  indictment --

25      MR. FRANZBLAU:  Yeah.

1    THE COURT:  -- the receipt of approximately 190,000
2  for Count II.

3         Your argument is that the receipt of it necessarily
4  includes the delivery of it, because they occurred
5  simultaneously?

6         MR. FRANZBLAU:  That's right, Judge.  And, look, I
7  acknowledge we could've used the words transferred and
8  delivery, and that would have been clearer.  But just because
9  we didn't use, you know, kind of the optimal verb to describe
10  the transaction, it's still accurate to describe it in terms
11  of B's receipt of funds from A.  We're talking about the same
12  single transaction.

13         So, Judge, this is -- there's no way this is a
14  constructive amendment, because we're talking about the same
15  crime.  In the worst-case scenario, this is a variant, where
16  the same crime is proven but it's through evidence different
17  than the factual allegations contained in the indictment.

18         Now, I want to be clear.  It's the government's
19  position this does not come close to amounting to a variance,
20  but this is the only thing it could be.  If it is a -- and by
21  the way, the Seventh Circuit recently had a good case
22  explaining the difference between variants and constructive
23  amendment.  It's *United States v. Heon Seok Lee*, 937 F.3d 797.

24         The big difference -- the key difference with
25  variance is that the defendant has to demonstrate prejudice to

1    his substantial rights.  And the key with the prejudice

2    showing is notice:  Was the defendant on notice about how the

3    government was going to prove up the crime?  And in this case,

4    Judge, the defendant cannot possibly show that his substantial

5    rights were prejudiced by lack of notice.

6         First of all, the indictment clearly informs the

7    defendant that he's charged with this transaction that

8    occurred on these specific dates.  And the defendant has known

9    all along exactly what transaction we're talking about.  Look,

10   for example, at the pretrial motions.

11        In the response to the defendant's motion to dismiss,

12   Judge, Docket Entry 81, pages 5 to 6, the government says, The

13   charged financial transaction is the physical transfer of drug

14   proceeds from a drug trafficking courier to the UC.  There's

15   no confusion.  There's no ambiguity.

16        The defendant's reply, Docket 82, page 3:  The

17   government bases the money laundering charges solely on the

18   transfer of funds from alleged traffickers to a government

19   agent.  Now, this is four months before trial.  The defendant

20   knows what the charged transaction is.  Now he's saying that

21   this is a new theory we've concocted?

22        Even more important, Judge, look at the jury

23   instruction the defense affirmatively agreed to, Docket 118,

24   page 31:  As it applies to Counts I through IV, financial

25   transaction means a transfer, delivery, or other

1  disposition -- other disposition.  How about receipt?  --

2  involving one or more monetary instrument.  Those are the

3  instructions the defense affirmatively agreed to.

4        So really, Judge, at its core, this is an argument

5  that the Court gave a wrong jury instruction.  But that

6  argument is totally waived, because the defendant actually

7  affirmatively agreed to the above instruction.  You can find

8  their affirmative agreement at Docket 143, pages 1402 to 1403.

9        THE COURT:  Which instruction are you referring to,

10 Mr. Franzblau?

11        MR. FRANZBLAU:  This is the definitional instruction

12 for the money laundering terms, so it's...

13        THE COURT:  I got it.

14        MR. FRANZBLAU:  It's page 31.  Yeah.

15        THE COURT:  Yeah.

16        And you're talking about the first paragraph, the

17 financial transaction?

18        MR. FRANZBLAU:  Yeah, yeah.  The definition of

19 financial transaction.  Exactly, Judge.

20        THE COURT:  Okay.  All right.  All right.  I think I

21 understand your argument.

22        Let's hear something -- a response from defendant.

23 And, again, unless it's Ms. Stevens, state your name if you're

24 going to be doing the talking.

25        MR. SCHWARTZ:  Judge, this is Aaron Schwartz.

1    So the first issue that I'd like to point out is that

2   the transaction was the delivery.  The first time that that

3   was raised was in the response brief, and we had a continuing

4   confusion in the pretrial motions as to what financial

5   transaction was at issue.  It wasn't until pretrial briefing

6   that we kind of weeded that out.

7    But nonetheless the indictment says what it says, and

8   the purpose of an indictment is to apprise the defense of the

9   charges and prepare his case.

10    THE COURT:  Were you surprised?

11    MR. SCHWARTZ:  I'm sorry?

12    THE COURT:  Did you indicate -- did you indicate any

13   confusion about this during trial?

14    MR. SCHWARTZ:  No.  Because the indictment is clear

15   that it's the receipt of the United States currency.  Further,

16   that wording in the indictment serves to identify who the

17   principal is through the aiding and abetting charges, so

18   that's where the constructive amendment is.  And this shift --

19   you know, how are we supposed to respond to that if trial was

20   over and we prepared our case accordingly?

21    THE COURT:  What would you have done differently if

22   you had understood that the indictment, by charging -- using

23   the word receipt, was conflating receipt with both the

24   delivery of the funds from the drug dealers to the undercover

25   agent --

1    MR. SCHWARTZ:  Well --

2    THE COURT:  If you had understood that receipt
3    included basically a -- the receipt implies there's a
4    delivery, and not even implies.  It's common sense there's a
5    delivery.  And if you had understood that it -- well, what
6    would you have done differently if you had understood receipt
7    included the actual delivery to cause the receipt?

8    MR. SCHWARTZ:  Sure.  I mean -- well, so first of
9    all, most the evidence at trial revolved around the receipt
10   and what happened to the funds thereafter.  But...

11   THE COURT:  I disagree.  I thought most of the
12   evidence at trial related to how the money got to the
13   undercover agent, which is the delivery:  There were calls
14   between Lim and Gan; there were the exchange of the number off
15   the dollar bill; there were delivery instructions, time and
16   place; the amount of money that was going to be delivered.  I
17   thought the majority of the conversations between Lim and Gan
18   related to getting the drug money to the undercover agent.

19   MR. SCHWARTZ:  Right.

20   But the way we viewed it was that we -- our case
21   focused on what happened after receipt, as the government
22   tried to connect the dots back to Mr. Gan.  And, you know,
23   back to the reasoning in *United States v. Lee*.  That is pretty
24   clear-cut law from the Seventh Circuit up to what the unit of
25   prosecution is in the Seventh Circuit.

1    Once the DTO delivered, that was one financial
2  transaction.  And I think you'll find support throughout the
3  other circuits in that, and the receipt is a wholly separate
4  transaction.  And, again, the money laundering charges -- much
5  of our case didn't need to focus on any of the alleged
6  criminal activity by the DTO prior to.

7    The government, you know, called witnesses to prove
8  that the funds came from unlawful sources, but we prepared our
9  case on the auspices that we had to defend on the basic aiding
10  and abetting principles and the receipt.  And that is --
11  that's what's in the indictment, and the government must be
12  held to prove what the indictment states.  They can't shift
13  the burden posttrial in a response brief.

14    THE COURT:  Okay.  Final argument from the government
15  on this.

16    MR. FRANZBLAU:  Judge, I just don't know how the
17  defense can say that they --

18    THE COURT:  This is?

19    MR. FRANZBLAU:  Oh, excuse me.  This is
20  Sean Franzblau for the government.

21    I just don't know what Mr. Schwartz is talking about.
22  Everything at trial that was presented had to do with the
23  transfer of the money from the DTO to the undercover.  There
24  was just nothing presented about what we did with it
25  afterwards.

1    And how he can say that at trial they were confused

2  about it, when three months before trial they filed something

3  with the Court saying the government bases the money

4  laundering charges solely on the transfer of funds from

5  alleged traffickers to a government agent.  I mean, there it

6  is.

7    That's the end of the inquiry.  They knew exactly

8  what we were talking about.  It's the charge in the

9  indictment.  It's the charge that was proven at trial.

10    We could have picked a better word.  I acknowledge

11  that, but it did not amount to a constructive amendment.  At

12  worst it's a variance, and there's absolutely no prejudice.

13    THE COURT:  Mr. Schwartz, I'm trying to -- I'm trying

14  to -- oh, go ahead.  Someone from the defense, because my

15  question is simply how you would have tried this case

16  differently.

17    Because your main defense to the -- not to the

18  conspiracy but to these undercover deals, I thought, was

19  entrapment, not a technical reading of receipt versus

20  delivery, but instead entrapment.  In fact, I never heard any

21  argument that what is alleged in the indictment was not what

22  was proven in front of the jury.

23    MR. SCHWARTZ:  So, Judge, again, the key

24  consideration here is we prepare our case to focus on the

25  aiding and abetting liability.  And the language in the

1    indictment served to point out who the principal was, not

2    principals.

3            What we would have done differently is focused on

4    principals, both the DTO and the government agent.  But as you

5    can clearly see, our legal arguments focused on the receipt

6    of.  And that's because what -- that's what the indictment

7    charged; so, yes, we would have probably had another section

8    in there addressing whether aiding and liability was lawful,

9    based on the DTO being the principal.

10           But that's just not in the indictment.  And the

11   government can explain their reasoning all they want and what

12   they said in follow-up briefs, but it is the indictment that

13   controls here.

14           THE COURT:  All right.

15           MR. FRANZBLAU:  May I respond just very quick?

16           THE COURT:  Go ahead.

17           MR. FRANZBLAU:  Sean Franzblau.

18           That is just demonstrably false.  If their defense

19   was based on Section 2(b) and that we can't be aiding and

20   abetting undercover, that would have been a legal question for

21   you to decide before trial.  That's not a factual issue for

22   the jury to decide.

23           That's not something they mentioned to the jury.

24   That's just not what happened at trial.  It's fiction.

25           THE COURT:  Okay.  Well, that does lead us to the

1   aiding and abetting instruction.  The *Freed* case, of course,
2   says that the instructions -- the pattern instruction is
3   possibly wrong email.

4           I'm surprised.  I'm embarrassed.  I didn't realize
5   that, but I'm surprised no one else raised it.

6           There was no objection at the instruction conference,
7   and I know that the -- you know, the *Freed* case talks about
8   whether there's a waiver on an argument like this.  And the
9   detail that's attached to an instruction conference matters if
10  there's an intentional waiver or giving up of an argument
11  relating to the instruction being wrong.

12          But the fact is that what we put on the record -- and
13  maybe this will be something I have to change in the future.
14  What we put in the record was a summation of what were
15  lengthy, lengthy discussions during an instruction conference,
16  and no one on either side raised the issue of the pattern
17  instruction, in light of *Freed*, defining the aiding and
18  abetting language incorrectly.

19          Is anyone aware of any cases since *Freed* that has
20  discussed this issue?  I know Judge Ellis had a case where she
21  discussed it in a posttrial motion in an opinion she wrote.
22  And, again, there was no real issue, just like in *Freed*,
23  because the conduct was of a principal, rather than an aider
24  and abettor; so it wasn't really relevant in the end, when
25  that instruction was given in Judge Ellis's case.  And that

1  was the conclusion of the *Freed* case.

2  But is anyone aware of any cases that have gone into

3  this in any detail since *Freed*?

4  I'll ask, first, the government.

5  MR. FRANZBLAU:  Judge, I am aware of one case.  It's

6  *United States v. Arthur Friedman*.  If you'll just give me one

7  second to pull up the cite.  *Friedman*, F-R-I-E-D-M-A-N.

8  THE COURT:  Okay.

9  MR. FRANZBLAU:  Sorry.  I'm just trying to get the

10  cite here.

11  Basically, the Court -- the government argued in that

12  case that -- well, the Court sort of didn't decide the issue.

13  They held that it was basically -- it would have been harmless

14  error because the government -- you know, their case wasn't

15  based on Section 2(b) liability.

16  And that's very much the case here as well, Judge.

17  The evidence shows that multiple people on the DTO side were

18  involved in the charged transfer.  The defendant was working

19  directly with and acting through those parties to complete the

20  charged transactions.

21  So you don't need to answer the question of whether

22  Section 2(b) liability applies when only a government agent is

23  involved.  That's not this case.  It's a straw man argument.

24  We never argued that to the jury.  They weren't -- it doesn't

25  make sense in the context of this case.

1           I want to make one other point clear, and then I'm

2 going to pass it over to Mr. Rothblatt to more specifically

3 address the jury-section question but -- jury-instruction

4 question.  But, you know, the parties have focused on aiding

5 and abetting in the posttrial briefs, but the indictment is

6 certainly not limited to secondary liability.  And we didn't

7 limit ourselves to that theory before the jury.

8           And after reviewing the trial transcripts and the

9 statutory scheme closer, it's our position that we proved both

10 principal and secondary liability as to all counts of

11 conviction.  And I want to raise that here, because we were

12 not clear about that in the response brief.

13           Judge, when it comes to money laundering, it's a bit

14 gray, frankly, where the line is between principal and

15 secondary liability.  And that's because of 1956(c)(2).  The

16 term "conducts" includes initiating, concluding, or

17 participating in initiating or concluding a transaction.

18           So the statute kind of stretches and spreads out

19 principal liability to cover any kind of participation in the

20 charged financial transaction.  Meaning if you take a --

21 you know, a subcomponent of the crime with the intent to

22 complete the whole crime, that's principal liability.  Now, in

23 other contexts that's aiding and abetting liability.

24           So under the facts of this case -- and I'm sorry I'm

25 not -- I just want to make this point before we get into the

1   jury instruction.  Principal and secondary liability, they

2   overlap.  The defendant participated in initiating and

3   concluding the charged transactions, which make him guilty as

4   a principal.  But his participation included his own

5   affirmative acts that advanced but did not complete the crime,

6   and also acting through others to complete the crime, which we

7   typically view in terms of Section 2 liability.

8          So here, it's really -- it's really a distinction

9   without a difference, at least to Counts II through IV.  So I

10  just wanted to make that point first, because we have not been

11  clear on that.  And I apologize for that.

12         That sort of dawned on me, that we're making this

13  a lot more complicated than it needs to be.  We proved both

14  principal and secondary liability.

15         Rich, do you want to --

16         THE COURT:  Excuse me.

17         MR. FRANZBLAU:  Go ahead.

18         THE COURT:  You're using 1956(c)(2) as your argument

19  that, by the definition, conducts -- that definition includes

20  conduct that encompasses what Gan did and, therefore, makes

21  him a principal for the charge?

22         MR. FRANZBLAU:  That's correct.

23         THE COURT:  Is there an instruction that defines

24  "conduct"?

25         MR. FRANZBLAU:  No.  I want to -- the jury was not

1  instructed on conducts.  That is not included in the pattern
2  instruction.

3      But the government would argue that -- well, I am
4  arguing that you don't need an instruction for that.
5  Conducts, you know, has sort of a common sense definition that
6  includes, you know, participating in a transaction.  And if
7  there's a mul- -- if there are multisteps in a single
8  transaction, I think the common, you know, plain meaning of
9  the word is clear enough to the jury.

10     But, again, it's a distinction without a difference
11 here, because the Section 2 liability in this case looks the
12 same as principal liability; so it just sort of adds to the
13 harmlessness of any error that was included in the jury
14 instructions.  But, in fact, there really wasn't an error.

15     And I'm going to turn it over to Mr. Rothblatt to
16 explain that, unless the Court...

17     THE COURT:  No.

18     Mr. Rothblatt, are you going to give me a cite for
19 *Friedman?*

20     MR. ROTHBLATT:  Yes, Judge.  This is
21 Richard Rothblatt on behalf of the government.

22     The *Friedman* Case is 971 F.3d 700.  And I think it'll
23 be a little unsatisfying to review the case.  The Court
24 doesn't clearly --

25     THE COURT:  I'd rather have the preview.

1    MR. ROTHBLATT: Yeah. It doesn't actually address

2    the *Freed* issue one way -- and the government will make the

3    position -- we believe the finding in *Freed* on the

4    Section 2(b) instruction and 5.06(b) is dicta, and the Court

5    already addressed this. The defendant has affirmatively

6    waived any challenge to the aiding and abetting jury

7    instruction, as the Court noted before. There were lengthy

8    discussions between the parties and the Court that were off

9    the record and then summarized on the record.

10    But even more than that, Judge, the defendant and

11   government submitted final proposed instructions with

12   objections. Those are on the record. And on page 35, Pattern

13   Instruction 5.06, it reads "agreed" in bold, highlighted.

14    On the Court transcript of the instruction

15   conference, the Court observed -- this is on the record at

16   143, page 1388 of the transcript. The objections by defense

17   are clearly stated on the instructions I got. And then when

18   we went through the instructions one by one, on page 1404 of

19   the transcript, the Court said, Page 35 is agreed and will be

20   given.

21    So this is in direct contrast to the cases cited by

22   defendant, where a defense attorney simply said, No objection,

23   during a rogue colloquy. Here, the defense had an opportunity

24   to review these instructions, go through them, and

25   affirmatively agreed to this one; so any argument now that

1 they were prejudiced by an improper instruction has been
2 waived.

3 But let's address the issue that even if the Court
4 does find that defendant forfeited the argument, rather than
5 waived it, there was no error, let alone plain error. So as
6 the *Freed* court pointed out, the pattern instructions are
7 presumed to accurately state the law. Of course, Section 2(a)
8 directly tracks the Supreme Court's ruling in *Rosemont v.*
9 *United States,* and there's no issue about that.

10 And the second paragraph has been upheld as a correct
11 statement of the law in several Seventh Circuit decisions
12 before that dicta in *Freed*. But the challenge instruction --
13 go ahead, Judge.

14 THE COURT: Go ahead.

15 MR. ROTHBLATT: The pattern instruction for
16 5.06(b) -- it's not directly coextensive with Section 2(b).
17 It simply states the well-known rule that a person is equally
18 responsible for an act he causes as an act that he takes. So
19 it's the government's position that the Court's commentary on
20 Pattern Instruction 5.06(b) in *Freed* was dicta.

21 And if there was an error here in providing this
22 instruction, these instructional errors are reviewed in the
23 context of the entire trial. And they're rarely a basis for
24 reversing a conviction.

25 It's the government's position here, as Mr. Franzblau

1   just articulated, and as we're happy to go through throughout

2   this hearing, at no point was the government relying on

3   Section 2(b) liability for the counts of conviction.  It's the

4   government's position that for Counts II through V, defendant

5   was a principal.  And to the extent there was aiding and

6   abetting liability, it was under Section 2(a); so there's no

7   plain error here warranting reversing of the conviction.

8           THE COURT:  And what's your position on the level of

9   intent that would be necessary for "willfully" on a nontax

10  case?  I realize willfully means, at least in the tax

11  context -- criminal tax context, not only you intended to

12  commit the conduct but you also knew it was illegal.  And

13  that's typically what people think it means when you have to

14  do something willfully.

15          But you pointed out cases, I thought, in your

16  response brief -- and I'm going to want to hear from

17  defendants on this.  But the willfully language does not

18  necessarily imply that you have -- for many offenses,

19  including a money laundering offense, that you knew your

20  conduct was illegal.

21          MR. FRANZBLAU:  Judge, this is Sean Franzblau for the

22  United States.

23          That's exactly right.  It's our position that willful

24  in this context would mean purposeful, not knowing that

25  something is illegal but intending to have a certain effect.

1  The definition of -- the heightened definition of willfulness,
2  where you have to actually know that something is illegal, is
3  really unique to tax, because of how technical the tax code
4  is.

5          And I think the cases, you know, explain that well.
6  It's really an exception.  It's become sort of our
7  understanding of willfulness, 'cause it comes up mostly in tax
8  cases.

9          But the cases we cite, you might think, stand for the
10 proposition that then the default is purposeful on this,
11 meaning intending to have a certain effect, not just knowing
12 about it but wanting it to happen.

13         THE COURT:  All right.  Okay.

14         Any additional argument for the government on this
15 point?

16         MR. FRANZBLAU:  Not on this point.  Thank you, Judge.
17 This is Sean Franzblau.

18         THE COURT:  All right.  Let's hear from defendants on
19 this, and, again, state your name.

20         MR. SCHWARTZ:  Yes.  Judge, Aaron Schwartz for the
21 defendant.

22         So under the instruction given in this case, the jury
23 was permitted to convict Gan on the basis of a noncriminal
24 intent under the aiding and abetting statute knowingly.  That
25 appeared nowhere in the statute.  And the Supreme Court, in

1  the case we cited, defined willfully as knowing the conduct
2  was illegal.

3          And Seventh Circuit reinforces that in *United States*
4  *v. Woods:*  Knowledge alone is insufficient, and the government
5  must also show intent to further the crime.  Now, crime is
6  knowing that there's --

7          THE COURT:  What about -- sorry, Mr. Schwartz.

8          What about the *Wheeler* case in the Seventh Circuit?
9  I thought that indicated that willfully just means
10  intentionally in this context.

11          MR. SCHWARTZ:  Did I cite *Wheeler*, Judge?

12          THE COURT:  I thought the government did, but --

13          MR. SCHWARTZ:  Okay.

14          THE COURT:  -- correct me.  I'll pull it from the
15  briefs.

16          But does anyone from the government -- can you point
17  to that?  Otherwise...

18          MR. ROTHBLATT:  Yes, Judge.  This is
19  Richard Rothblatt on behalf of the government.

20          We cited *Wheeler*, on page 17, in a different context
21  with regard to jury instructions.

22          MR. FRANZBLAU:  No -- sorry.  This is Sean Franzblau.

23          On page 18 we cite *Wheeler* for the proposition
24  that -- the Court explains that the definition of willfully is
25  statute specific.  But generally, it means intentional, unless

1  it is in the context of a technical statute, such as the

2  federal tax law.  That's the point I was getting at.

3          Thank you, Judge.  I should've actually cited the

4  case with the point I was making, but that's the case.

5          THE COURT:  Well, and that's, Mr. Schwartz, what I

6  wanted you to respond to was that --

7          MR. SCHWARTZ:  Yeah.

8          THE COURT:  And if you don't have the case at the tip

9  of your fingers, that's fine.  But if you can -- it seems as

10  if the willful intent, which is a heightened intent, applies

11  mainly to tax cases and is more crime specific rather than --

12  you know, there's nothing that says willful in the statute, is

13  there -- money laundering statute?

14          MR. SCHWARTZ:  In the aiding and abetting statute?

15          THE COURT:  No.  In the money laundering statute

16  itself as principle.

17          MR. FRANZBLAU:  No, I don't believe so.

18          THE COURT:  All right.  And there are statutes that

19  can -- specifically tax statutes that do contain the word

20  willful, and that's where I was -- so we start with that basic

21  fact.  It's not required to prove willfulness in the statute

22  itself.

23          MR. SCHWARTZ:  That's correct, Judge.  I don't have

24  any quarrels with that, but again -- I'm sorry.

25          This is Aaron Schwartz for the defendant.

1          *Woods* was in the context of aiding and abetting, and

2   it explicitly said that knowledge is not sufficient.  The

3   government must show the intent to further the crime.  I have

4   no quarrels with your understanding of willfulness in the tax

5   law context, but it's the fact -- it's very simple.

6          The fact that there was a lesser *mens rea* used to

7   convict on what we're arguing is pure and separate aiding and

8   abetting liability.  There's a case in the Seventh Circuit,

9   *United States v. Edward*, 869 F.3d 490, and that was about the

10  failing to inform the jury about an essential element of

11  witness tampering and the corrupt mental state that

12  distinguishes unlawful from innocent interference with an

13  investigation.

14         And the facts in this case, with the aiding and

15  abetting liability -- it is entirely plausible that the jury

16  could've found that a Chinese national residing in Mexico did

17  not know that his wholly extraterritorial conduct would

18  violate United States Code.  The outcome, again, might be

19  different --

20         THE COURT:  No.  Mr. Schwartz, I'm going to have to

21  disagree with you on that one.  Everything he did, by way of

22  the types of conversations he had with Lim, what appeared to

23  be at least a -- you could find -- a reasonable jury could

24  find that there was discussions between Gan and the

25  dope dealers and the dope dealers, both in Mexico -- and we

1  can call them drug trafficking organizations, I guess, instead
2  of dope dealers.

3          But the DTOs in Mexico, the DTOs who were selling the
4  narcotics in the United States, and the couriers who gathered
5  all that money up -- I just think the evidence -- at least a
6  reasonable jury could conclude that anyone who had a piece of
7  this -- any part of these transactions understood, and
8  reasonably a jury could reasonably find and understood, the
9  illegality of their conduct, that they knew --

10         MR. SCHWARTZ:  Judge --

11         THE COURT:  -- what they were doing was against the
12 law.

13         MR. SCHWARTZ:  Judge, Aaron Schwartz.  I'm sorry.
14 Go ahead, Judge.

15         THE COURT:  No, no.  Go ahead.  Proceed.

16         MR. SCHWARTZ:  So I guess let me -- I respectfully
17 disagree with the factual pattern that you just recited.  I
18 don't think there was any evidence at trial that Gan was
19 communicating directly with any DTO members or any of the
20 couriers, and I think that's supported by the transcripts and
21 the evidence.

22         THE COURT:  But how did -- well, if that's true, how,
23 in fact, did -- when the -- how did the information about how
24 to meet with Lim and her organization, which turned out to be
25 undercover agents -- how did that information get to Lim from

1   Gan, if he wasn't in communication with the dope dealers on
2   the ground in the United States?

3          MR. SCHWARTZ:  That was a subject for trial, Judge.
4   I don't even want to begin speculating.

5          THE COURT:  Well, I don't think you have to.  Well,
6   I'll ask the government that, but I don't think you have to
7   speculate.  That's a reasonable inference that could be drawn
8   from the evidence, that the -- Lim's undercover agents and Lim
9   couldn't know who was going to meet them and where without her
10  telling Gan and Gan talking to the people on the ground in the
11  United States.

12         I'll let the government fill this in, but that was my
13  recollection of the evidence.

14         MR. FRANZBLAU:  Judge, this is Sean Franzblau.

15         Your recollection is exactly right.  I mean,
16  Special Agent Dennewitz walked through this process, how it
17  works, and charted it out.  And defendant occupied that upper
18  right-hand corner spot of being the broker in Mexico who was
19  passing -- who's, first of all, reaching out to the
20  money laundering courier on the ground to initiate the
21  transaction, collecting the pickup information, the serial
22  number on the dollar bill, the phone number for the courier,
23  and the code name, and then passing it to the DTO client.

24         Then we showed overwhelmingly that that's exactly the
25  process that they were using.  And the most compelling

1 evidence, Judge, comes from the June 26 pickup. If you
2 recall, a few things went wrong that day.

3 And the defendant is literally on the phone with Lim
4 and the drug traffickers at the same time. He's calling to
5 say, I've got my client on the other line. He's pissed off;
6 he wants to know where the courier is; this isn't the first
7 time we're doing this. How are you screwing this up like
8 this?

9 He's going back and forth between the DTO and Lim.
10 You have it in real-time captured on recording. It matches up
11 exactly with what Agent Dennewitz testified to.

12 It's not only a reasonable inference. It is the only
13 reasonable inference, based on the evidence at trial.

14 THE COURT: And, Mr. Schwartz, I think the problem
15 there for defendant's point of view is could a reasonable jury
16 conclude that? I think they could. But then we go back to
17 the instruction, and I'll ask a further question on that.

18 You know, what would have been different if the word
19 willfully had been added to the 5.06 instruction instead of
20 knowingly, 'cause I'm going back to the definition of
21 willfulness in the instructions? They don't define it. It's
22 at page -- it's Instruction 411 of the patterns. They
23 intentionally say you don't define it. You used the language
24 that you get from the statute, because it's statute specific.
25 Now, you can certainly argue -- and you've got the

1  argument there, and you've made it, that the statute,

2  Section 2(b) contains the word willfully.  On the other hand,

3  the money laundering statute itself does not contain the word

4  willfully.

5          MR. SCHWARTZ:  Well --

6          THE COURT:  So maybe you can comment on that.

7          MR. SCHWARTZ:  Sure.

8          Well, Judge, I think the reason that willfully is in

9  the aiding and abetting statute is because it's --

10          THE COURT:  Aaron Schwartz.

11          MR. SCHWARTZ:  I'm sorry.  Aaron Schwartz for the

12  defense.

13          The reason that willfully is in the aiding and

14  abetting statues is because it's separate conduct.  It's

15  extraneous.  So in order to be found liable for things under

16  that statute -- there is a higher *mens rea*, you know.

17          So things like making phone calls and sending

18  text messages and, you know, even associating with those

19  involved in criminal activity -- 2(b) weeds that out by

20  holding the government to a higher burden to show that they

21  furthered a crime that they knew was a crime.  And it's --

22          THE COURT:  Well, let's assume that -- sorry to

23  interrupt -- let's assume it is a higher *mens rea* that they

24  would have been required to prove.

25          How would that have been presented to the jury?  The

1   word willfully would be in that 5.06 instruction, but would
2   there be a definition of willfully that would had to have been
3   added?  I don't see that in the patterns.

4           Where would the definition of willfully have come
5   from?  And how would it have been different, ultimately, than
6   the proof that was presented where -- I thought the evidence
7   was, frankly, overwhelming that the defendant necessarily knew
8   what he was doing was illegal, because of the nature of how
9   they were going about doing it.  They weren't doing this
10  through wire transfers to a bank in real names, you know, in
11  direct -- using anything that resembled something that's a
12  legitimate financial transaction.

13          So how would the -- what would the instruction look
14  like, not just adding the word willfully, but how would that
15  have been defined to the jury?  And then how is the conduct
16  that actually was proven up any different than whatever that
17  definition may be?

18          MR. SCHWARTZ:  Judge, Aaron Schwartz for the defense.
19          I would resort back to the *Woods* case, that the
20  government must show intent to further the crime and that
21  Mr. Gan must have known that his actions outside the
22  United States was a crime.  Again, when we're talking about
23  aiding and abetting, we're only talking about the liability
24  under that statute, not the knowingly under the
25  money laundering statute.  So, of course, we would have

1   objected to the jury instructions and had some sort of

2   definition of willfully, in that the defendant knew what he

3   was doing particularly was a crime, not that any other

4   complicit defendants/nondefendants were committing a specific

5   crime.

6         THE COURT:  How can anyone who's handling hundreds of

7   thousands, if not millions, if you look at the conspiracy

8   count, dollars in drug proceeds -- and I go back to the

9   statement that Pan and Gan had with Lim, where they said --

10   where Lim indicated somewhat naively, What is all this money

11   for?  And they told her, Well, for drugs, of course.  I --

12   you know, I think even Lim was play-acting naive on something

13   like that.

14         But how could anyone in Mr. Gan's position, where

15   he's dealing with -- the inference could be -- a reasonable

16   inference a jury could draw is he's dealing with drug kingpins

17   in Mexico and arranging for people who work for those drug

18   kingpins who have sold drugs and gathered hundreds of

19   thousands of dollars in drug proceeds and then having it

20   delivered in, like, the Oakbrook shopping center mall, of all

21   places, or in a hotel of a downtown -- you know, a Near

22   North Side hotel in a suitcase, using not a driver's license

23   to show an ID, not a passport to show an ID, but using the

24   last -- the serial numbers from a dollar bill to make sure it

25   matched what were given to the drug traffic organization

1  people as the numbers that were the key to knowing they were
2  handing over all this money to someone who was part of the
3  organization -- how could a jury not reasonably believe that
4  Gan knew what he was doing was against the law?
5          MR. SCHWARTZ:  This is Aaron Schwartz for the
6  defense.
7          Well, for fear of not getting admonished again,
8  Judge --
9          THE COURT:  Mr. Schwartz, I'm not admonishing you.  I
10 hope you haven't taken it like that.
11         MR. SCHWARTZ:  No.
12         THE COURT:  I'm just playing devil's advocate on it.
13         MR. SCHWARTZ:  No, of course.  You know, it's a tough
14 fact pattern.  But, again, it's -- in the aiding and abetting
15 liability statute, you have to focus on the defendant's
16 conduct, and it's what he knew that he was doing was illegal.
17         Okay.  He might have known that the underlying
18 transactions, which we argued were not unlawful -- but in --
19 for this specific example, he might have known the underlying
20 transactions were illegal.  But his assistance -- what did he
21 do?  Was that illegal?  Did he know that was illegal, to do
22 whatever the government alleged he did?
23         And that's why there's a higher *mens rea* in that
24 statute, and that's why I pointed out that he's a foreign
25 national residing in a different country.

1    THE COURT:  Okay.  All right.

2    Anything else on this point from defense?

3    MR. SCHWARTZ:  Well, Judge, I don't know where you're

4    going next, but there was some discussion of the underlying

5    statute itself, Money Laundering Control Act.  And I just

6    wanted to point out -- I want to point out that --

7    *United States v. Morrison*, the Supreme Court basically said

8    that the extraterritorial reach of the statue is a merits

9    question reserved for the jury that must be proven beyond the

10   reasonable doubt.

11   And the Seventh Circuit *en banc* agreed with that case

12   in the antitrust context and said that extraterritorial

13   application is an element of the offense.  Limitations under

14   reach of the statute describe what conduct the law purports to

15   regulate and what lies outside its reach.  That is *Minn—Chem,*

16   *Inc., v. Agrium, Inc.*, 683 F.3d 845.

17   And that's followed up by Judge Pallmeyer's opinion

18   in *United States v. Firtash.*  It says:  These merit-based

19   arguments as to the extraterritorial reach of a statute, even

20   intermixed with, quote/unquote, jurisdictional questions

21   should be determined at trial.  So that's just an important

22   backdrop, since I know one of your questions was, Could the

23   acquitted conduct in Count I of the conspiracy be considered

24   or even could this Court engage in fact finding about the

25   reach of the statute?  And even more importantly is that the

1  government conceded in their pretrial briefing that that

2  alleged conspiracy conduct ended before any of the

3  transactions in Counts II through V.

4  I'm going to quote from the government:  The evidence

5  will show that by May 2018, Gan had discontinued laundering

6  money with Pan.  Though as explained below, Gan continued to

7  negotiate a conspiracy-related (inaudible) with Pan through at

8  least October 2018; however, the conduct that gave rise to

9  Counts II through V is separate from the Count I conspiracy.

10  So I just want to clear up the procedural and substantive

11  language and interpretations of the Money Laundering Control

12  Act.

13  THE COURT:  Mr. Schwartz, so then your position is

14  that, given the fact that Count I was an entirely separate set

15  of facts from Counts II through V, the extraterritorial

16  argument that you're raising as to the -- basically, the

17  undercover counts can't rest on conduct that occurred in

18  Count I?

19  MR. SCHWARTZ:  Right.  And so --

20  This is Aaron Schwartz for the defense.

21  So there's this blur of all the evidence that was

22  presented at trial and timing.  And, you know, everything that

23  the government said so far, in terms of facts presented at

24  trial, those need to be compartmentalized.  And the Court need

25  be weary of whether or not the reach of the Money Laundering

1   Control Act was proven beyond a reasonable doubt.

2           Because if the Court goes into a fact-finding

3   process, it's going to invade the province of the jury.  And

4   we're getting into *United States v. Apprendi* territory.

5           THE COURT:  Well, before we get there -- before we

6   get to *Apprendi* --

7           MR. SCHWARTZ:  Sure.

8           THE COURT:  -- unlike *Morrison* -- I don't recall the

9   statute in *Morrison,* but I don't think there was actually a --

10  remind me on *Morrison.*  I thought it was a banking-type case.

11          MR. SCHWARTZ:  Judge, Aaron Schwartz for defense.

12          That was on 10(b), securities fraud.

13          THE COURT:  Okay.

14          MR. SCHWARTZ:  And what happened is the Supreme Court

15  struck down the Second Circuit's conduct-and-effects test and

16  cleared up this misnomer of is *United States v. Lee*

17  jurisdiction really jurisdiction or is it a merit-based

18  argument; and clearly said it's a merit-based argument that

19  should go to the jury.  Because inherent in every federal

20  criminal case is jurisdiction, and that's through

21  18 U.S.C. 3231; so extraterritorial jurisdiction really isn't

22  jurisdiction.  It is the limits of what conduct falls under

23  the underlying criminal statute.

24          THE COURT:  Okay.  And I agree with that.  But then

25  don't we go to 1956(f)(1), which is -- unlike many criminal

1  statutes -- for instance, the FCPA, which you've cited, really

2  is inapplicable because the FCPA says you can't indict a

3  foreign national who has no contact with the United States.

4  We can't go indict the president of -- I won't name a country

5  to -- I don't want to start an international incident.

6  But you can't indict a president of a foreign

7  country, who never set foot in the United States, who was

8  taking bribes from a United States corporation to operate a

9  business in that country.  FCPA says you can indict the

10 company, and you can indict United States citizens who were

11 causing those bribes or making the bribes in a foreign

12 country.  But you can't indict the foreign president, and I

13 think that's the law.

14 Then you get to the money laundering statute under

15 1956(f)(1), and it talks about this statute having -- you have

16 jurisdiction.  And a person who is a non-U.S. citizen can be

17 indicted if the conduct occurs, in part, in the United States,

18 and the conduct certainly occurred, in part, in the

19 United States.  And it would seem as if the defendant caused

20 it, or at least -- either caused it or was -- the government's

21 argument is he was a principal; he was part of it.

22 So I forget where we started on this.  But I need you

23 to address the language of the statute itself, because the

24 extraterritorial argument I don't think is the same, when you

25 have a statute allowing for the indictment of a foreign -- a

1  non-U.S. citizen, if he does -- if he participates in conduct

2  that occurs, at least in part, in the United States.

3          MR. SCHWARTZ:  Sure, Judge.

4          Aaron Schwartz for the defense.

5          The way I read it, the way I cited it, and the way

6  all the cases really agree with me, especially the *Hoskins*

7  case, is that it's the defendant's conduct and whether the

8  defendant's conduct was in the United States.  It's

9  geographical, so -- and there's several courts that agree.

10          You know, there's the *Gálvez Peña* case, which I

11 believe I cited, from the Northern District of Georgia.  The

12 issue of extraterritorial reach of the statute hinges on

13 whether the underlying act of money laundering occurred, at

14 least in part, in the United States.  And there's been no

15 conduct by Mr. Gan in the United States.

16          And I think that's dispositive.  And it must be

17 proven beyond a reasonable doubt, that his -- that his conduct

18 occurred in part in the United States, not others.  And that's

19 why we get into secondary liability, and it's so difficult.

20          And as I stated in my briefs, this usually isn't a

21 difficult determination, because everybody's in the

22 United States.

23          THE COURT:  Right.

24          MR. SCHWARTZ:  But here he's not.  And, Judge, I

25 think you agreed that he was not a principal in this case.

1  And, you know, even if there was no aiding and abetting in the

2  charges and this was solely hinging on substantive statute,

3  that conduct need occur in the United States, not acquitted

4  coconspirators and certainly not government agents.

5         THE COURT:  What about phone calls to the

6  United States or BlackBerry messages?  How do those -- if he

7  calls the United States or takes a call from the

8  United States, how does that affect this issue of liability

9  under the 1956(f)(1)?

10        MR. SCHWARTZ:  Judge, Aaron Schwartz again.

11        Again, I do not think that there was evidence

12  presented at trial, at least in the time frame that we're

13  talking about -- you know, we have to be mindful of the

14  separate conduct included in Count I, that he directly made

15  phone calls to the United States.  And in the initial motion,

16  I address the amount of activity that would have to occur for

17  it to be reasonable under the other theories of jurisdiction

18  in this case.  But I certainly don't think phone calls or

19  text messages would be sufficient.  It's conduct directly

20  involving the transaction which is the conduct at issue.

21        THE COURT:  Well, are you saying basically that --

22  and I guess you are -- but he can direct conduct in the

23  United States, he can participate through phones or BlackBerry

24  messages or other forms of communication directly to the

25  United States, but if he never sets foot in the United States,

1  this money laundering statute can't apply to him?

2      MR. SCHWARTZ:  Judge, Aaron Schwartz for the defense.

3      It's so hard to speculate because we have all these

4  other variables.  So if you want to give me that hypothetical

5  again -- and we'll narrow it just to that hypothetical -- I'll

6  try to address it.

7      THE COURT:  Well, the hypothetical is what a

8  reasonable jury could find in this case.  Of course, he never

9  stepped foot in the United States, other than when he was

10  arrested in Los Angeles.  When he was involved in these

11  Counts II through V transactions, he was operating, I think,

12  out of Guadalajara and was making calls or communications of

13  some kind -- the government will have to -- I'm sure they'll

14  come back with the precise nature of the communications in a

15  minute.

16      But there were communications between Lim and Gan.

17  Lim was in Chicago, and there were -- a reasonable jury can

18  conclude there were communications between Gan and

19  drug trafficking organization couriers in Chicago.  That's

20  the -- it's not even a hypothetical.  I think that's what a

21  reasonable jury could've concluded from the evidence.

22      But it seems to be your argument that because he

23  didn't accept the money, gather the money in Chicago, step

24  foot in Chicago, and, you know, make these arrangements, he

25  can't be subject to liability, even under the money laundering

1  statute that says a noncitizen -- if the conduct occurs in
2  part in the United States, a noncitizen can be liable.
3      And let me back up.  Sorry for the multiple questions
4  here.
5      It's your position that the conduct -- it's not
6  the -- it's got to be conduct by the United -- by the
7  non-United States citizen.
8      It's his conduct that has to occur in the
9  United States?
10     MR. SCHWARTZ:  Yeah.
11     Aaron Schwartz for the defense.
12     Yes.  And I would direct you, Judge, to the cases
13  addressed in acting electronically, where the defendant
14  himself initiated transactions, even though he was in another
15  country --
16     THE COURT:  Uh-huh.
17     MR. SCHWARTZ:  -- because he was directly involved
18  with the transaction.  And, again, it's a policy, and you are
19  being asked today to see what the outer limits of the
20  Money Laundering Control Act are.  And I think this is one of
21  the first cases in the country where it's clearly outside.
22     The acting electronically, sure.  The other cases --
23  you know, finding extraterritorial reach on -- you know, when
24  everybody's inside the United States, but we are really
25  stretching the bounds here.  And you have to look at the

1    Supreme Court cases discussing the policy behind

2    extraterritorial jurisdiction, Congressional reach of foreign

3    citizens acting abroad.  And I think that that's the issue

4    here.

5              THE COURT:  Okay.  All right.  Well, thank you.

6              Let's hear from the government on this.

7              MR. FRANZBLAU:  Judge, Sean Franzblau for the

8    United States.

9              With due respect, the defense is just completely and

10   totally confused on the extraterritorial jurisdiction issue.

11   Let's start with the plain language of the statute.

12   Section 1956(f) says:  There is extraterritorial jurisdiction

13   over the conduct prohibited by this section -- over the

14   conduct prohibited by this section, if, in the case of a

15   non-U.S. citizen, the conduct occurs in part in the

16   United States.

17             The conduct prohibited by the section is the

18   financial transaction, not the location of the people causing

19   the financial transactions, the financial transaction itself.

20   It does not say that a non-U.S. citizen can violate the

21   statute only if physically present in the United States.

22             Congress knows how to limit jurisdiction that way.

23   Like, as you said, in the Foreign Corrupt Practices Act.  They

24   didn't do that here, and that's unsurprising because that

25   would turn basic jurisdictional principles on their head.

1       Let's just take a step back.  Generally speaking,
2   federal criminal statues apply extraterritorially when the
3   conduct relevant to the statute's focus occurs substantially
4   within the United States.  That is true whether or not the
5   statute contains an explicit extraterritorial provision.
6   That's *RJR Nabisco,* and the court does a nice job in *Firtash*
7   of going through all these different principles.

8       In other words, Judge, the default rule for criminal
9   jurisdiction is that if substantial conduct constituting the
10  crime occurs within the United States, federal courts have
11  jurisdiction over any party liable for the crime regardless of
12  where the party was physically located when he committed the
13  acts that made him liable and regardless of nationality.  Now,
14  there can be due process limitations on this but not
15  jurisdictional.  Here, the criminal cash transfers, which is
16  the focus of the statute, occurred entirely within the
17  United States.

18      So even if the Money Laundering Control Act did not
19  have the extraterritorial provision, this Court would have
20  jurisdiction over the defendant, despite the fact that all of
21  his acts that make him liable for those criminal cash
22  transfers occurred outside the United States.  The question is
23  where did the crime occur.  1956(f) --
24          THE COURT:  Now --
25          MR. FRANZBLAU:  Sorry.

1           THE COURT:  Let me interrupt you for a minute.

2           I suppose that's the way out-of-country narcotics

3  dealers get indicted, even though they never -- El Chapo or

4  any of these other drug lords -- so-called drug lords get

5  indicted in the United States for conduct that occurs -- well,

6  for -- when they've never stepped in the United States.

7           MR. FRANZBLAU:  This is Sean Franzblau.

8           That is exactly right, Judge.  This is absolutely

9  right.  That's a very good example.

10          THE COURT:  Because --

11          MR. FRANZBLAU:  So all that 19 -- I'm sorry.

12          THE COURT:  Well, 21 U.S.C. 841 doesn't contain this

13  type of jurisdictional statement like the money laundering

14  statute does.

15          MR. FRANZBLAU:  Correct.

16          THE COURT:  And I suppose the argument is -- and I'm

17  not putting words in your mouth, but I'm anticipating the

18  argument is this makes it even clearer there is jurisdiction.

19          MR. FRANZBLAU:  This is Sean Franzblau.

20          That's exactly right, Judge.  And all that 1956(f)

21  does is it codifies this default rule with respect to

22  non-U.S. citizens.  It arguably expands it a little bit

23  because it doesn't require substantial conduct.  It just says

24  "any part."

25          But then what it's really doing is it's further

1    extending the normal bounds of extraterritorial reach to U.S.

2    citizens who commit violative financial transactions that do

3    not touch the United States in any way.  That's the only real

4    extension of the default rule that's going on in 1956(f).  And

5    so it makes sense that Congress would want to, you know, make

6    extra clear that the statute applies extraterritorially and

7    how it applies, because money laundering tends to have,

8    you know, more of an international component than other

9    crimes.

10            Now, defendant argues that the Money Laundering

11    Control Act extraterritorial provision actually curtails the

12    reach of the statute to less than the default rule.  So the

13    Supreme Court tells us in *RJR Nabisco* that such a clear

14    affirmative indication of extraterritoriality is the strongest

15    evidence that a statute applies extraterritorially.  But in

16    defendant's mind, it's the opposite.

17            In defendant's mind, Section 1956(f) says that the

18    statute only reaches a non-U.S. citizen if he is physically

19    present in the U.S. when he commits the acts that makes him

20    liable.  That's just plain wrong; not what the statute says.

21    There's nothing in the plain language of the statute that

22    suggests Congress intended to change the default rule.

23            If they had intended to change the default rule, they

24    would have spoken much more clearly.  They know how to change

25    the default rule.  Look at the Foreign Corrupt Practices Act.

1          Now, with the Foreign Corrupt Practices Act, it makes
2   sense to change the default rule because the crime is bribing
3   foreign officials, which tends to happen overseas.  Obviously,
4   if a non-U.S. citizen is bribing foreign officials overseas,
5   the United States doesn't have any interest or reach in
6   prosecuting that.  But money laundering is different.

7          Money laundering -- the transactions can occur
8   anywhere, regardless of where the person causing those
9   transactions is physically located.  It's very common for the
10  transaction to occur in a different location than where the
11  participant is located at the time of the transaction.

12         So why would Congress do that?  It doesn't make sense
13  to limit jurisdiction like that in the context of
14  money laundering, which frequently has its international
15  component.  And by its very nature, there's usually a
16  different location for the transaction and the person
17  committing the transaction.

18         It just doesn't make sense.  And it would lead, as
19  Your Honor was getting to, to absolutely ridiculous results
20  under the defendant's understanding of the statute.

21         Let's say the defendant was visiting Niagara Falls
22  and he's on the New York side of the falls and he picks up his
23  phone and he calls Lim:  Hey, I've got a money laundering
24  pickup for you, give me the serial number, the code.

25         All right.  She passes it to him while he's in

1  New York.  And the pickup's in Chicago.  He knows that.  He's
2  telling her it's in Chicago.

3          He gets the information from Lim.  He passes it to
4  the DTO members while he's in the United States.  We get him
5  there.

6          With the defendant's understanding of the statute, if
7  he goes to the other side of the falls in Canada and he does
8  the exact same thing, directing the conduct at the
9  United States, we can't reach him.  That is ridiculous.  It
10  turns basic jurisdictional principles on their head.

11          If Congress was going to do that, they would have
12  spoken clearly.  They did not do so.  All of the cases that
13  defendant cites, including this *U.S. v. Lloyds TSB Bank*
14  concern non-U.S. citizens located outside the United States
15  assisting with financial transactions that occur entirely
16  outside the United States.

17          Nobody is disputing there's no extraterritorial reach
18  in that scenario, but that is not this case.

19          THE COURT:  All right.  Last word --

20          MR. SCHWARTZ:  Judge --

21          THE COURT:  -- then we'll move on.

22          MR. SCHWARTZ:  Sure.

23          Judge, Aaron Schwartz for defense.

24          The *Lloyds* case again, Judge -- at least two cases
25  disagree with the government's position, and our reading of

1  the statute is not ridiculous.  The *Lloyds* case -- there's two
2  of them.  This one being 639 F.Supp.2d 314.

3       The conduct can't be attributed to Gan absent that he
4  participated in the underlying conduct while in the
5  United States.  That's the same reasoning that the
6  Second Circuit took in *Hoskins*, that there has to be conduct
7  by the defendant in the United States.

8       And *Morrison* furthers that by saying the
9  conducts-and-effects test to procure jurisdiction was struck
10 down.  And, again, we do get into due process concerns here.
11 But our argument, again, is grounded on the wording of the
12 statute.

13      And you have to look at it -- of what the statute
14 says and what it doesn't say, and explicitly wholly
15 extraterritorial conduct by a noncitizen is not covered under
16 that statute.  And that's -- I'll rest on that, Judge.

17           THE COURT:  Okay.  Thank you.  All right.

18      Let's talk real briefly about the transportation of
19 the funds to evade law enforcement or to conceal and disguise
20 the nature, location, source, ownership to control the
21 proceeds.

22      Mr. Schwartz, why don't you briefly tell me your
23 argument on that.  And I'll hear from the government.

24           MR. SCHWARTZ:  Sure, Judge.

25      So, I mean, very simply, you know, the evidence at

1 trial was that the funds were being transferred back to DTO

2 members in Mexico. And the specific transactions at issue

3 here, they weren't used to disguise anything. It was the

4 government agent's receiving the proceeds and then the

5 government agent's then putting them into fake bank accounts.

6 I don't think there's any question, Judge -- and I

7 wouldn't even argue it -- that the subsequent transactions in

8 the acquitted conspiracy -- those transactions were certainly

9 designed to hide the source of the funds, conceal the source

10 of the funds. But the specific transactions at issue were

11 not, and that was testified to by the agents. And I know they

12 backtracked those statements on cross.

13 But very simply the three transactions at issue did

14 no more other than transfer ownership from one to the other,

15 and there was no concealment that would fall under the

16 Supreme Court case. And, Judge, I'm sorry. I'm forgetting

17 the name of it.

18 THE COURT: *Wheeler*. *Wheeler*.

19 MR. SCHWARTZ: That is the defendant's position.

20 THE COURT: I'll let the government respond, and I

21 guess the real question is was there sufficient evidence --

22 once again, we're not dealing with a situation where we're --

23 you're arguing to the jury. The jury made a finding.

24 And so could a reasonable jury find that the manner

25 in which that money was delivered from the drug trafficking

1    organization to what they thought was a money laundering
2    courier, then designed in whole or in part to conceal and
3    disguise the nature, location, source, ownership, and control
4    of the proceeds?  And that's really the question:  Could a
5    reasonable jury have concluded that?

6              Let's hear from the government.

7              MR. FRANZBLAU:  Judge, this is Sean Franzblau.

8              That is the question, plus viewing the facts in the
9    light most favorable to the government, as you know.

10             So, Judge, this issue need not detain us for long.
11   There was expert testimony directly on point.  So we went
12   through lengthy, detailed testimony with Agent Dennewitz
13   regarding the money-pickup process.

14             Again, the defendant is conceptually confused,
15   talking about these later transactions.  This trial is about
16   DTO passing it to the MLO.  That's the transaction we're
17   talking about.

18             So we had days -- it was *ad nauseam* regarding the
19   money-pickup process, the passing of serial numbers, the code
20   names, the use of burner telephones, meeting between strangers
21   in parking lots.  And then I asked Agent Dennewitz -- excuse
22   me -- Mr. Rothblatt asked Agent Dennewitz, transcript
23   page 399:  What's the purpose of passing cash in this
24   elaborate procedure?  Dennewitz:

25             "ANSWER:  The purpose is to conceal the source of the

1  money."

2  Then we presented overwhelming evidence that the
3  defendant was engaging in these exact same processes to
4  transact -- exact same.  Judge, the Seventh Circuit has
5  explicitly identified the use of third parties to move money
6  as evidence that may be considered whether a transaction was
7  designed to conceal.  That's *U.S. v. Magluta*, 418 F.3d 1166 at
8  page 1176.

9  That ends the inquiry right there.  You have direct
10  testimony on point and the Seventh Circuit saying this is
11  absolutely something you can look at.  Based on that alone,
12  viewing the facts in the light most favorable to the
13  government, of course, a reasonable jury could conclude that.
14  Again, there's nothing else a reasonable jury could conclude.

15  What possible other purpose could there be for going
16  through these ridiculous procedures, other than concealing who
17  is the true owner of the money?  They're passing it off to a
18  third party so that it's concealed, as it moves through the
19  banking system, who it actually belongs to.

20  Again, none of the cases that defendant cites are on
21  point.  We're not saying that they were physically hiding the
22  money to facilitate the transfer.  That would be like if the
23  DTO courier, you know, put the money in a suitcase and wrapped
24  it up in tape and put it under his chair.  That would be
25  physically hiding the money while he drives it.

1  That's not designing to conceal the source or

2  ownership, something fundamental about the nature of the

3  money.  That's just hiding it to facilitate the transport so,

4  if you get pulled over, the police don't find it.  This is

5  fundamentally different.

6  They're trying to break the link between who owns and

7  controls the money so it can move through the financial system

8  without being linked to the drug traffickers.  Again, in a

9  light -- in a light most favorable to the government, this is

10  just a no -- this is a no-brainer.

11  THE COURT:  All right.  Mr. Schwartz, last word on

12  this.

13  MR. SCHWARTZ:  Sure, Judge.

14  Aaron Schwartz for the defense.

15  I'll just go through, you know, what the

16  Seventh Circuit has identified as the hallmarks of

17  money laundering and the mere transfer at issue here -- the

18  three mere transfers.  Yes, they used code words.  But, again,

19  those were -- they were designed to elude law enforcement.

20  They weren't designed to conceal the source or the origin of

21  the funds.

22  And the Seventh Circuit's three factors, again, are,

23  one, that the criminally derived money is placed into a

24  legitimate enterprise.  That was not the case here in any of

25  the three transactions.

1       Number two, the funds are layered through various
2  transactions to obscure the original source.  That was
3  ancillary to the transactions at issue here.  And under the
4  Tenth Circuit's case in *Garcia*, that can't be considered for
5  the transactions at issue here.  Those are ancillary.

6       And, three, the newly laundered funds are integrated
7  into a legitimate financial world in the form of bank notes,
8  loans, letters of credit.  Again, ancillary and not what is at
9  issue here.

10      Thank you, Judge.

11      THE COURT:  Well, Mr. Schwartz, if you look at the
12  instruction on page 32, it defines the term conceal or
13  disguise.  And I think the jury was properly instructed.  If
14  there was an absence of evidence -- well, obviously you're
15  arguing that this is kind of a -- notwithstanding the verdict,
16  there was no evidence, because certainly they were properly
17  instructed on this and were allowed, if there was some
18  evidence to hang their hat on, to find that the concealment
19  occurred.

20      Doesn't this really, though, break the chain?  And
21  the way they did it, it does make it impossible to know where
22  the money came from, who the dealers were that were doing
23  this, because the people delivering the money were not
24  identified, as far as I could tell, with the people selling
25  the narcotics that generate the money.

1    MR. SCHWARTZ:  So Aaron Schwartz for the defense.

2        Again, I think that occurred ancillary to the

3    transactions at issue.  And the Seventh Circuit is cautioned

4    against finding, as a matter of law, transactions such as

5    these mere transfers.  There has to be more, and I think,

6    you know, I laid out all the various factors that must be

7    considered.

8        And I'll agree with you, Judge, that it happened

9    afterwards.  But, again, we run into these variables here that

10   the Court must consider.  These transactions were undercover

11   transactions.

12       A lot of what the government is citing are facts that

13   occurred under the acquitted conspiracy.  So the undercover

14   agents received the proceeds in Counts II through V.  It was a

15   separate set of facts than what occurred in Count I.

16       So I'll rest on that, Judge.

17       THE COURT:  Okay.  Very good.  Thank you.

18       My last question that I have relates to what I've

19   indicated, Mr. Schwartz, I was going to raise today, which is

20   why -- what evidence is there that -- well, let me rephrase

21   it.

22       For me to consider the conspiracy conduct for

23   sentencing purposes, I have to find that it occurred by a

24   preponderance of the evidence.  And that's a big deal in this

25   case.  Because if I find that it was, in fact, proven by a

1  preponderance, it becomes part of relevant conduct and the
2  guidelines become significantly higher for Mr. Gan.

3          And we don't know why -- well, I -- there's nothing
4  to indicate on the record why the jury found Mr. Gan not
5  guilty of Count I.  There certainly was, in retrospect, I
6  think an instruction that was confusing as to unanimity to
7  find not guilty on Count I -- for someone to be found not
8  guilty of Count I.  But that's not really the issue to address
9  right now, because the jury did find him not guilty of
10 Count I.

11         So the question is:  Why wasn't that proven by a
12 preponderance?  I point to -- and what would seem to suggest
13 was proven by a preponderance is Lim's testimony, coupled with
14 the fairly extensive set of BlackBerry messenger
15 communications, and the corroboration of Lim through the
16 travel records and phone records and even from Gan's phone
17 when he was arrested.  But I think what it comes down to is
18 whether or not I believe Lim by a preponderance.

19         Because if I believe Lim by a preponderance, or even
20 a greater standard, I believe I can then consider this conduct
21 for purposes of relevant conduct.  That's kind of the summary
22 question.  And if you can address that, or someone else from
23 your team is going to address that, please do.

24         MS. STEVENS:  Your Honor, Brooke Stevens for defense.
25         So there's sort of two threshold questions.  And if

1  the Court wishes to, because obviously we aren't doing

2  sentencing today, we can submit further written documents on

3  this.

4       There's sort of two issues:  The first is the

5  actual --

6       THE COURT:  And let me interrupt you.  I think that's

7  probably a good idea, because I think the main focus of your

8  briefs -- I think it was in the sentencing memo -- was that I

9  can't consider this conduct because it was acquitted conduct.

10  And I don't believe that's the law, and so that's not how I'm

11  going to consider it.

12       Because it was acquitted, it doesn't mean it's out of

13  the realm of being something I can consider.  But I think your

14  suggestion, to submit something in writing, is a good one,

15  given the gravity of a finding by me that he committed this by

16  a preponderance, because of the way the guidelines work.

17       MS. STEVENS:  Then with that in mind, Your Honor,

18  I'll just skip the oral argument section of that and just

19  submit something in writing.

20       THE COURT:  I think that's probably in the best

21  interest of your client, because then you can go through it in

22  enough detail that you're satisfied with it when you're

23  done --

24       MS. STEVENS:  Thank you, Your Honor.

25       THE COURT:  -- rather than the pressure of oral

1  argument.  I think that makes sense.

2  And I'll give the government a chance to respond to

3  that, although I think your brief did address the substance;

4  so I'm not requiring any rebuttal from the government on this.

5  I'll give you the opportunity, if you want, after you see what

6  the defense files.  But I think you addressed it -- made the

7  argument that Lim was to be believed by a preponderance for

8  the reasons I just gave.

9  MR. FRANZBLAU:  Judge, this is Sean Franzblau for the

10  United States.

11  That's correct.  I think that I've addressed it

12  thoroughly, and I don't see a need for me to file anything

13  else.

14  THE COURT:  All right.  Well, Ms. Stevens, how much

15  time do you want to file such a document?

16  MS. STEVENS:  14 days.

17  THE COURT:  Sure.  Sure.

18  Mr. Gan has to be sentenced, and we have to get

19  resolution on this.  But 14 days is certainly reasonable.

20  It's important --

21  MS. STEVENS:  Yeah.  Actually, Your Honor, can I make

22  that 21 days, 'cause I do have an appellate brief that's due

23  in about 14 days.

24  THE COURT:  That's fine.

25  MS. STEVENS:  Thank you.

1          THE COURT:  That's fine.  Even were I to find it was

2    just a money laundering charge, I think we're still well

3    into -- we're not close to the guideline time that Mr. Gan has

4    already been in custody, I don't think anyway.  So...

5          MS. STEVENS:  I believe we're close, but not there

6    yet, Your Honor, yes.

7          THE COURT:  Okay.  All right.

8          So 21 days, which, Emily, is when?

9          THE CLERK:  That would be October 26.

10          THE COURT:  Okay.  I don't want to set a new

11    sentencing date yet until I've decided how I'm going to rule

12    on these posttrial motions, whether I'm going to do it orally

13    or in writing.  And if it's in writing, it's going to take a

14    little longer.  But as soon as I've made a decision on what

15    the ruling will be and how I'm to deliver it, if it's, in

16    fact, a denial, we'll set a sentencing date at that time.  And

17    if it's a grant, then it depends on what the nature of the

18    grant is, whether it's a judgment, acquittal, or a new trial.

19    So to be continued, that portion of it.

20          But I think it's wise to put your arguments on the

21    acquitted conduct being considered in writing, and you have

22    until October 26 to do that.

23          MS. STEVENS:  Thank you, Your Honor.

24          THE COURT:  All right.  Anything else from the

25    government?

1    MR. FRANZBLAU:  This is Sean Franzblau.

2    Can I make one last point, just to clarify the

3    record?

4    THE COURT:  Yes.

5    MR. FRANZBLAU:  In our response briefing with the

6    1960 Count II -- Count V -- excuse me -- it really focused on

7    Section 2(b).  And, again, we overly confused things in the

8    response.  It is our argument that we also proved up principal

9    liability as to Count V.

10    The crime is operating some money laundering -- an

11    unlicensed money laundering business.  The defendant was

12    clearly operating it himself as a principal.  Again, I think

13    it's a bit of a distinction without a difference here, but I

14    just wanted to make that clear.

15    THE COURT:  I had thought that was where you were

16    going, because that was your argument on II through IV; so I

17    sensed it was also the same argument for Count V.  But thanks

18    for clarifying that.

19    MR. FRANZBLAU:  Thank you, Judge.

20    THE COURT:  Okay.  And on the defense, anything else?

21    MS. STEVENS:  I don't believe so, Your Honor.

22    MR. SCHWARTZ:  Judge, Aaron --

23    MS. STEVENS:  Oh, go ahead, Aaron.

24    MR. SCHWARTZ:  Aaron Schwartz for defense.

25    THE COURT:  Yeah.

1    MR. SCHWARTZ:  Nothing further, Judge.  Thank you.

2         THE COURT:  All right.  Well, thanks a lot.

3    MR. SEIDEN:  Your Honor, Glenn Seiden.  And nothing

4  further.

5         THE COURT:  Okay.  Well, thank you, all.  This is --

6  you're all very -- made very good arguments, and it was all

7  very helpful for me to try and sort through what the -- what's

8  been filed.  So thank you, all.

9         MR. FRANZBLAU:  Thank you, Judge.

10        THE COURT:  Bye-bye.

11        MR. ROTHBLATT:  Thank you.  Bye-bye.

12       (Time noted:  11:01 a.m.)

13                      CERTIFICATE

14    I certify that the foregoing is a correct transcript from

15  the record of proceedings in the above-entitled matter.

16  */s/ Elia E. Carrión*            *14th day of September, 2021*
    _____        _____
17  *Elia E. Carrión*                      *Date*
    *Official Court Reporter*

18

19

20

21

22

23

24

25